**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PAT SULLIVAN, KAREN RHYNE, STEVE ELLEFSON, MARK EISEN, BRUCE ELDER and JON NAEF, individually and on behalf of all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| FLUIDMASTER, INC., | |
| Defendant. | |

Plaintiffs Pat Sullivan, Karen Rhyne, Steve Ellefson, Mark Eisen, Bruce Elder, and Jon Naef (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Fluidmaster, Inc. ("Fluidmaster" or "Defendant"). In support thereof, Plaintiffs allege as follows based upon personal knowledge as to their own conduct and on information and belief as to the acts of others.

## NATURE OF THE ACTION

1. Fluidmaster manufactures and markets a line of braided steel supply lines used to supply water to common household fixtures including faucets, toilets and dishwashers, known as Fluidmaster NO-BURST® braided stainless steel supply lines (hereinafter, the "Fluidmaster Supply Lines" or the "Braided Lines" or the "NO-BURST Lines"). A specific description and sample pictures of the NO-BURST Lines are set forth in Paragraphs below.

2. This lawsuit arises out of damages sustained by Plaintiffs and the Class that were proximately caused by Fluidmaster's defective NO-BURST Lines, which were used in the construction of Class members' homes and other structures or which were otherwise installed on the homes and structures of Plaintiffs and the Class.

3. Plaintiffs bring this consumer class action against Fluidmaster on behalf of themselves and all individuals and entities that own or have owned Fluidmaster NO-BURST Lines or who own or have owned homes or other structures physically located in the United States, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed (the "Class").

4. As evidenced by the name of its product, Fluidmaster pursued an aggressive branding and marketing strategy with respect to its Braided Lines, stating that they are of high quality, built with superior materials and only sold after rigorous testing. Specifically, Fluidmaster advertises its Braided Lines as "tough," "heavy-duty," "NSF approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."

5. Moreover, for over two decades, Fluidmaster has sold its Braided Lines under the registered trademark, NO-BURST®.



6. Notwithstanding the name of the product, because of poor material selection and a defective design, Fluidmaster's NO-BURST® Lines routinely rupture and burst. The Braided Lines burst because Fluidmaster uses an inferior grade of stainless steel that is susceptible to

corrosion from everyday household cleaners that are expected to be used and stored in close proximity to the Braided Lines as they are intended to be used. Fluidmaster used inadequate low-pressure flexible rubber tubing that easily bursts if the stainless steel braiding intended to protect corrodes from ordinary exposure to water, air, and household products. Additionally, Fluidmaster's NO-BURST lines routinely fail at the coupling nut, even when properly installed and hand tightened.



7.      The defects in the Fluidmaster NO-BURST Braided Lines are so severe that Plaintiffs and Class members must replace and discard their Braided Lines sooner than reasonably expected.

8.      Plaintiffs and the class have suffered damages including the loss of the benefit of the bargain, in that they paid for a product that was worth less than what was represented by Fluidmaster, and Plaintiffs and the Classes would not have purchased the braided lines had they known of the defect at the time of sale.

9.      Plaintiffs and the Class have suffered harm as a result of Fluidmaster's actions because their Braided Lines contained a material design defect which caused the Braided Lines

to rupture and burst, or alternatively break at the coupling nut, causing harm not only to the Braided Lines, but also to other real and personal property. In addition, because of the flooding that actually has or will occur due to the defects described herein, there is a serious risk of harm in the event the flooding takes place in areas where electrical outlets, appliances, and related household items could cause electrocution to anyone who may come into contact with or near those items as water is an electrical conductor.

10.     Thousands of Fluidmaster's NO-BURST® Lines have been, and continue to be, purchased and installed in residential and commercial buildings across the country.  Far from the dependable, heavy-duty parts that Fluidmaster represents them to be, the defective Braided Lines are inevitable failures waiting to happen, with the potential to cause a range of damages including catastrophic flooding and property destruction.

11.     Upon information and belief, in an attempt to correct the design defect alleged herein, Fluidmaster changed the design of its NO-BURST Lines in or around 2003 to include higher pressure-rated inner water-carrying tubing such that if the exterior stainless steel braiding support was lost, the supply line would not rupture, or would not rupture as easily.

12.     NO-BURST Lines using defective materials, however, are still being sold and installed in residential and commercial buildings across the country.

13.     Despite Fluidmaster's numerous representations regarding the high quality and dependability of its NO-BURST Lines, Fluidmaster knows and has known of the design defects alleged herein and that there was a substantial risk that its NO-BURST Lines would burst, leak, break, or otherwise fail.  Fluidmaster has failed to disclose that risk to consumers.

14.     Plaintiffs seek to recover, for themselves and the Class, all costs associated with repairing, removing and/or replacing their Braided Lines, as well as the costs of repairing any

damage to their properties caused by the failure of the Braided Lines to perform as represented and warranted. Plaintiffs also seek injunctive relief requiring Fluidmaster to modify its unfair and fraudulent practices so as to uniformly provide relief in accordance with its obligations under the law. Plaintiffs and the class have suffered damages including the loss of the benefit of the bargain, in that they paid for a product that was worth less than what was represented by Fluidmaster, and Plaintiffs and the Classes would not have purchased or continued to use the NO-BURST Braided Lines had they known of the defect at the time of sale.

## PARTIES

*Plaintiffs*

### A.     Pat Sullivan

15.     Plaintiff Pat Sullivan is citizen of the State of Illinois who resides in Carpentersville, Illinois.

16.     In or about 2002, Mr. Sullivan purchased a home in which a 20" long, 3/8" compression, 1/2" pipe Fluidmaster NO-BURST Braided Line (B1F20) was installed under his kitchen sink from the cold water supply to the kitchen faucet.

17.     On July 3, 2014, the Fluidmaster Braided Line burst under his kitchen sink and flooded approximately two thirds of the main floor of his home, as well as flooding his finished basement. Although the damages are still be calculated, he estimates that his real and personal property sustained between $15,000 and $30,000 in property loss and damages, including the destruction of the actual braided water line.

18.     The flooding to Mr. Sullivan's home included damage to various electrical fixtures, including but not limited to his basement ceiling light fixture, wall mounted surround sound speakers, LED lighting in a hutch. In addition, the kitchen flooding was in the proximity

of his electrical kitchen appliances, placing Mr. Sullivan and his family at risk of electrocution upon discovering the flooding prior to shutting off their electricity.

19.     Mr. Sullivan notified Fluidmaster of his Braided Line failure twice, but Fluidmaster failed to adequately address the damages that this Plaintiff incurred as a result of the failure of his NO-BURST Braided Line.



20.     Photograph (above) of Mr. Sullivan's burst Fluidmaster NO-BURST Braided Line.

21.     Mr. Sullivan would not have left the Fluidmaster Braided Line installed in the home he purchased, exposing his real and personal property to flooding and exposing himself and his family to safety risks, had Fluidmaster disclosed the propensity for the Braided Line to spontaneously rupture and fail.

**B.     Karen Rhyne**

22.     Plaintiff Karen Rhyne is citizen of the State of Tennessee who resides in Kingston, Tennessee.

23.     Ms. Rhyne had a 3/8 inch NO-BURST® Braided Line (part number 39961001825), that was purchased in April 2012 from a Lowe's Home Improvement store and

was installed connecting the water supply to her bathroom toilet.

24.     Just over one year after she purchased this Fluidmaster Braided Line, on August 4, 2013 the coupling nut on Ms. Rhyne's NO-BURST® Braided Line broke, causing a steady stream of water to flood her bathroom all night long. The broken line caused extensive damage to the bathroom, the surrounding areas of her home, and damaging her personal property in addition to the failure of the Braided Line itself.



25.     Photograph (above) of Karen Rhyne's NO-BURST Braided Line.

26.     Ms. Rhyne incurred approximately $7,638.33 in expenses related to the damages caused by the Braided Line's defect, failure and subsequent flooding.

27.     After her home was flooded, Ms. Rhyne contacted Fluidmaster and mailed her broken NO-BURST® Braided Line to their claims department as they requested. Four months later, she received a letter from Fluidmaster denying responsibility for the defective line and damages caused. Fluidmaster's claims agent initially offered her $100.00 "in the interest of customer service," and later offered her $500.00 so long as she would sign Fluidmaster's Property Damage Release. She refused to do so and received no relief or remedy.

28.     Ms. Rhyne would not have purchased and installed the Braided Line, and exposed her real and personal property to flooding, had Fluidmaster disclosed the propensity for the

Braided Line to spontaneously rupture and fail.

**C.      Steve Ellefson**

29.      Plaintiff Steve Ellefson is citizen of the State of North Dakota who resides in Bismarck, North Dakota.

30.      Mr. Ellefson had a Braided Line installed in his master bedroom bathroom on the cold water line in late 2000 or early 2001.

31.      On May 25, 2013, Mr. Ellefson's NO-BURST® Braided Line ruptured and failed, causing damage not only to the Braided Line but also, as a result of flooding, to Mr. Ellefson's master bathroom and bedroom.



32.      Photograph of Mr. Ellefson's NO-BURST Braided Line (above).

33.      Mr. Ellefson's damages included carpet cleaning necessitated by water flooding in the area of the Braided Line failure that also ran down heat vents and into a utility room.  New drywall had to be installed in the area beneath the failure, and a cabinet also suffered damage from water that ran underneath it.

34.      Mr. Ellefson notified Fluidmaster of his Braided Line failure, but Fluidmaster failed to adequately address the damages that this Plaintiff incurred as a result of the failure of his NO-BURST Braided Line.

35.     Mr. Ellefson would not have purchased and installed the NO-BURST® Braided Line, and exposed his real and personal property to flooding, had Fluidmaster disclosed the propensity for the Braided Line to spontaneously rupture and fail.

**D.     Mark Eisen**

36.     Plaintiff Mark Eisen is a citizen of the State of Georgia who resides in Atlanta, Georgia.

37.     Mr. Eisen had a 3/8" Female Compression, 1/2" Female pipe, 20 inch length NO-BURST® Braided Line installed under the kitchen sink in his home in approximately 2003.

38.     Mr. Eisen's NO-BURST Braided Line ruptured and burst in November 2013, resulting in damage not only to the Braided Line, but as a result of flooding, did extensive damage to his kitchen and garage, as well. In addition, the kitchen flooding was in the proximity of his electrical kitchen appliances, placing Mr. Eisen and his family at risk of electrical shock or electrocution upon discovering the flooding prior to shutting off their electricity.

39.     Photograph of Mr. Eisen's NO-BURST Braided Line (below).



40.     Mr. Eisen notified Fluidmaster of his Braided Line failure but Fluidmaster failed to adequately address the damages that this Plaintiff incurred as a result of the failure of his NO-

BURST Braided Line.

41.    Mr. Eisen would not have purchased and installed the Braided Line, and exposed his real and personal property to flooding, had Fluidmaster disclosed the propensity for the NO-BURST Braided Line to spontaneously rupture and fail.

**E.    Bruce Elder**

42.    Plaintiff Bruce Elder is a citizen of the State of Maine who resides in Windham, Maine.

43.    Mr. Elder had a NO-BURST® Braided Line 3/8" Female Compression Thd [Thread] 1/2" Female Pipe Thd [Thread] Faucet B1F12 12" length installed in his rental property and attached to a hot water supply to a sink in September 2001.

44.    Mr. Elder's Braided Line ruptured and burst on or about November 30, 2012, causing damage not only to the Braided Line, but as a result of flooding, to other property as well.  The flooding damaged and ruined personal property of Mr. Elder's tenant, which had to be replaced.  The flooding also necessitated plumbing expenses relating to having the failed Braided Line removed and replaced.

45.    Photograph of Mr. Elder's NO-BURST Braided Line (below).



46.     Mr. Elder notified Fluidmaster of his Braided Line failure but Fluidmaster failed to adequately address the damages that this Plaintiff incurred as a result of the failure of his NO-BURST Braided Line.

47.     Mr. Elder would not have purchased and installed the Braided Line, and exposed his real and his tenant's personal property to flooding, had Fluidmaster disclosed the propensity for the Braided Line to spontaneously rupture and fail.

**F.      Jon Naef**

48.     Plaintiff Jon Naef is citizen of the State of Alabama who resides in Daphne, Alabama.

49.     In approximately 2009 or 2010, Mr. Naef purchased a Fluidmaster Braided Line which was installed in a third floor bathroom in his home.

50.     On December 14, 2012, the coupling nut of Mr. Naef's Fluidmaster Braided toilet connector line broke, causing water to pour from the line and flooding the two floors below that bathroom.

51.     Photograph of Mr. Naef's NO-BURST Braided Line (below).



52.     The damage from the failure of Mr. Naef's Braided Line included not only the

loss of that line, but extensive flooding in all three levels of his residence and damage to his family's personal property. The property damage to the residence and his personal property exceeded $60,000.00. In addition, the flooding was in the proximity of his electrical fixtures and outlets, as well as other electrical appliances, placing Mr. Naef and his family at risk of electrical shock or electrocution upon discovering the flooding prior to shutting off their electricity.

53.     Mr. Naef notified Fluidmaster of his Braided Line failure but Fluidmaster failed to adequately address the damages that this Plaintiff incurred as a result of the failure of his NO-BURST Braided Line.

54.     Mr. Naef would not have purchased and installed the NO-BURST® Braided Line, and exposed his real and personal property to flooding, had Fluidmaster disclosed the propensity for the Braided Line to spontaneously rupture and fail.

*Defendant*

55.     Defendant Fluidmaster, Inc. ("Defendant" or "Fluidmaster") is a California corporation with its corporate headquarters and principal place of business located at 30800 Rancho Viejo Road, San Juan Capistrano, California 92675.  Fluidmaster conducts substantial business in Illinois and throughout the United States, including the sale and distribution of its NO-BURST® Braided Lines, which can be purchased at stores such as Home Depot, Lowe's, Menards, TrueValue, Walmart, and Ace Hardware.

## JURISDICTION AND VENUE

56.     This Court has jurisdiction over this class action pursuant to 28 U.S.C. §1332(d), as the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed classes is a citizen of a state different from Fluidmaster.

57.     The requirement of minimal diversity is met as the dispute is between citizens

of different states. Plaintiff Sullivan is a citizen of Illinois; Plaintiff Rhyne is a citizen of Tennessee; Plaintiff Ellefson is a citizen of North Dakota; Plaintiff Eisen is a citizen of Georgia; Plaintiff Elder is a citizen of Maine; Plaintiff Naef is a citizen of Alabama; and Defendant Fluidmaster is a citizen of California.

58.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, *et seq.* because a substantial part of the events or omissions giving rise to the claim occurred in this District. Additionally, Defendant Fluidmaster regularly conducts substantial business in Illinois, including the sale and distribution of its NO-BURST® Braided Lines.

## SUBSTANTIVE ALLEGATIONS

59.     Fluidmaster, a corporation that conducts business throughout the United States, designed, manufactured, assembled, tested, labeled, marketed, advertised, and offered for distribution and sale defective Braided Lines with the specific purpose that they be installed by builders, plumbers and consumers in homes and other buildings throughout the United States. These Braided Lines were designed and introduced as a safe and superior alternative to rigid metal pipes with shutoff valves. Their safety features ("NO-BURST") were lauded as a safe product which was of merchantable quality, and fit for their intended and reasonably foreseeable uses.

60.     Braided stainless steel supply lines are used to transport water from a supply pipe to a plumbing fixture (*e.g.*, a toilet, faucet, dishwasher, *etc.*).  The lines primarily consist of three parts: the inner flexible tubing, the outer braided steel wire designed to protect it, and the coupling nuts which connect the lines to adjacent plumbing fixtures.  Because they can be installed in tight spaces, braided stainless steel supply lines have found widespread application in residential and commercial plumbing.

61.     Fluidmaster, however, knowingly failed to disclose that its NO-BURST Braided Lines were subject to a serious design defect, were unsafe, and posed a substantial risk of failure, in that they would rupture and burst resulting in flooding and damaging building owners' real and personal property. Even after their Braided Lines lines began failing, Fluidmaster failed to notify consumers of the defects.

62.     In recent years, losses due to water leaks, flooding, and mold damage caused by faulty and defective supply lines have risen. Because the water being transported is under pressure, deterioration of the stainless steel braiding due to corrosion can cause the lines to become brittle and burst, even under normal pressure conditions and absent any faulty installation and/or misuse by the consumer.

63.     In addition, in the early 1990s, Fluidmaster began manufacturing the NO-BURST Braided Line coupling nuts from less expensive acetal plastic rather than metal. Although Fluidmaster promotes its plastic coupling nuts as "heavy duty" and "durable and easy to grip" for installation, the plastic coupling nuts regularly suffer from a circumferential fracture and cause the NO-BURST Braided Lines to fail, flooding the property of consumers.

    A.     **Fluidmaster's Claims Regarding Product Quality**

64. On Fluidmaster's website, visitors find a picture of the Company's founder, Adolf Schoepe, who the website claims changed the plumbing industry in 1957 when he invented the famously dependable Fluidmaster toilet fill valve.[1] Visitors also find a number of claims regarding the allegedly high-quality materials that Fluidmaster products are made from and the allegedly long, useful, lifespan customers can expect from them:

> Why do Fluidmaster parts last so long? Superior engineering and
> top-grade materials. We keep that spirit of invention alive by
> always looking (and finding) new ways to make our repair parts

---

[1] http://www.fluidmaster.com/history

work better and last longer.

http://www.fluidmaster.com/history

65. Fluidmaster describes how its toilet valves (the Company's flagship product) are subjected to rigorous testing, including tests meant to simulate exposure to water with extreme pH or chlorine levels:

> Fluidmaster's team of engineers oversees a rigorous product testing program, exposing valves to conditions that greatly exceed typical household circumstances. Up to 20 valves cycle 24-hours a day in the Engineering Lab, sometimes flushing water that is altered to simulate the extreme pH or chlorine levels that exist in other regions. To maintain a competitive stance, Fluidmaster also regularly tests valves from other manufacturers, using the same demanding protocol.

http://fluidmasterpro.com/history

66. Fluidmaster describes how "[t]he popularity of [its] valves has created a perfect springboard for Fluidmaster's expansion into related product lines," such as braided stainless steel connectors/supply lines, explaining in detail:

> In addition to the inaugural fill valve, Fluidmaster's complete line of toilet repair parts includes flush valves, flappers, tank levers, dual flush valves, bowl wax, toilet repair kits, ballcocks and connectors. Fluidmaster's growing global distribution network reaches more than 80% of the world's population and spans over 87 countries. With manufacturing facilities across the globe, Fluidmaster is quick to market, quick to manufacture and *quick to deliver with unparalleled quality assurance*.

(Emphasis added).[2]

67. To reassure consumers of the outstanding quality of their products, Fluidmaster's marketing materials emphasize their vast market share, which has resulted from providing the "highest quality" products:

---

[2] http://fluidmasterpro.com/history/

> Fluidmaster is the #1 selling brand of toilet repair products in the world. In fact, our products are found in more toilets than all other brands combined. For more than 50 years, Fluidmaster has been at the forefront of the toilet care market by providing innovative yet easy-to-use products that are of the highest quality.

68. Fluidmaster's marketing is clear and unambiguous -- consumers can depend on the Company's products, including its NO-BURST® Braided Lines, because they are "of the highest quality," they are made of superior materials, and their products are rigorously tested before finding their way into homes across the world.

**B. Fluidmaster's NO-BURST® Lines**

69. Fluidmaster manufactures a line of braided stainless steel supply lines under the registered trademark "NO-BURST® that are the subject of this lawsuit.

70. Fluidmaster began using the "NO-BURST" designation in the 1980s and registered the trademark in 1989.

71. Fluidmaster's NO-BURST Lines typically retail for between $2.00 to $20.00, depending on the length of the line and the type of fixture. The specific line of products that are the subject of this lawsuit is set forth below:

| Name | Lengths Available |
|---|---|
| NO-BURST® Braided Stainless Steel Fluidmaster Supply and Toilet Supply Lines | 6", 9", 12", 16" and 20" |
| NO-BURST® Braided Stainless Steel Fluidmaster Supply Lines (with re-enforced vinyl) | 6", 9", 12", 16" and 20" |
| NO-BURST® Braided Stainless Steel Faucet Connectors | 9", 12", 16", 20", 30" and 36" |
| NO-BURST® Braided Stainless Steel Dishwasher Connectors | 48" |

| NO-BURST® Braided Stainless Steel Ice Maker Connectors | 12", 60", 72" 84", 96", and 120" |
|---|---|
| NO-BURST® Braided Stainless Steel Washing Machine Connectors | 48", 60" and 72" |
| NO-BURST® Braided Stainless Steel Water Heater Connectors | 12", 18" and 24" |



72. Fluidmaster's NO-BURST Lines are easily identifiable, as the Company's name and part number are stamped or etched onto the crimp sleeve located at the end of the line. For example, a line might be stamped "#FLUIDMASTER USA W222#."

73. Fluidmaster advertises its NO-BURST Lines as "tough," "heavy-duty," "NSF-approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."

74. For example, Fluidmaster's NO-BURST Lines are described as follows on its website:

NO-BURST®
Braided Stainless Steel Fluidmaster Supply Lines

High bursting strength. Each foot of No-BURST® connectors contains 220 feet of stainless steel wire. Stainless ferrules are extra-long with double radial crimps for more security. Tough, NSF-approved, re-enforced polymer core resists chlorine and chloramines. Ample inside diameter for high flow capacity. Captive cone washes seal tightly.

Exceptional flexibility for fast, easy installation. Won't kink or crease, even in the tightest of spaces. Heavy-duty brass nuts are durable and easy to grip.

Exceeds all requirements for flexible water connectors.

75. On its website, Fluidmaster also provides a series of "Appliance Maintenance Tips." Fluidmaster instructs consumers to inspect water supply connectors annually and "[r]eplace if bulging or unable to straighten out any kinks." For best results, consumers are told to "replace with a braided, flexible stainless steel connector such as NO-BURST®."

76. Fluidmaster does not instruct its customers to inspect their NO-BURST Lines for signs of corrosion or warn them of the Braided Lines' susceptibility to corrosion, rupture and bursting.

**C. Fluidmaster's Warranty**

77. Fluidmaster provides either a five-year -- or, in some cases, depending on the date of manufacture, a ten-year -- limited express warranty on each of its NO-BURST Lines.[3] Pursuant to the standard warranty, Fluidmaster promises to repair or replace "any part which proves to be defective in workmanship or materials" under normal use for five (5) years from the date of purchase.

78. The warranty is made subject to the following "Exclusions":

FLUIDMASTER SHALL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING COSTS OF INSTALLATION, WATER DAMAGE, PERSONAL INJURY OR FOR ANY DAMAGES

---

[3] http://www.fluidmaster.com/warranty

RESULTING FROM ABUSE OR MISUSE OF THE PRODUCT, FROM OVERTIGHTENING OR FROM FAILURE TO INSTALL OR MAINTAIN THIS PLUMBING PRODUCT IN ACCORDANCE WITH THE WRITTEN INSTRUCTIONS. DO NOT USE IN-TANK DROP-IN TOILET BOWL CLEANERS CONTAINING BLEACH OR CHLORINE. USE OF SUCH PRODUCTS WILL RESULT IN DAMAGE TO TANK COMPONENTS AND MAY CAUSE FLOODING AND PROPERTY DAMAGE. USE OF SUCH PRODUCTS WILL VOID THIS WARRANTY.

### D. Fluidmaster's NO-BURST® Lines Are Defective

79. At all times relevant to this Complaint, and prior to the purchase by Plaintiffs and the Class members of their Braided Lines, Fluidmaster was aware that its Braided Lines contained an inherent design defect that caused them to burst, rupture, leak, and fail, and that the defect was present at the point of sale.

80. Fluidmaster knew, or but for its reckless indifference should have known, that it was receiving and was going to continue to receive reports of burst and broken NO-BURST Lines.

81. Despite its knowledge, Fluidmaster did not disclose to its customers or prospective purchasers that there was a substantial risk that its NO-BURST Lines would manifest the defect (rupture and bursting of the inner tubing on the lines after corrosion of the stainless steel braiding and/or the failure of the braided line's coupling nut).

82. Consumers who purchased the NO-BURST Braided Lines had no way of knowing that the lines were defective at the point of sale.

83. Fluidmaster's NO-BURST Lines are defective because they do exactly what they are not supposed to do: they burst. The defect is a design flaw stemming from Fluidmaster's use of substandard materials.

84. Specifically, Fluidmaster uses a grade of stainless steel that is known to corrode and fracture in the presence of low levels of bleach or chlorine, chemicals that are

present in common household cleaners that are reasonably and foreseeably used and stored near NO-BURST Lines.

85.     Additionally, Fluidmaster used a low pressure-rated water-carrying inner tubing that herniates and ruptures if support from the exterior stainless steel braiding is lost.

86.     NO-BURST Lines using defective materials, however, are still being sold and installed in residential and commercial buildings across the country.

87.     Although a layperson might believe that stainless steel cannot corrode, this is inaccurate.  When stainless steel is exposed to oxygen, a microscopic layer of corrosion forms almost immediately over its entire surface, sealing the steel from further oxidation and stopping further corrosion.  If stainless steel is scratched or scraped, the protective layer is lost, but will reform again to "heal" the exposed area.

88.     The braided stainless steel covering of a supply line pulsates and moves with changes in water pressure and as a result of a phenomenon known as water hammer, which occurs when flowing water is forced to stop or change direction suddenly, as when a valve is closed at the end of a pipeline system, causing a knocking sound.  This movement causes the braid's wires to rub against one another, and the protective coating of corrosion on the surface of the stainless steel is lost and reformed over and over again.

89.     Unlike solid rubber or copper tubing, the braided nature of the surface stainless steel supply lines allows them to capture water.  The water and any chemical it contains seeps through the braid and is trapped between the braid and the inner flexible tubing.  If the water contains chlorides found in common household cleaners, the corrosion that happens as the braid moves is accelerated.  This process, which will eventually cause the braiding to fail and the line to burst, is known as chloride stress corrosion.

90.     Under normal and foreseeable conditions, the outer stainless steel shell of Fluidmaster's NO-BURST Lines deteriorates, making it thin and brittle, causing the braiding to separate, exposing the inner flexible tubing, and causing it to lose strength.

91.     When this happens, normal water pressure allows the low-pressure tubing to herniate until it ruptures, resulting in an uncontrolled release of water.  Pictures of ruptured lines are set forth below:



92.     Chloride stress corrosion is a well-known and generally accepted phenomenon by the scientific community and in the plumbing industry.  Fluidmaster knew or was reckless in not knowing that by selecting an inferior grade of stainless steel, combined with low-pressure inner rubber tubing, it was creating a product designed to fail.  These defects were present at the time of manufacture and point of sale to Plaintiffs and the Class, who did not have knowledge of the defects.

93.     Additionally, certain Fluidmaster NO-BURST Lines are connected to the adjacent plumbing fixture with a polymeric "acetal" (or in layman terms, plastic) coupling nut which was manufactured and/or distributed by Fluidmaster.

94.     The coupling nut fractures due to fatigue loading (i.e., repetitive cycling of a load through normal use) and an improper design with sharp edges that are susceptible to

fracture. As a result, small fractures progress through ordinary use and vibrations, leading to failure of the coupling nut itself.

 

95.     Fluidmaster selected "acetal" for the plastic coupling nut material. This material is particularly susceptible to fractures, especially when the design includes sharp corners, like those found in the threads of the coupling nut in the NO-BURST Braided Lines.

96.     Despite Fluidmaster's claims of durability and heavy-duty craftsmanship, the coupling nuts on its NO-BURST Brailed Lines fail to adhere to the design standards in the plastics industry. Under stress, polymer molecules in plastics "relax." If the stresses to the plastic component are minimal, the component will deflect and rebound. However, if the plastic component is subjected to long term stresses, like those from constant pressure or tightening, the component begins to fracture and eventually fails altogether without warning to the unsuspecting consumer.

97.     The design defect in Fluidmaster's coupling nut on its braided lines is present at the time of manufacture and at the point of sale to Plaintiffs and the Class, who are not aware of the design defects nor are forewarned of the consequences of fractures and failure of the coupling nut.

### E.    Inadequate Labeling and Warnings

98.    Fluidmaster had a duty to adequately design its NO-BURST Lines to keep from rupturing and bursting and to provide warnings as to how they could burst because of their defective nature.  Specifically, the label fails to warn that the NO-BURST Lines will burst due to the "stress corrosion" process described above.

99.    Likewise, Fluidmaster fails to warn consumers of the likelihood of failure of the acetal coupling nut. Although the lines warn "DO NOT OVERTIGHTEN" and "HAND TIGHTEN ONLY," these vague instructions leave the installer to decide how tight is "tight enough" but not "too tight."

100.    By 2007, Fluidmaster was aware that its installation instructions and warnings were vague and ambiguous, and that at least 390 plastic coupling nut failures of its Braided Lines resulted from over-tightening of the nut during routine installation. *See USAA Casualty Ins. Co. v. Fluidmaster, Inc.*, Case No. 06-CC-10212.

101.    The label also fails to identify the gravity of the hazards that can result from the bursting of the line and that such failure is likely to cause water damage, flooding, and even catastrophic flooding.  The label contains no warnings regarding how to avoid these risks, and no disclosure that after the warranty period the lines should be replaced or they may fail.

102.    Without proper warnings, Plaintiffs and the Class were left on their own to determine whether their Braided Lines were about to fail as a result of their design defect.  The reasonable expectation of a consumer of the Braided Lines is that the life expectancy of a properly designed supply line connected to a toilet, for example, will equal or surpass that of the toilet (15 years of average life expectancy), unless warned or informed by the manufacturer otherwise.

F.   **Fluidmaster Changed the Design of the NO-BURST Braided Lines**

103.     Upon information and belief, in an attempt to correct the design defect alleged herein, in or around 2003 Fluidmaster changed the design of its NO-BURST Lines to incorporate an inner tubing with a higher pressure rating.   Upon information and belief, Fluidmaster strengthened the water-carrying inner tubing to reduce or delay the bursting of the tubing should the exterior stainless steel braiding support be lost to corrosion.

104.     Additionally, Fluidmaster re-designed its acetal coupling nuts, and upon information and belief, began manufacturing the coupling nuts using glass-reinforced polypropylene, a material which is high in strength, stiffness, and resistant to impacts. Furthermore, these coupling nuts were redesigned to reduce the sharp transitions within the plastic coupling nut which are significantly more prone to fracturing than rounded transitions.

105.     Upon information and belief, as early as 2003, Fluidmaster remedied some of the defects of its NO-BURST Braided Lines by incorporating stronger inner tubing and selecting a stronger material for its plastic coupling nut. However, Fluidmaster failed to publicize the fact that the NO-BURST Braided Lines (which continued to be sold within its distribution networks) were known to burst and break. Fluidmaster also did not recall the defectively designed Braided Lines, nor did Fluidmaster notify property owners that the defective Braided Lines could spontaneously fail and should be replaced.

106.     Upon information and belief, instead of notifying consumers of the known defects of its NO-BURST Braided Lines, Fluidmaster reduced its warranty from ten years to five years.

107.     Thus, at all times which are material to this matter, and at times prior to the damages suffered by the Plaintiffs and Class Members, Fluidmaster knew that: a) the risk of the

failure of its NO-BURST Braided Lines was substantial due to the Line's defective design and material selection; b) Plaintiffs and Class Members were unaware of the substantial risk that the NO-BURST Braided Lines would burst or break; c) Plaintiffs and Class Members had a reasonable expectation that Fluidmaster would disclose the risk and cure the defects of their product; and d) Plaintiffs and Class Members were unaware that their Braided Lines should be replaced to avoid sudden catastrophic failure of the NO-BURST Braided Lines or that they had a useful life that was shorter than their stated warranty period.

### G. Plaintiffs and the Class Suffered Damages

108.　　As Plaintiffs exemplified in Paragraphs above, Plaintiffs and the Class have suffered harm as a result of Fluidmaster's actions because their Braided Lines contained a material design defect which caused the Braided Lines to rupture and burst, or alternatively break at the coupling nut, causing harm not only to the Braided Lines, but also to other real and personal property. In addition, because of the flooding that actually has or will occur due to the defects described herein, there is a serious risk of harm in the event the flooding takes place in areas where electrical outlets, appliances, and related household items could cause electrocution to anyone who may come into contact with or near those items as water is an electrical conductor.

109.　　Plaintiffs and the Class had a reasonable expectation that the service life of the NO-BURST Braided Lines was at least 15 years (in fact, a competitor named Floodchek has a 20-year warranty on Braided Lines such as the ones sold by Fluidmaster in this case),[4] which would equate to the same useful life as the plumbing component (*e.g.*, toilet) to which it was affixed.

---

[4] http://www.floodchek.com/resources/braided-wire-washer-hose.html

110. The Braided Line design defect, however, caused Plaintiffs' and the Class members' Braided Lines to experience premature failure that is disproportionate to the age of the component or to the age of the plumbing fixture (*e.g.*, toilet, faucet, etc.).

111. The injuries sustained by Plaintiffs and the Class flow directly from the core common facts surrounding Fluidmaster's misconduct, including, without limitation: (a) that the Braided Lines suffered from a design defect which was known to Fluidmaster that led the lines to rupture and burst or for the coupling nut to fail; (b) that the Braided Lines were defective for their intended use at the time of sale; (c) that Fluidmaster did not provide adequate warnings concerning the defective nature of the Braided Lines; and (d) that Fluidmaster, despite knowing of the design defects, failed to provide any public notice or warning, or institute a recall to repair or replace the defective Braided Lines.

112. Plaintiffs' and Class members' damages include, without limitation: (a) amounts paid for the defective Braided Lines; (b) amounts paid to remediate real and personal property damage caused by flooding after the failure of a Fluidmaster Braided Line; (c) amounts paid to replace the defective Braided Lines; and (d) expenses incurred on incidental and consequential damages. Plaintiffs and the Class also lost the benefit of the bargain with respect to their purchase of the Braided Lines in that they would not have purchased them if they had known of the defects that existed at the point of sale, or they would not have paid the price they paid, wrongly believing that the Braided Lines were not defective. In addition, there is a serious risk of harm to Plaintiffs or members of the Classes if they come into contact with any electrical outlet, appliance or related item, as water flooding from the defective lines is a conductor of electricity.

113. Plaintiffs, through online and related research, have found that many

complaints concerning the problems and defects outlined herein have occurred across the country, and in fact numerous insurance companies have filed suit against Fluidmaster for their defective braided lines in order to recover monies paid by the insurance companies to various homeowners for flooding and related property damage.

## CLASS ACTION ALLEGATIONS

114.    This action is brought and is properly maintained as a nationwide class action pursuant to Fed. R. Civ. P. 23 on behalf of a class defined as follows:

> All individuals and entities that own or have owned Fluidmaster NO-BURST Lines; or who own or have owned homes or other structures physically located in the United States, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed (the "Class"). Excluded from the Class is Fluidmaster, any entity in which Fluidmaster has a controlling interest, and Fluidmaster's legal representatives, assigns and successors.

115.    Alternatively, or in addition to the nationwide Class claims, Plaintiffs bring these claims under Fed. R. Civ. P. 23 on behalf of themselves and on behalf of Subclasses of individuals and entities residing in each of the states in which a named Plaintiff resides and each of the states where the laws are similar to each of the states in which a named Plaintiff resides ("State Subclasses"). The State Subclasses are defined as:

> All individuals and entities in the applicable State that own or have owned Fluidmaster NO-BURST Lines; or who own or have owned homes or other structures physically located in the applicable State, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed. Excluded from the State Subclasses is Fluidmaster, any entity in which Fluidmaster has a controlling interest, and Fluidmaster's legal representatives, assigns and successors.

116.    The Class and the State Subclasses are collectively referred to herein as the "Class."

117.    Plaintiffs reserve the right to redefine the Class prior to the certification of the Class.

118.    The Class (and each State Subclass) is so numerous that individual joinder of all Class members is impracticable.  The actual number of Class members is unknown at this time, but numbers in the thousands. The true number of Class members is likely to be known by Fluidmaster and may be ascertained through its books and records, and through discovery of its retailers and distributors.

119.    There are numerous questions of law and fact that are common to Plaintiffs and the Class (and each State Subclass) and that predominate over any questions that may affect individual Class members, including, without limitation:

a.    Whether Fluidmaster's Braided Lines are defective;

b.    Whether Fluidmaster's Braided Lines suffer from common design defects, as alleged herein;

c.    Whether the design defects with respect to Fluidmaster's Braided Lines results in the Braided Lines being prone to rupture, burst, break, and resulting in failure to perform the task for which they were designed;

d.    Whether Fluidmaster knew or should have known of the defect in the Braided Lines prior to putting them into the stream of commerce for purchase by Plaintiffs and the Class;

e.    Whether Fluidmaster properly advised consumers about the likelihood of the Braided Lines' premature failure;

f.    Whether Fluidmaster owed a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting and marketing of the Braided Lines;

g.    Whether Fluidmaster breached its duty to Plaintiffs and the Class by

designing, manufacturing, advertising and selling to Plaintiffs and the Class defective Braided Lines;

h.      Whether Fluidmaster breached its duty to Plaintiffs and the Class by failing promptly to remove the defective Braided Lines from the marketplace or take other remedial action;

i.      Whether the Braided Lines fail to perform in accordance with the reasonable expectations of ordinary consumers;

j.      Whether the Braided Lines fail to perform as advertised, marketed and warranted;

k.      Whether Fluidmaster breached its express warranties to Plaintiffs and the Class by advertising, marketing and selling defective Braided Lines to Plaintiffs and the Class;

l.      Whether Fluidmaster breached its implied warranties to Plaintiffs and the Class by advertising, marketing and selling Braided Lines that were not of a merchantable quality, nor fit for the ordinary purpose for which they were sold;

m.      Whether Plaintiffs and the Class members did not receive the benefit of their bargain in purchasing the Braided Lines;

n.      Whether Plaintiffs and the Class are entitled to compensatory damages, and the amount of such damages for the replacement and remediation of the Braided Lines;

o.      Whether Fluidmaster's representations regarding the suitability and exemplary nature of its Braided Lines, and its omissions and concealment of facts to the contrary regarding the Braided Lines' design defect constitute violations of state

consumer protection laws;

      p.     Whether Fluidmaster continued to market and sell the defective Braided Lines under the name "NO-BURST" when the manufacturer knew that the Lines would spontaneously burst or break, causing damage to the property of consumers;

      q.     Whether Fluidmaster has been unjustly enriched by its conduct, as alleged herein; and

      r.     Whether Fluidmaster should be required to notify all Class members about their defective Braided Lines.

120.     Plaintiffs have the same interests in this matter as all Class members, and their claims are typical of all Class members. As a result of the uniform design defects inherent in the Braided Lines' formulation, the Braided Lines have failed and will continue to prematurely fail, causing Plaintiffs and Class members to suffer damages in the form of unreimbursed costs associated with replacing the Braided Lines and remediating flood damage.

121.     Plaintiffs will fairly and adequately represent the interests of the Class members and do not have interests adverse to the Class. Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in the prosecution and successful resolution of consumer class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so.

122.     Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant, and/or because adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of non-party Class members.

123. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, making appropriate both declaratory and injunctive relief with respect to the Class as a whole. The members of the Class are entitled to injunctive relief as set forth below.

124. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because, as set forth above, questions of law and fact common to the Class predominate over questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Furthermore, the likelihood that individual members of the Class will prosecute separate actions is remote given the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of damages at issue for each individual Class member. This action will be prosecuted in a manner to ensure the Court's able management of this case as a class action, and Plaintiffs know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT

125. At all relevant times, Fluidmaster affirmatively concealed from Plaintiffs and the Class the design defect inherent in the Braided Lines.

126. Fluidmaster had a duty to inform Plaintiffs and the Class of the defect, about which Fluidmaster knew or should have known. Specifically, Fluidmaster has known for years of the problems and defects outlined herein through various complaint forums and as the result of numerous suits being filed against Fluidmaster by various insurance companies. Notwithstanding their duty to inform Plaintiffs and class members, Fluidmaster has never disclosed the defect to Plaintiffs and the Class. To the contrary, Fluidmaster has consistently maintained that its

Braided Lines are "NO-BURST," "tough," "heavy-duty," "NSF-approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."

127.     Plaintiffs and the Class could not have discovered the defect or Fluidmaster's attempts to avoid disclosure of the defects alleged herein. Thus, the running of the applicable statutes of limitation have been tolled with respect to any claims that Plaintiffs or the Class members have brought or could have brought as a result of the unlawful or fraudulent course of conduct described herein.

128.     In addition, Fluidmaster is estopped to plead the statute of limitations because it failed to disclose facts that it was obligated to disclose concerning the defects in the NO-BURST Braided Lines. Fluidmaster actively concealed and misrepresented to Plaintiffs and the Class members facts that were essential to understanding that Plaintiffs and the Class members had claims against Fluidmaster, and Fluidmaster thus acted to prevent Plaintiffs and the Class members from learning that they possessed claims against Defendant. Had Plaintiffs and the Class members been aware of the facts which Fluidmaster misrepresented and concealed, they would have commenced suit against Fluidmaster before the running of any statute of limitations alleged to be applicable to this case.

129.     Fluidmaster is further estopped from asserting any statute of limitations defense, contractual or otherwise, to the claims alleged herein by virtue of its fraudulent concealment.

## FIRST CAUSE OF ACTION
### Violation of Similar Uniform Deceptive Trade Practices Acts
### On behalf of the Class

130.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

131.     The Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2, *et seq.*) was in full force and effect during the relevant time period applicable to this Complaint.  Similar statutes, in their material respects, are in effect in many jurisdictions within the United States.[5]

132.     Plaintiffs and the Class are consumers within the meaning of the uniform deceptive trade practices acts given that Fluidmaster's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

133.     The consumer fraud statutes and/or interpretive case law of Illinois' sister states have also either: (a) expressly prohibited omissions of material fact, without regard for reliance on the deception; or (b) have not addressed those issues.

134.     Once Fluidmaster knew of the risks of the design defect inherent in the Braided Lines, Plaintiffs and the Class were entitled to disclosure of the defect because: (a) a significant risk of a rupture and burst, causing flooding damage, would be a material fact in a consumer's decision-making process; and (b) without Fluidmaster's disclosure, consumers would not know that there was any risk of a rupture and burst.

---

[5] Ariz. Rev. Stat. § 44-1522, *et seq.*; Ark. Code Ann. § 4-88-107, *et seq.*; Cal. Bus. Prof. Code § 17200, *et seq.*; Colo. Rev. Stat. § 6-1-101, *et seq.*; Conn. Gen. Stat. § 42-110b, *et seq.*; Del. Code Ann. tit. 6, § 2511, *et seq.*; D.C. Code Ann. § 28-3901, *et seq.*; Fla. Stat. Ann. § 501.201, *et seq.*; Idaho Code § 48-601, *et seq.*; 815 Ill. Comp. Stat. 505/2, *et seq.*; Ky. Rev. Stat. Ann. § 367.110, *et seq.*; La. Rev. Stat. Ann. tit. 15, § 1401, *et seq.*; Me. Rev. Stat. tit. 5, § 205-A, *et seq.*; Mich. Stat. Ann. § 19.418(1), *et seq.*; Minn Stat. § 8.31, *et seq.*; Mo. Rev. Stat. § 407.010, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; Nev. Rev. Stat. § 598.0903, *et seq.*; N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*; N.J. Rev. Stat. § 56:8-1, *et seq.* and N.J. Rev. Stat. § 56:12-1, *et seq.*; N.M. Stat. Ann. § 57-12-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. § 75-1.1, *et seq.*; N.D. Cent. Code § 51-15-01, *et seq.*; Okla Stat. tit. 15, § 751, *et seq.*; Or. Rev. Stat. § 646.605, *et seq.*; 73 Pa. Cons. Stat. § 201-1, *et seq.*; R.I. Gen. Laws § 6-13.1-1, *et seq.*; S.C. Code § 39-5-10, *et seq.*; S.D. Codified Laws § 37-24-1, *et seq.*; Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*; Vt. Stat. Ann. tit. 9, § 2451, *et seq.*; Va. Code Ann. § 59.1-196, *et seq.*; Wash. Rev. Code § 19.86.010, *et seq.*; Wis. Stat100.18, *et seq.*; and Wyo. Stat. Ann. § 40-12-101, *et seq.*

135.    Moreover, because Fluidmaster offers only a five or ten year warranty, consumers were further entitled to know that any defect might not exhibit itself until after Fluidmaster's limited warranty expired.

136.    Fluidmaster continuously failed to disclose to Plaintiffs and the Class that there was a substantial risk of the NO-BURST Lines rupturing and bursting.

137.    Through its "NO-BURST" Braided Line name, Fluidmaster repeatedly made a false statement of material fact, which was known to each consumer who purchased these Lines due to the bold "NO-BURST" labeling attached to the Lines. Consumers reasonably relied upon the truth of the Fluidmaster labeling, and personal property damages were incurred by consumers as a result of this reliance.

138.    Fluidmaster knew that if the defect to its Braided Lines was disclosed, Plaintiffs and the Class would not purchase the Braided Lines.  Fluidmaster intended that Plaintiffs and the Class would rely on the deception by purchasing defective Braided Lines, unaware of the material facts described herein.  This conduct constitutes consumer fraud within the meaning of the various consumer protection statutes.

139.    Plaintiffs and the Class have been damaged by Fluidmaster's deception because they purchased their Braided Lines harboring an undisclosed defect that caused (or will cause) the NO-BURST Braided Lines to eventually rupture and burst.

140.    If Fluidmaster had disclosed the relevant facts to Plaintiffs and the Class, they could have (and would have) prevented economic injury by purchasing a non-defective stainless steel-Braided Line or other type of supply line, thus avoiding the risk altogether.

141.    Fluidmaster committed deceptive acts or practices within the meaning of the uniform deceptive trade practices acts by engaging in the practices alleged herein, including,

without limitation, by failing to disclose the material defects concerning the Braided Lines.

142.     Fluidmaster's conduct is also unfair insofar as it offends public policy; is so oppressive that the consumer has little alternative but to submit; and causes consumers substantial injury.

143.     As a direct and proximate result of the unfair and deceptive acts or practices of Fluidmaster alleged herein, Plaintiffs and the Class members have incurred damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**On behalf of the Class**

144.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein and asserts these allegations in the alternative to any warranty claims brought on behalf of the State Subclasses.

145.     Substantial benefits have been conferred on Fluidmaster by Plaintiffs and the Class by purchasing the Braided Lines and Fluidmaster knowingly and willingly accepted and enjoyed those benefits.

146.     Fluidmaster knew or should have known that payments received from Plaintiffs and the Class for the Braided Lines were paid with the expectation that they would perform as represented.

147.     Fluidmaster's retention of these benefits is inequitable.

148.     Plaintiffs and the Class are entitled to recover from Fluidmaster all amounts wrongfully collected and improperly retained by Fluidmaster, plus interest.

149.     As a direct and proximate cause of Fluidmaster's wrongful conduct and unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees,

costs and interest.

## THIRD CAUSE OF ACTION
### Negligence
### On behalf of the Class

150.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

151.    Fluidmaster was negligent in that it failed to use reasonable care when it designed, created, manufactured, assembled, labeled, tested, distributed and sold its Braided Lines.

152.    As the manufacturer and/or seller of a consumer product, Fluidmaster owed a duty to Plaintiffs and the Class to provide a safe and quality product, and a duty to provide a product that would perform as it was intended and expected. Fluidmaster also owed a duty to Plaintiffs and the Class to provide adequate instructions and warnings for proper and safe use of the product. Fluidmaster further owed a duty to provide Plaintiffs and the Class with information related to the Braided Lines' reasonable expected life span and information related to its maintenance and replacement. Fluidmaster owed a duty to disclose to the consumer known defects that it knew existed, yet failed to do so to the detriment of the Classes.

153.    Fluidmaster breached each of these duties.

154.    As a direct and proximate result of Fluidmaster's negligence, lack of care and other wrongful acts, Plaintiffs and the Class members have incurred damages in an amount to be determined at trial.

155.    As a result of Fluidmaster's negligence, Plaintiffs and Class members have suffered economic losses for the damages for inadequate value, cost of repair and replacement of their defective Braided Lines, as well as damage to other personal property which resulted from a sudden and dangerous failure of the Braided Lines, causing flooding to the property of the Plaintiffs and Class Members.

156.    The Plaintiffs and Class members' damages were proximately caused by Fluidmaster's intentional false representation of its Braided Lines as "NO-BURST" lines, even after Fluidmaster knew that the defects in the Braided Lines were causing it to burst and/or break at the coupling nut.

157.    The damages suffered by the Plaintiffs and Class members were proximately caused by a negligent misrepresentation made by Fluidmaster, a corporation which is in the business of supplying information for the guidance of consumers and actively holds itself out to be "the #1 selling brand of toilet repair products in the world. . . [and] at the forefront of the toilet care market by providing innovative, yet easy-to-use products that are of the highest quality."

**FOURTH CAUSE OF ACTION**
**Strict Liability -- Design Defect and Failure to Warn**
**On behalf of the Class**

158.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

159.    Fluidmaster designed, manufactured, sold and/or distributed defective Braided Lines to Plaintiffs and the Class.

160.    The Braided Lines that Fluidmaster designed, manufactured, sold and/or distributed were defective in their design, and were defective when they left Fluidmaster's control.

161.    Fluidmaster knew, or should have known, that the Braided Lines contained a non-obvious danger in their material composition.  Fluidmaster knew that the Braided Lines were highly susceptible to failure under expected installation conditions, and that consumers would not repeatedly replace their Braided Lines without an instruction to do so.

162.    Fluidmaster knew that Plaintiffs and the Classes would use the Braided Lines

without first inspecting their durability. Fluidmaster failed to inform Plaintiffs and the Class as to the Braided Lines' susceptibility to sudden catastrophic failure. Fluidmaster failed to warn consumers that it was necessary to periodically inspect and replace the Braided Lines, even if the Lines had not yet failed or even if the Lines were still within the warranty period measured after the consumer's date of purchase of the Braided Line.

163.    The Braided Lines were defective due to inadequate warnings and inadequate inspection and testing, and inadequate reporting regarding the results of quality control testing and safety inspections, or lack thereof.

164.    Had Plaintiffs and the Class been adequately warned concerning the likelihood that the Braided Lines would fail, they would have taken steps to avoid damages by replacing the Braided Lines or by not purchasing them.

165.    Fluidmaster after learning that its NO-BURST Braided Lines could suddenly burst and/or their coupling nut could fracture and break, had a post-sale duty to warn consumers of the possibility that catastrophic failure and flooding could result from the failure of its Lines, even when used for their intended purpose.

166.    As a direct and proximate result of the defective condition of the Braided Lines, Plaintiffs and the Class members have incurred damages to both their Braided Lines and to their adjacent personal and real property in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Negligent Failure to Warn**
**On behalf of the Class**

167.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

168.    Fluidmaster manufactured, designed, sold and/or distributed defective Braided Lines to Plaintiffs and the Class, and which were defective from the time that the Braided Lines

were manufactured.

169.    Fluidmaster knew or reasonably should have known that its Braided Lines were defective and dangerous and/or were likely to be dangerous when used in a reasonably foreseeable and expected manner.

170.    Fluidmaster knew or reasonably should have known that Plaintiffs and the Class would not realize that their Braided Lines were defective and posed a danger of causing substantial property damage, both to the product itself and the adjacent real and personal property of the Plaintiffs and Class.

171.    Fluidmaster failed to adequately warn of the danger or instruct Plaintiffs and the Class on the safe use of the Braided Lines, and further, failed to warn Plaintiffs and the Class of the risks associated with signs of corrosion of the braided steel or minute fractures of the coupling nut.

172.    A reasonable manufacturer, distributor, assembler, or seller under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the product, including, without limitation, by providing detailed installation and maintenance instructions together with warnings to periodically inspect and/or replace the Braided Lines.

173.    As a direct and proximate result of the defective condition of the Braided Lines, Plaintiffs and the Class members have incurred damages in an amount to be determined at trial.

174.    Fluidmaster after learning that its NO-BURST Braided Lines could suddenly burst and/or their coupling nut could fracture and break, had a post-sale duty to warn consumers of the possibility that catastrophic failure and flooding could result from the failure of its Lines, even when used for their intended purpose.

175.    Fluidmaster's negligent failure to warn or instruct Plaintiffs and the Class was a

substantial factor in causing the harm to the Plaintiffs and Class, placing their safety and personal property at risk.

**SIXTH CAUSE OF ACTION**
**Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.***
**On behalf of the Class**

176.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

177.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages."  10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

178.     There is an actual controversy between Fluidmaster and Plaintiffs concerning:

      a.     whether the Braided Lines are defectively designed thus causing them to fail;

      b.     whether Fluidmaster knew or should have known of the defect;

      c.     whether Fluidmaster failed to warn against the potential unsuitability of its defectively designed Braided Lines; and

      e.     whether Fluidmaster knowingly attempted to remediate the defects in its Braided Lines before Plaintiffs sustained any damage and without providing notice to Plaintiffs and the Class about the defects.

179.     Pursuant to 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

180.     Despite the repeated failures of its Braided Lines, Fluidmaster refused to acknowledge that its product is defectively designed.  Fluidmaster attempted to remediate the defective design without advising consumers of the defect.

181.    Accordingly, based on Fluidmaster's failure to act, Plaintiffs seek a declaration that the Braided Lines are defective in their design, workmanship, material choices, and labeling, as alleged herein.  The defective nature of the Braided Lines is material and requires disclosure to all persons who own the Braided Lines.

182.    The declaratory relief requested herein will generate common answers that will settle the controversy related to the alleged defective design and labeling of the Braided Lines and the reasons for their repeated failure. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

### SEVENTH CAUSE OF ACTION
**Illinois Breach of Express Warranty**
**Plaintiff Sullivan on Behalf of the Illinois Class**

183.    Plaintiff Sullivan repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

184.    As fully pled above, Fluidmaster had knowledge of the defects to its Braided Lines and NO-BURST Braided Lines and that these lines pose a serious safety risk to consumers like Plaintiff Sullivan and Class Members.

185.    Fluidmaster expressly represented and warranted to Plaintiff Sullivan and Class Members by and through oral and written statements, descriptions, and affirmations of fact through its website, print advertising, marketing materials, and even the name "NO-BURST" prominently on many of its products, that the quality of its Braided Lines was safe and fit for their intended purposes.

186.    Fluidmaster expressly represented and warranted the quality of the Braided Lines against defects in materials and workmanship for a period of either ten or five years (depending on the date of purchase of the Braided Line), promising to "replace any part of this plumbing

product which proves to be defective in workmanship or materials under normal use for ten [or alternately five] years from the date of purchase."

187.   Fluidmaster publicized these statements to consumers and was aware that consumers would reasonably rely on these warranties related to the quality and workmanship of the Braided Lines using statements like "Fluidmaster is quick to market, quick to manufacture and quick to deliver with *unparalleled quality assurance*" (emphasis added).

188.   These express warranties were unavoidably material to the Plaintiff and Class Members who would have chosen to purchase a different product if they had prior knowledge that a sudden failure of the Braided Line would result in damage to the line itself as well as surrounding personal property of the Plaintiff and Class Members.

189.   Plaintiff Sullivan and Class members reasonably relied on these express warranties when they chose to purchase Fluidmaster Braided Lines and NO-BURST Braided Lines.

190.   At the time that they made these express warranties, Fluidmaster knew the use for which the Braided Lines were intended, and Fluidmaster expressly warranted that the Lines were fit and safe for their intended purpose.

191.   At the time that they made these express warranties, Fluidmaster knew of the latent defects in materials and workmanship inherent in the Braided Lines, but continued to market the Braided Lines and NO-BURST Braided Lines by means of false and misleading information, including that the lines would last ten years (or alternately five years) without acknowledging or warning consumers of their actual design defects.

192.   The Braided Lines purchased by Plaintiff Sullivan and Class Members did not conform to Fluidmaster's promises and descriptions.

a.      The design of the Fluidmaster Braided Lines and NO-BURST Braided Lines are produced using a grade of stainless steel, which is known to corrode and fracture, which is substantially certain to fail when used for its intended purpose due to Fluidmaster's choice of materials. The stainless steel braiding has an unreasonably high likelihood of corroding and failing when subjected to common household chemicals that are reasonably and foreseeably used and stored near the Braided Lines.

b.      The design of the Fluidmaster Braided Lines and NO-BURST Braided Lines include low pressure inner tubing which is substantially certain to fail when used for its intended purpose due to Fluidmaster's choice of materials. This inner tubing has an unreasonably high likelihood of bursting when the stainless steel braiding covering the tubing fails.

c.      Additionally, the design of the Fluidmaster Braided Lines and NO-BURST Braided Lines includes a plastic coupling nut, which is substantially certain to fail when used for its intended purpose due to Fluidmaster's choice of materials. These coupling nuts have an unreasonably high likelihood of fracturing when subjected to the daily pressures and stressors of its intended use.

193.   Plaintiff Sullivan and the Illinois Class members have incurred damages including but not limited to the destruction of their Braided Line and water damage to their homes as well as destruction to their personal property as described herein as a direct and proximate result of Fluidmaster's misrepresentations in its express warranty.

43

## EIGHTH CAUSE OF ACTION

**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1,** *et seq.* **("The CFA")**
**Plaintiff Sullivan on Behalf of the Illinois Class**

194.     Plaintiff Sullivan repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

195.     At all times relevant hereto, Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq. ("The CFA"), was in full force and effect.

196.     Plaintiff Sullivan and other Illinois Class members may sue as consumers within the meaning of the CFA because Fluidmaster's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

197.     Section 2 of the CFA renders unlawful the "use or employment of any deception [including the] concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct or any trade or commerce."

198.     When Fluidmaster designed, developed, manufactured, marketed, and sold the Class products, it was involved in the conduct of trade and commerce under the CFA.

199.     At the time Fluidmaster developed, manufactured, marketed, and sold the Braided Lines, it knew that they contained defects that pose serious safety risks to consumers like Plaintiff and Class Members.

200.     Nonetheless, Fluidmaster concealed its knowledge of the defect from consumers like Plaintiff Sullivan and Illinois class members and instead sold its Braided Lines as safe for normal use.

201. The defects pose serious safety risks to consumers and to their real and personal property, which were hidden from the consumers.

202. Fluidmaster intentionally concealed the unreasonable safety risks associated with the defective Braided Lines which were material facts to consumers like Plaintiff and Class Members. Indeed, no reasonable consumer would have knowingly bought a Braided Line for use if that consumer had known that the product was designed with serious defects.

203. Upon information and belief, in or around 2003 when Fluidmaster changed the design of its NO-BURST Lines to incorporate an inner tubing with a higher pressure rating, Fluidmaster concealed this defect of the earlier design from consumers including Plaintiff and Illinois Class members, failing to remove the defective NO-BURST Braided Lines from the stream of commerce even after attempting to remediate its own design defects.

204. Upon information and belief, when Fluidmaster re-designed its acetal coupling nuts, the company concealed the earlier design defect from consumers including Plaintiff and Illinois Class members, and failed to remove the defective design from the market or to warn consumers of its design defects.

205. When it attempted to remedy some of the defects of its NO-BURST Braided Lines, Fluidmaster failed to publicize the fact that the NO-BURST Braided Lines (which continued to be sold within its distribution networks) were known to burst and break.

206. Fluidmaster did not recall the defectively designed Braided Lines, nor did Fluidmaster notify property owners that the defective Braided Lines could spontaneously fail and should be replaced.

207. Fluidmaster's intentional misrepresentations, omissions and concealments of material fact constitute unfair and/or deceptive practices in violation of the CFA.

208.     Fluidmaster violated the CFA not only when it sold the Braided Lines representing them to be safe and specifically represented the Lines to be "no-burst." When Fluidmaster failed to disclose to Plaintiff and the Illinois class members that the Braided Lines had a defect (or multiple defects) which would result in the Braided Lines bursting despite their name and labeling, Fluidmaster's misrepresentations posed serious safety risks to consumers, their real and personal property, and the public.

209.     Fluidmaster violated the CFA when it sold a product that it knew was unsafe to use, when it held out to the public that its Braided Lines could be used safely, and when it failed to warn consumers that the Braided Lines contained defects that pose serious safety risks to consumers and the public.

210.     Fluidmaster's deceptive practices, including but not limited to the NO-BURST Braided Line name and marketing of the product, were designed to induce Plaintiff and the Illinois class members to purchase the Braided Lines containing the defect and to avoid the cost of replacing, repairing or retrofitting the defective Braided Lines still being sold in retail stores and already in use by thousands of consumers throughout Illinois.

211.     Fluidmaster's violations of the CFA were designed to conceal, and Fluidmaster failed to disclose, material facts about the defect and the unreasonable safety risks of the Braided Lines in order to induce Plaintiff and the Illinois class members to purchase additional Braided Lines, and in order allow Fluidmaster to avoid the cost of recalling, replacing, repairing or retrofitting the Braided Lines.

212.     Plaintiff and the Illinois class members suffered injury in-fact as a direct result of Fluidmaster's violations of the CFA in that they have paid for Braided Lines that pose an immediate safety risk and will have to be repaired or replaced.

213.     Had Fluidmaster disclosed the true quality and defective nature of the Braided Lines, Plaintiff and class members would not have purchased the Braided Lines or would have paid substantially less for them.

214.     Plaintiff and class members have also been denied the use of their Braided Lines, expended money on replacements, repairs, and damages to their personal property and suffered as a result of Fluidmaster's conduct.

215.     To this day, Fluidmaster continues to violate the CFA by concealing the defective nature of the Braided Lines by failing to issue a recall of the NO-BURST Braided Lines, by failing to notify customers of the serious safety issues posed by the defects of these Lines, and by failing to offer replacements of their defective Braided Lines to consumers.

216.     As a direct and proximate result of Fluidmaster's unfair acts or practices alleged herein, Plaintiff Sullivan and Illinois class members were damaged.

**NINTH CAUSE OF ACTION**
**Illinois Classes, Violation of Illinois Uniform Deceptive Trade Practices Act**
**(815 ILCS 510/1, *et seq*.)**
**Plaintiff Sullivan on Behalf of the Illinois Class**

217.     Plaintiff Sullivan repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

218.     At all times relevant hereto, there was in full force and effect the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1, *et seq*.

219.     Under Illinois' UDTPA, 815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: ". . . (5) represents that goods or services have . . . uses, benefits, or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or

model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

220.     As a corporation, Fluidmaster is a "person" within the meaning of 815 ILCS 510/1 (5).

221.     Fluidmaster's actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of 815 ILCS 510/1, *et seq*.

222.     All of the conduct and misrepresentations alleged herein occurred in the course of Defendant's business and was part of a pattern or generalized course of conduct.

223.     As described more fully above, Fluidmaster knew of the defect and that the Braided Lines posed a serious safety risk to consumers. Fluidmaster concealed that knowledge and misrepresented to consumers and the public that its Braided Lines were safe for their intended use. Illustrations of Fluidmaster's concealment of the defect include: its continuation of the use of the "NO-BURST" name despite knowledge that the Braided Lines were regularly bursting, continuation of advertising that stated that the Braided Lines as "tough," "heavy-duty," "NSF-approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."

224.     Despite its knowledge of the serious safety risk the Braided Lines posed to consumers, their property, and the public, Fluidmaster failed to issue a warning or repair, retrofit, recall and/or replace the Braided Lines and instead concealed the defect and the safety issues with the Braided Lines for years and is still concealing it today.

225.     As an entity with exclusive knowledge regarding the safety risk and defect in the Braided Lines, Fluidmaster had a duty to disclose the defects, particularly in light of the fact that the Braided Lines posed a serious safety risk to Plaintiff and the Illinois class members.

226.     Plaintiff and the Illinois class members reasonably expected that Fluidmaster would disclose the existence of the Defects and the serious safety risk the Braided Lines posed to consumers and the public and reasonably expected that Fluidmaster would not sell a product that was unsafe to use, information which is and was material to Plaintiff and class members.

227.     Fluidmaster, at all times relevant, knew or should have known that Plaintiff and the Illinois class members did not know of, or could not have reasonably discovered, the safety risk or the defect and that Fluidmaster was in exclusive possession of the knowledge of the defect.

228.     By concealing the serious safety risk posed by its Braided Lines and the existence of the defect and representing that the Braided Lines were safe, Fluidmaster engaged in actionable conduct within the meaning of the UDTPA.

229.     Had Plaintiff and class members known of the serious safety risk and/or the defect in the Braided Lines, they would not have purchased the Braided Lines or would have paid substantially less for their Braided Lines.

230.     Defendant's deceptive, unfair, fraudulent, and unlawful conduct alleged herein was specifically designed to and did induce Plaintiff Sullivan and Illinois Class Members to purchase the Braided Lines and NO-BURST Braided Lines.

231.     Fluidmaster violated the UDTPA when it concealed and/or failed to disclose the serious safety risk to consumers that its Braided Lines posed, and concealed and/or failed to disclose the fact that the Braided Lines were defective as described herein when it had a duty to disclose the safety risks and the defect, and instead sold the Braided Lines and NO-BURST Braided Lines as if they were fit for ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

232.     Fluidmaster violated the UDTPA when it failed to disclose the fact that the Braided Lines posed a serious safety risk and were defective as described herein when it had a duty to disclose the safety risk to consumers and to disclose the defect and instead falsely represented that the Braided Lines were safe for consumer use and sold the Braided Lines as if they were safe for consumer use.

233.     Plaintiff and the Illinois class members lost money or property as a result of their purchases and thus Plaintiff has standing to represent the classes in this action.

234.     As a direct and proximate result of Fluidmaster's violation of the Illinois UDTPA alleged herein, Plaintiff Sullivan and the Illinois Class were damaged.

235.     Based upon the Illinois UDTPA, Plaintiff Sullivan and Illinois Class seek injunctive relief against Defendant Fluidmaster based upon the vast market share which Fluidmaster claims to have for replacement plumbing parts and the extremely high likelihood that the Plaintiff and Illinois Class members may personally suffer future harm to their real and personal property from the failure of Fluidmaster Braided Lines in their homes, businesses, and rental properties.

**TENTH CAUSE OF ACTION**
**Illinois, Unjust Enrichment**
**Plaintiff Sullivan on Behalf of the Illinois Class**

236.     Plaintiff Sullivan realleges and incorporates by reference all paragraphs as though fully set forth herein and asserts these allegations in the alternative to any warranty claims.

237.     Fluidmaster had knowledge of the defect and the serious safety risks it poses, which it failed to disclose to Plaintiff and the Class Members.

238. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the defect of the Braided Lines and the concealment of the defect, Fluidmaster obtained monies which rightfully belong to Plaintiff and the Class Members to the detriment of the Plaintiff and the Class Members.

239. Fluidmaster appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiff and the Class Members, who without knowledge of the defect either paid a higher price for their Braided Lines, which actually had lower values or received monies for Braided Lines Plaintiff and the Class Members would not have purchased.

240. It would be inequitable and unjust for Fluidmaster to retain these wrongfully-obtained profits.

241. Fluidmaster's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

242. Plaintiff and the Class are entitled to restitution of the profits unjustly obtained, plus interest.

## ELEVENTH CAUSE OF ACTION
### Illinois, Fraud by Concealment
### Plaintiff Sullivan on Behalf of the Illinois Class

243. Plaintiff Sullivan repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

244. Plaintiff brings this Count on behalf of the Illinois State Class ("Class," for purposes of this Count).

245. Fluidmaster had a duty to disclose these safety, quality, dependability, and reliability issues because Fluidmaster consistently marketed the Braided Lines as safe and "no burst."

246.     Once Fluidmaster made representations to the public about safety, quality, dependability, and reliability, Fluidmaster was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated. A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

247.     Upon information and belief, in or around 2003 when Fluidmaster changed the design of its NO-BURST Lines to incorporate an inner tubing with a higher pressure rating, Fluidmaster concealed this defect of the earlier design from consumers including Plaintiff and Illinois Class members.

248.     Upon information and belief, when Fluidmaster re-designed its acetal coupling nuts and began manufacturing the coupling nuts using glass-reinforced polypropylene, redesigning the coupling nuts to reduce the sharp transitions within the plastic coupling nut, Fluidmaster concealed this defect of the earlier design from consumers including Plaintiff and Illinois Class members.

249.     When it remedied some of the defects of its NO-BURST Braided Lines, Fluidmaster failed to publicize the fact that the NO-BURST Braided Lines (which continued to be sold within its distribution networks) were known to burst and break. Fluidmaster also did not recall the defectively designed Braided Lines, nor did Fluidmaster notify property owners that the defective Braided Lines could spontaneously fail and should be replaced.

250.     In addition, Fluidmaster had a duty to disclose these omitted material facts because they were known and/or accessible only to Fluidmaster, which has superior knowledge and access to the facts, and Fluidmaster knew they were not known to or reasonably discoverable by Plaintiff and the Class Members.

251.     These omitted facts were material because they directly impact the safety, quality, and reliability of the NO-BURST Braided Lines. Whether a braided plumbing line is a quality and reliable product and has been manufactured and designed according to industry standards are material facts for a reasonable consumer. Fluidmaster possessed exclusive knowledge of the defects and quality control issues rendering the Braided Lines inherently more dangerous and unreliable than similar plumbing lines.

252.     Fluidmaster actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class Members to purchase Braided Lines at a higher price for the NO-BURST Braided Lines, which did not match the Braided Lines' true value.

253.     Fluidmaster still has not made full and adequate disclosure and continues to defraud Plaintiff and the Class Members.

254.     Plaintiff and the Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and the Class Members' actions were justified.

255.     Fluidmaster was in exclusive control of the material facts, and such facts were not known to Plaintiff or the Class Members.

256.     As a result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damage. Those Class Members who want to rescind their purchase are entitled to restitution and consequential damages to their physical and personal property which arose from the sales transaction.

257.     Fluidmaster's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights and well-being.

258.     Fluidmaster's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, and Plaintiff, individually and on behalf of the Class Members, reserves the right to assert a claim for punitive damages upon satisfying the applicable statutory prerequisite pursuant to Illinois law.

**TWELFTH CAUSE OF ACTION**
**Breach of Express Warranty**
**Tenn. Code Ann. § 47-2-313**
**Plaintiff Rhyne on Behalf of the Tennessee Class**

259.     Plaintiff Rhyne repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

260.     Fluidmaster is a "merchant" within the meaning of Tenn. Code Ann. § 47-2-313.

261.     The Braided Lines are "goods" within the meaning of Tenn. Code Ann. § 47-2-313.

262.     As set forth herein, Fluidmaster had knowledge of the defective design of its Braided Lines and that they posed a serious risk to consumers including Plaintiff Rhyne and the Tennessee Class.

263.     Despite its knowledge, Fluidmaster expressly warranted in writing that it would replace defective parts. See Fluidmaster's Warranty located at http://www.fluidmaster.com/index.asp?bhcp=1.

264.     In selling its NO-BURST Braided Lines, Fluidmaster expressly warranted in writing that it would repair and adjust to correct defects in materials and workmanship of any part supplied by Fluidmaster. In fact, Fluidmaster has not repaired or adjusted the Braided Lines, and nor can it given their defective design.

265.    These warranties were made not only in its written agreement to customers but also in advertisements and in uniform statements provided by Fluidmaster to its salespeople.

266.    These warranties, affirmations and promises were part of the basis of the bargain between Fluidmaster and Plaintiff Rhyne and the Tennessee Class members, who relied on the existence of the express warranties.

267.    By selling NO-BURST Braided Lines containing the defect to consumers like Plaintiff Rhyne and the Tennessee Class after it had knowledge of the defect, Fluidmaster breached its express warranty to provide Braided Lines that were free from defects.

268.    Fluidmaster also breached its express warranty to repair and correct material defects or component malfunctions in its Braided Lines when it failed to do so despite knowledge of the defect and despite its knowledge of alternative designs and materials.

269.    Further, any "repairs" offered by Fluidmaster do not and cannot remedy the problems with its Braided Lines because of the design defect.

270.    The warranty of repair to the Braided Lines fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Rhyne and the Tennessee Class whole and because Fluidmaster has refused to provide the promised remedies within a reasonable time.

271.    Also, as alleged herein, at the time Fluidmaster warranted and sold the Braided Lines, it knew the Braided Lines did not conform to the warranties and were inherently defective, and Fluidmaster wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Braided Lines.

272.     Accordingly, Plaintiff Rhyne and the Tennessee Class are not limited to the limited warranty of "repair" and Plaintiff Rhyne and the Tennessee Class seek all remedies allowed by law.

273.     As detailed above, Fluidmaster was notified of Plaintiff Rhyne's Braided Line defect but failed to provide a defect-free Braided Line to Plaintiff Rhyne free of charge or to provide an adequate retrofit to remedy the defect.

274.     As detailed above, Fluidmaster was provided with notice and has been on notice of the defect and of its breach of express written warranties through consumer warranty claims reporting problems with the Braided Lines, customer complaints, and its own internal and external testing, and failed to repair, replace or retrofit the Braided Lines to ensure that they were free of materials defects or component malfunctions as Fluidmaster promised.

275.     As a direct and proximate result of Fluidmaster's breach of its express warranties, Plaintiff Rhyne and the Tennessee Class have incurred damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### Tenn. Code Ann. § 47-2-314
### Plaintiff Rhyne on Behalf of the Tennessee Class

276.     Plaintiff Rhyne repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

277.     Fluidmaster is a "merchant" within the meaning of Tenn. Code Ann. § 47-2-314.

278.     The Braided Lines are "goods" within the meaning of Tenn. Code Ann. § 47-2-314.

279.     Fluidmaster's implied warranty of merchantability accompanied the sale of the Braided Lines to Plaintiff Rhyne and the Tennessee Class.

280.     Fluidmaster warranted that the Braided Lines were fit for ordinary use.

281.     The materials, design and repeated failure of the Braided Lines made them defective and unfit for the ordinary purposes for which they are used. The Braided Lines are not fit for ordinary use.

282.     Any effort by Fluidmaster to disclaim or limit its responsibility for its defective Braided Lines would be unconscionable under the circumstances, including because Fluidmaster knew its Braided Lines were unfit for normal use. Through its conduct, Fluidmaster breached its implied warranty of merchantability and is liable to Plaintiff Rhyne and the Tennessee Class.

283.     Plaintiff Rhyne and the Tennessee Class have provided notice to Fluidmaster regarding the problems they experienced with the Braided Lines and, notwithstanding such notice, Fluidmaster failed and refused to remedy the problems. Further, Fluidmaster had actual knowledge of the defect.

284.     As a result of Fluidmaster's breach of the implied warranty of merchantability, Plaintiff Rhyne and the Tennessee Class members have incurred damages in an amount to be determined at trial.

**FOURTEENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**N.D. Cent. Code, § 41-02-30**
**Plaintiff Ellefson on Behalf of the North Dakota Class**

285.     Plaintiff Ellefson repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

286.     Fluidmaster is a "merchant" within the meaning of N.D. Cent. Code, § 41-02-30.

287.     The Braided Lines are "goods" within the meaning of N.D. Cent. Code, § 41-02-30.

288.     As set forth herein, Fluidmaster had knowledge of the defects concerning its Braided Lines and that they posed a serious risk to consumers such as Plaintiff Ellefson and the North Dakota Class.

289.     Despite that knowledge, Fluidmaster expressly warranted in writing that it would replace defective parts.     See Fluidmaster's Warranty located at http://www.fluidmaster.com/index.asp?bhcp=1.

290.     In selling the Braided Lines, Fluidmaster expressly warranted in writing that it would repair and adjust to correct defects in materials and workmanship of any part supplied by Fluidmaster.  Fluidmaster has not repaired or adjusted, and has been unable to repair or adjust, the Braided Lines' materials, workmanship and/or design defects.

291.     These warranties were made not only in its written agreement to customers but also in advertisements and in uniform statements provided by Fluidmaster to its salespeople.

292.     These warranties, affirmations and promises were part of the basis of the bargain between Fluidmaster and Plaintiff Ellefson and the North Dakota Class members, who relied on the existence of the express warranties.  Fluidmaster's express warranties became a basis for the bargain between Plaintiff Ellefson and the North Dakota Class members and Fluidmaster.

293.     By selling its Braided Lines containing the defect to consumers such as Plaintiff Ellefson and the North Dakota Class members after it gained knowledge of the defect, Fluidmaster breached its express warranty to provide Braided Lines that were free from defects.

294.     Fluidmaster also breached its express warranty to repair or correct material defects or component malfunctions in its Braided Lines when it failed to do so despite knowledge of the defect and knowledge of alternative designs, materials and/or options for retrofits.

295.     Further, any "repairs" Fluidmaster offers do not remedy the safety issue with its Braided Lines and are not adequate to remedy the serious issues caused by the defect.

296.     The warranty of repair to the Braided Lines fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Ellefson and the North Dakota Class whole and because Fluidmaster has refused to provide the promised remedies within a reasonable time.

297.     At the time Fluidmaster warranted and sold its Braided Lines, it knew that they did not conform to the warranties and were inherently defective, and Fluidmaster wrongfully and fraudulently misrepresented and/or concealed material facts regarding its Braided Lines.

298.     Accordingly, Plaintiff Ellefson and the North Dakota Class are not limited to the limited warranty of "repair" and seek all remedies allowed by law.

299.     As detailed herein, Fluidmaster was notified of Plaintiff Ellefson's Braided Line defect, but failed to provide a defect-free Braided Line to Plaintiff Ellefson free of charge or to provide an adequate retrofit to remedy the defect.

300.     As detailed herein, Fluidmaster was provided with notice and has been on notice of the defect and of its breach of express written warranties through consumer warranty claims reporting problems with the Braided Lines, customer complaints, and its own internal and external testing, and failed to repair, replace or retrofit the Braided Lines to ensure they were free of materials defects or component malfunctions as Fluidmaster promised.

301.     As a direct and proximate result of Fluidmaster's breach of its express warranties, Plaintiff Ellefson and the North Dakota Class have incurred damages in an amount to be determined at trial.

## FIFTEENTH CAUSE OF ACTION

**Breach of Implied Warranty of Merchantability**
**N.D. Cent. Code, § 41-02-31**
**Plaintiff Ellefson on Behalf of the North Dakota Class**

302.     Plaintiff Ellefson repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

303.     Fluidmaster is a "merchant" within the meaning of N.D. Cent. Code, § 41-02-31.

304.     The Braided Lines are "goods" within the meaning of N.D. Cent. Code, § 41-02-31.

305.     Fluidmaster's implied warranty of merchantability accompanied the sale of the Braided Lines to Plaintiff Ellefson and the North Dakota Class.

306.     Fluidmaster impliedly warranted that its Braided Lines were fit for ordinary use.

307.     The design and repeated failure of the Braided Lines made them defective and, thus, unfit for the ordinary purposes for which they are used.  The Braided Lines are not fit for ordinary use.

308.     Any effort by Fluidmaster to disclaim or otherwise limit its responsibility for its defective Braided Lines is unconscionable under the circumstances, including because Fluidmaster knew that its Braided Lines were unfit for normal use.  Through its conduct,

Fluidmaster breached its implied warranty of merchantability and is liable to Plaintiff Ellefson and the North Dakota Class.

309.     Plaintiff Ellefson provided notice to Fluidmaster regarding the problems he experienced with his Braided Lines and, notwithstanding such notice, Fluidmaster failed and refused to remedy the problems.  Further, Fluidmaster had actual knowledge of the defect.

310.     As a result of Fluidmaster's breach of the implied warranty of merchantability, Plaintiff Ellefson and the North Dakota Class members have incurred damages in an amount to be determined at trial.

**SIXTEENTH CAUSE OF ACTION**
**Violation of the Georgia Uniform Deceptive Trade Practices Act**
**O.C.G.A. § 10-1-371, *et seq.***
**Plaintiff Eisen on Behalf of the Georgia Class**

311.     Plaintiff Eisen repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

312.     Fluidmaster is a "person within the meaning of O.C.G.A. § 10-1-371(5).

313.     In marketing, promoting and selling its Braided Lines as suitable for ordinary use, Fluidmaster:

a.   represented that its Braided Lines have sponsorship, approval, characteristics, components, uses, benefits or qualities that they do not have;

b.   represented that its Braided Lines are of a particular standard, quality or grade when they are of another; and

c.   advertised Braided Lines with the intent not to sell them as advertised.

314.     Plaintiff and the Georgia Class members have suffered harm as a result of purchasing unsafe and defective Braided Lines that were not merchantable.

315.     As a result of Fluidmaster's violations of the Georgia Uniform Deceptive Trade Practices Act, Plaintiff and the Class Members have incurred damages in an amount to be determined at trial and seek appropriate injunctive relief to remedy this misconduct, along with all other remedies or damages available under O.C.G.A. § 10-1-371, *et seq.*

**SEVENTEENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**O.C.G.A. § 11-2-313**
**Plaintiff Eisen on Behalf of the Georgia Class**

316.     Plaintiff Eisen repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

317.     Fluidmaster is a "merchant" within the meaning of O.C.G.A. § 11-2-313.

318.     The Braided Lines are "goods" within the meaning of O.C.G.A. UCC § 11-2-313.

319.     Fluidmaster had knowledge of the defect in its Braided Lines and that they contained defects that applied to consumers such as Plaintiff Eisen and the Georgia Class.

320.     Despite its knowledge, Fluidmaster expressly warranted in writing that it would replace defective parts. See Fluidmaster Warranty located at http://www.fluidmaster.com/index.asp?bhcp=1.

321.     In selling its Braided Lines, Fluidmaster expressly warranted in writing to repair and adjust to correct defects in materials and workmanship of any part supplied by Fluidmaster. Fluidmaster has not repaired or adjusted, and has been unable to repair or adjust, the Braided Lines' materials, workmanship and/or design defects.

322.     These warranties were made not only in its written agreement to customers, but also in advertisements and in uniform statements provided by Fluidmaster to its salespeople.

323.     These warranties, affirmations and promises were part of the basis of the bargain between Fluidmaster and Plaintiff Eisen and the Georgia Class, who relied on the existence of the express warranties.  Fluidmaster's express warranty became a basis for the bargain between Plaintiff Eisen and the Georgia Class and Fluidmaster.

324.     By selling its Braided Lines containing the defect to consumers such as Plaintiff Eisen and the Georgia Class members after it gained knowledge of the defect, Fluidmaster breached its express warranty to provide Braided Lines that were free from defects.

325.     Fluidmaster also breached its express warranty to repair or correct the material defects or component malfunctions in its Braided Lines when it failed to do so despite knowledge of the defect and knowledge of alternative designs, materials and/or options for retrofits.

326.     Fluidmaster has not repaired such material defects or component malfunctions in its Braided Lines.

327.     Further, any "repairs" Fluidmaster offers do not remedy the safety issue with its Braided Lines and are not adequate to remedy the serious issues caused by the defect.

328.     The warranty of repair to the Braided Lines fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Eisen and the Georgia Class whole and because Fluidmaster has refused to provide the promised remedies within a reasonable time.

329.     At the time Fluidmaster warranted and sold its Braided Lines, it knew that they did not conform to the warranties and were inherently defective, and Fluidmaster wrongfully and fraudulently misrepresented and concealed material facts regarding its Braided Lines.

330.     Accordingly, Plaintiff Eisen and the Georgia Class are not limited to the limited warranty of "repair" and seek all remedies allowed by law.

331.     As detailed herein, Fluidmaster was notified of Plaintiff Eisen's Braided Line defect but failed to provide a defect-free Braided Line to Plaintiff Eisen free of charge or to provide an adequate retrofit to remedy the defect.

332.     As detailed herein, Fluidmaster was provided with notice and has been on notice of the defect and of its breach of express written warranties through consumer warranty claims reporting problems with the Braided Lines, customer complaints, and its own internal and external testing, and failed to repair, replace or retrofit the Braided Lines to ensure that they were free of materials defects or component malfunctions as Fluidmaster promised.

333.     As a direct and proximate result of Fluidmaster's breach of its express warranties, Plaintiff Eisen and the Georgia Class members have incurred damages in an amount to be determined at trial.

### EIGHTEENTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**
**O.C.G.A. § 11-2-314**
**Plaintiff Eisen on Behalf of the Georgia Class**

334.     Plaintiff Eisen repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

335.     Fluidmaster is a "merchant" within the meaning of O.C.G.A. § 11-2-314.

336.     The Braided Lines are "goods" within the meaning of O.C.G.A. § 11-2-314.

337.     Fluidmaster's implied warranty of merchantability accompanied its sale of its Braided Lines to Plaintiff Eisen and the Georgia Class.

338.     Fluidmaster impliedly warranted that its NO-BURST Braided Lines were fit for ordinary use.

339.     The design and repeated failure of Fluidmaster's Braided Lines made them defective and, thus, unfit for the ordinary purposes for which the goods are used.  The Braided Lines are not fit for ordinary use.

340.     Any effort by Fluidmaster to disclaim or limit its responsibility for its defective Braided Lines is unconscionable under the circumstances, including because Fluidmaster knew that its Braided Lines were unfit for normal use. Through its conduct, Fluidmaster breached its implied warranty of merchantability and is liable to Plaintiff Eisen and the Georgia Class.

341.     Plaintiff Eisen has provided notice to Fluidmaster regarding the problems he experienced with his Braided Lines and, notwithstanding such notice, Fluidmaster failed and refused to remedy the problems.  Further, Fluidmaster had actual knowledge of the Defects.

342.     As a result of Fluidmaster's breach of the implied warranty of merchantability, Plaintiff Eisen and the Georgia Class members have incurred damages in an amount to be determined at trial.

## NINETEENTH CAUSE OF ACTION
### Breach of Express Warranty
### 11 M.R.S. § 2-313
### Plaintiff Elder on Behalf of the Maine Class

343.     Plaintiff Elder repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

344.     Fluidmaster is a "merchant" within the meaning of 11 M.R.S. § 2-313.

345.     The Braided Lines are "goods" within the meaning of 11 M.R.S. § 2-313.

346.     As set forth herein, Fluidmaster had knowledge of the defects with its Braided Lines and that they posed a serious risk of flooding to consumers such as Plaintiff Elder and the Maine Class members.

347.     Despite its knowledge, Fluidmaster expressly warranted in writing that it would replace defective parts.     See Fluidmaster Warranty located at http://www.fluidmaster.com/index.asp?bhcp=1.

348.     In selling its Braided Lines, Fluidmaster expressly warranted in writing that it would repair and adjust to correct defects in materials and workmanship of any part supplied by Fluidmaster.  Fluidmaster has not repaired or adjusted, and has been unable to repair or adjust, the Braided Lines' materials, workmanship and/or design defects.

349.     Fluidmaster's warranties were made not only in writing to customers but also in advertisements and in uniform statements provided by Fluidmaster to be made by salespeople.

350.     These warranties, affirmations and promises were part of the basis of the bargain between Fluidmaster and Plaintiff Elder and the Maine Class, who relied on the existence of the express warranties.  Fluidmaster's express warranties became a basis for the bargain between Plaintiff Elder and the Maine Class.

351.     By selling its Braided Lines containing the defect to consumers like Plaintiff Elder and the Maine Class members after it gained knowledge of the defect, Fluidmaster breached its express warranty to provide Braided Lines that were free from defects.

352.     Fluidmaster also breached its express warranty when it failed to repair or correct material defects or component malfunctions in its Braided Lines despite its knowledge of the defect and knowledge of alternative designs and materials.

353.     Further, any "repairs" Fluidmaster offers do not remedy the safety issue with its Braided Lines and are not adequate to remedy the serious issues caused by the defects.

354.     The warranty of repair to the Braided Lines fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Elder and the Maine Class whole

and/or because Fluidmaster has refused to provide the promised remedies within a reasonable time.

355.     Also, as alleged herein, at the time Fluidmaster warranted and sold its Braided Lines, it knew they did not conform to the warranties and were inherently defective, and Fluidmaster wrongfully and fraudulently misrepresented and concealed material facts regarding its Braided Lines.

356.     Accordingly, Plaintiff Elder and the Maine Class are not limited to the limited warranty of "repair" and may seek all remedies allowed by law.

357.     As detailed herein, Fluidmaster was notified of Plaintiff Elder's Braided Line defect but failed to provide a defect-free Braided Line to Plaintiff Elder and the Maine Class members free of charge or to provide an adequate retrofit to remedy the defect.

358.     As detailed herein, Fluidmaster was provided with notice and has been on notice of the defects and of its breach of express written warranties through consumer warranty claims reporting problems with the Braided Lines, through consumer complaints, and through its own internal and external testing. Despite these notifications and this knowledge, Fluidmaster failed to repair, replace or retrofit the Braided Lines to ensure they were free of materials defects or component malfunctions, as Fluidmaster had promised.

359.     As a direct and proximate result of Fluidmaster's breach of its express warranties, Plaintiff Elder and the Maine Class have incurred damages in an amount to be determined at trial.

## TWENTIETH CAUSE OF ACTION

**Breach of Implied Warranty of Merchantability**
**11 M.R.S. § 2-314**
**Plaintiff Elder on Behalf of the Maine Class**

360.    Plaintiff Elder repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

361.    Fluidmaster is a "merchant" within the meaning of 11 M.R.S. § 2-314.

362.    The Braided Lines are "goods" within the meaning of 11 M.R.S. § 2-314.

363.    Fluidmaster's implied warranty of merchantability accompanied the sale of the Braided Lines to Plaintiff Elder and the Maine Class members.

364.    Fluidmaster impliedly warranted that the NO-BURST Braided Lines were fit for ordinary use.

365.    The design and repeated failure of the Braided Lines made them defective and, thus, unfit for the ordinary purposes for which they are used.  The Braided Lines are not fit for ordinary use.

366.    As set forth herein, any effort by Fluidmaster to disclaim or otherwise limit its responsibility for its defective Braided Lines is unconscionable under all of the circumstances, including because Fluidmaster knew that its Braided Lines were unfit for normal use.  Through its conduct, Fluidmaster has breached its implied warranty of merchantability and is liable to Plaintiff Elder and the Maine Class.

367.    Plaintiff Elder and the Maine Class have provided notice to Fluidmaster regarding the problems they experienced with the Braided Lines and, notwithstanding such notice, Fluidmaster has failed and refused to remedy the problems.  Further, Fluidmaster had actual knowledge of the defect.

368.     As a result of Fluidmaster's breach of the implied warranty of merchantability, Plaintiff Elder and the Maine Class members have incurred damages in an amount to be determined at trial.

## TWENTY-FIRST CAUSE OF ACTION

### Violation of the Alabama Extended Manufacturer's Liability Doctrine (AEMLD)
### Plaintiff Naef on Behalf of the Alabama Class

369.     Plaintiff Naef repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

370.     Fluidmaster is a "manufacturer" and "seller" who placed the Braided Lines and NO-BURST Lines on the market in a defective condition which was unreasonably dangerous to the Plaintiff and similarly situated Alabama Class members as the ultimate end users of this product.

371.     Fluidmaster is engaged in the business of selling plumbing parts, and holds itself out as "the #1 selling brand of toilet repair products in the world."

372.     Plaintiff Naef and other similarly situated members of the Alabama Class purchased the Fluidmaster lines in the condition which they were manufactured, without substantial changes in the condition that the Fluidmaster lines were manufactured.

373.     Plaintiff Naef and other similarly situated members of the Alabama Class used the Braided Lines and NO-BURST Lines in the usual and customary manner for which they were intended, and installed these lines according to the instructions and warnings supplied by the manufacturer, Fluidmaster.

374.     Fluidmaster conducted itself in a negligent manner by placing the NO-BURST Braided Lines on the market, and Plaintiff Naef and Alabama Class members suffered significant property damage to when they used the Braided Lines for their intended purpose.

375.     Plaintiff Naef suffered sudden and catastrophic damage to his property including but not limited to the destruction and breakage of the NO-BURST Line, water damage to three levels of his home, including but not limited to areas which include electrical services and appliances, and damages within the structure of his home.

376.     Fluidmaster, through its distributor, sold Plaintiff Naef a product that was in a defective condition from the point of manufacture and which was unreasonably dangerous to Plaintiff Naef as the consumer of this product.

377.      The Fluidmaster NO-BURST Braided Line with an acetal plastic coupling nut does not meet the reasonable expectations of an ordinary consumer as to its safety when used for its intended purpose, which is to safely and reliably deliver water from the supply to a plumbing fixture.

378.     Upon information and belief, prior to Plaintiff Naef's purchase of the NO-BURST Braided Line, Defendant Fluidmaster knew of design defects to the Braided Lines and made changes to the design and materials of the Braided Lines. However, Fluidmaster failed to notify consumers of the design defects and failed to recall defective products, which continued to be sold to unsuspecting consumers.

379.     Plaintiff Naef and the Alabama Class members have suffered harm as a result of purchasing the Braided Lines that were unreasonably dangerous when used for their intended purpose.

380.     As a result of Fluidmaster's violations of the Alabama Extended Manufacturer's Liability Doctrine, Plaintiff Naef and the Alabama Class members have incurred damages in an amount to be determined at trial and seek appropriate injunctive relief to remedy this misconduct, along with all other remedies or damages available.

## TWENTY-SECOND CAUSE OF ACTION

**Breach of Express Warranty**
**Alabama Code § 7-2-313**
**Plaintiff Naef on Behalf of the Alabama Class**

381.    Plaintiff Naef repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

382.    Fluidmaster is a "seller" within the meaning of Ala. Code § 7-2-103.

383.    The Fluidmaster Products are "goods" within the meaning of Ala. Code § 7-2-105.

384.    Fluidmaster, by naming its Braided Lines "NO-BURST" and by describing the Lines as "no burst" plumbing lines, warranted to consumers like Plaintiff Naef and the Alabama Class that this product would not burst, and this express warranty became a part of the basis of the bargain. The NO-BURST Braided Lines failed to conform to this affirmation and promise made by Fluidmaster.

385.    Fluidmaster had knowledge of the defect in its Braided Lines and that it posed a serious risk of failure to consumers such as Plaintiff Naef and the Alabama Class.

386.    By selling its Braided Lines containing the defect to consumers such as Plaintiff Naef and the Alabama Class members after it gained knowledge of the defect, Fluidmaster breached its express warranty to provide Braided Lines that were free from defects.

387.    Fluidmaster also breached its express warranty to repair or correct material defects or component malfunctions in its Braided Lines when it failed to do so despite knowledge of the defect and knowledge of alternative designs, alternative materials and/or options for retrofits.

388.    Upon information and belief, Defendant Fluidmaster knew of design defects to the Braided Lines as early as 2003 and made changes to the design and materials of the Braided

Lines. However, Fluidmaster failed to notify consumers of the design defects and failed to recall defective products, which continued to be sold to unsuspecting consumers.

389.     Any "repairs" Fluidmaster offers do not remedy the defect with its Braided Lines and are not adequate to remedy the serious damages caused by the defect.

390.     The limited warranty of repair to the Braided Lines fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Naef and the Alabama Class whole and because Fluidmaster has refused to provide the promised remedies within a reasonable time.

391.     At the time Fluidmaster warranted and sold its Braided Lines, it knew that they did not conform to the warranties and were inherently defective, and Fluidmaster wrongfully and fraudulently misrepresented and concealed material facts regarding its Braided Lines.

392.     Accordingly, Plaintiff Naef and the Alabama Class are not limited to the limited warranty of "repair" and seek all remedies allowed by law.

393.     As detailed herein, Fluidmaster was notified of Plaintiff Naef's defect with his Braided Lines, but failed to provide a defect-free Braided Line to Plaintiff Naef free of charge or to provide an adequate retrofit to remedy the defect.

394.     As detailed herein, Fluidmaster was provided with notice by Plaintiff Naef as well as other consumers and has been on notice of the defect and of its breach of express written warranties through thousands of consumer warranty claims reporting problems with the NO-BURST Braided Lines, customer complaints, and its own internal and external testing, and still failed to repair, replace or retrofit its Braided Lines to ensure that they were free of material defects or component malfunctions as Fluidmaster promised.

395.     As a direct and proximate result of Fluidmaster's breach of its express warranties, Plaintiff Naef and the Alabama Class members have incurred damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief, individually and on behalf of the Class:

a.     an Order certifying the Class and appointing Plaintiffs as the Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.     an award for equitable and injunctive relief enjoining Fluidmaster from continuing to pursue the policies, acts and practices described in this Complaint;

c.     an award of damages and enhanced damages under statutory and common law as alleged in this Complaint, in an amount to be determined at trial;

d.     an award of pre-judgment and post-judgment interest at the maximum rate allowable by law;

e.     an award of reasonable attorneys' fees and reimbursement of costs incurred by Plaintiffs and Plaintiffs' counsel in connection with this action; and

f.     such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims set forth above.

Dated: July 24, 2014                    Respectfully submitted,

                              By:     /s/ Edward A. Wallace
                                    Edward A. Wallace
                                    Amy E. Keller
                                    **WEXLER  WALLACE LLP**
                                    55 West Monroe Street, Suite 3300
                                    Chicago, Illinois 60603
                                    312-346-2222 Telephone
                                    312-346-0022 Facsimile
                                    Email: eaw@wexlerwallace.com
                                           aek@wexlerwallace.com

Gregory F. Coleman
Lisa A. White
**GREG COLEMAN LAW PC**
Bank of America Center
550 Main Avenue, Suite 600
Knoxville, TN 37902
T: (865) 247-0080
F: (865) 522-0049
E: greg@gregcolemanlaw.com
    lisa@gregcolemanlaw.com


Shanon J. Carson
Lawrence Deutsch
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: scarson@bm.net
        ldeutsch@bm.net

*Attorneys for Plaintiffs and the Putative
Classes*