# EXHIBIT 73

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **IN RE: FLUIDMASTER, INC., WATER CONNECTOR COMPONENTS PRODUCTS LIABILITY LITIGATION** | MDL No. 2575 |
| | Honorable Robert M. Dow, Jr. |
| This Document Relates to: | |
| *Rensel, et al., v. Fluidmaster, Inc.,* Case No. 14-cv-000648; | |
| *Sullivan, et al., v. Fluidmaster, Inc.,* Case No. 1:14-cv-05696; | |
| *Hardwick v. Fluidmaster, Inc.,* Case No. 1:14-cv-00363; | |
| *Hungerman, et al. v. Fluidmaster, Inc.,* Case No. 2:14-cv-00994; | |
| *Wyble v. Fluidmaster, Inc.,* Case No. 14-cv-01826; | |
| *Larson v. Fluidmaster, Inc.,* Case No. 1:14-cv-10222 and | |
| *Smith v. Fluidmaster, Inc.,* Case No. 8:15-cv-02173 (C.D. Cal.). | |

**PLAINTIFFS' PROPOSED TRIAL MANAGEMENT PLAN
IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

Plaintiffs propose the following preliminary Trial Management Plan ("Plan")[1] to demonstrate the ease with which the "class claims, issues or defenses" may be manageably tried to a jury for final resolution of the defect allegations regarding Fluidmaster, Inc.'s ("FM") No-Burst Water Supply Lines ("No-Burst Lines").[2] FM admits uniformity in the design of the No-Burst Lines for which it continues to confront thousands of "claims based on the same product defect" as those sought to be resolved through this Plan. The No-Burst Lines present two clear and precise defects: (i) the knowing selection of a rubber material (Santoprene or EPDM) incapable of withstanding normal household water pressure after the stainless steel corrodes due to routine exposure to chlorine; and (ii) the Toilet Connector's acetal coupling nut designed with sharp corners at the base of its internal thread root leading to creep rupture when installed. All legal theories for these claims are dependent on a finding the No-Burst Lines are defective, and FM contends its "central" defense to these claims is that over 99.9+% of the parts at issue have not failed. These two defect allegations, along with FM's central affirmative defense, is ripe for resolution by a jury here in "one-stroke" as common issues predominate.

As set forth in detail herein, a trial of such an action would present no significant management difficulties, and could be easily accomplished by this Court in a manner that will ensure that all relevant issues are adequately litigated, while protecting the rights of all involved

---

[1] Although a trial plan is not required for class certification, *Gillespie v. Equifax Info. Servs., LLC*, No. ___, 2008 U.S. Dist. LEXIS 82483, *26 (N.D. Ill. Oct. 15, 2008), *Murry v. Am.'s Mortg. Banc, Inc.*, Nos. 03 C 5811, 03 C 6186, 2006 U.S. Dist. LEXIS 42900, at *17 (N.D. Ill. June 5, 2006), Plaintiffs put forth the following plan that will efficiently resolve common issues, and demonstrate to the Court that the proposed class action is manageable. *See* Fed. R. Civ. P. 23(b)(3)(D); Advisory Committee Notes, 2003 Amendments.

[2] "No-Burst Water Supply Lines" is defined as a Toilet Supply Line with an Acetal Coupling Nut; or any of the following connectors with a Santoprene or EPDM inner lining: Braided Stainless Steel Toilet Supply Line; Braided Stainless Steel Faucet Connector; Braided Stainless Steel Dishwasher Connector; Braided Stainless Steel Ice Maker Connector; Braided Stainless Steel Washing Machine Connector; and Braided Stainless Steel Water Heater Connector.

parties consistent with Fed. R. Civ. P. 23, the Class Action Fairness Act ("CAFA"), and the Due Process Clause of the United States Constitution.

This Trial Plain provides a roadmap to aid the Court in assessing how a single trial can be conducted related to the defects in the No-Burst Lines.

## CLASSES AND CLAIMS

Plaintiff seeks application of California law, the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.* to the following nationwide class pursuant to Rule 23(b)(3):

> All persons who purchased or leased a No-Burst Line, not for resale, or sustained damage from the failure of a No-Burst Line, between April 24, 2011, and the date of certification.

Additionally, Plaintiffs propose certifying the following State Subclasses:[3]

> 1. Pursuant to Rule 23(b)(3), breach of warranty on behalf of all persons who purchased or acquired a No-Burst Line, or sustained damage from the failure of a No-Burst Line, between April 24, 2004, and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, and Tennessee.[4]

Plaintiffs propose the following as class representatives of the Rule 23(b)(3) breach of warranty State Subclasses: Jeff Hungerman – Pennsylvania, John Naef – Alabama, Brian Kirsch – Vermont, Steve Larson – Minnesota, Steven Rensel / Rocky Wyble – Arizona, Karen Rhyne – Tennessee.

> 2. Pursuant to Rule 23(c)(4), negligence on behalf of all persons who sustained damage from the failure of a No-Burst Line, between April 24, 2012 [or applicable statute of limitation], and the date of certification in Pennsylvania,

---

[3] The Seventh Circuit has offered strong guidance in this situation concerning the creation of subclasses by the district judge under Rule 23(b)(3) concerning state warranty laws. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 802 (7th Cir. 2013) cert denied 2014 U.S. LEXIS 1507 (Feb. 24, 2014). Any potential manageability problems presented by proximate cause or damage for Plaintiffs' negligence and strict liability claims are alleviated through certification of particular liability issues pursuant to Rule 23(c)(4).

[4] Plain tiff Karen Rhyne's theory of liability will be based on the implied warranty of merchantability as explained herein.

    Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California and New Hampshire.[5]

3. Pursuant to Rule 23(c)(4), strict liability on behalf of all persons who sustained damage from the failure of a No-Burst Line, between April 24, 2012 [or applicable statute of limitation], and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California and New Hampshire.[6]

The proposed class representatives of the Rule 23(b)(3) breach of warranty State Subclasses are also proposed as class representative for the negligence and strict liability Rule 23(c)(4) State Subclasses for particular issues. Plaintiffs additionally propose the following class representatives for the Rule 23(c)(4) State Subclasses for particular issues: Jared Sanborn – Pennsylvania, Bruce Elder – Maine, Pat Sullivan – Illinois, Bryant Hardwick – New Hampshire, Steve Ellefson – North Dakota, Kevin Smith – California, Mark Eisen – Georgia.

Plaintiffs propose the following issues for certification to establish liability for the State Subclasses pursuant to Rule 23(c)(4):

- **Issue One**. Whether the No-Burst Water Supply Lines are defective because of the flaws in the design of the acetal coupling nut, including the material selection of acetal combined with its sharp corners in the thread root.

- **Issue Two:** Whether the No-Burst Water Supply Lines are defective because the design of the acetal coupling nut is susceptible to creep rupture that results in the circumferential fracture.

- **Issue Three:** Whether the No-Burst Lines are defective because the design of the acetal coupling nut cannot withstand 12 ft-lbs of installation torque without the onset of creep.

---

[5] Each of these states have a 2 year statute of limitations on negligence claims, except for the following: (i) Maine (Maine Rev. Stat. Title 14, Ch. 205, § 752) and North Dakota (N.D. Cent. Code Sec. 28-01-16, 2) where the limitations period goes back 6 years; New Hampshire (N.H. Rev. Stat. § 508.4) and Vermont (Vt. Stat. Ann. Title 12, § 512) where the limitations period goes back 3 years; and Tennessee (Tenn. Code. Ann. § 28-3-104) where the limitations period goes back 1 year. Given the liability only certification pursuant to Rule 23(c)(4) sought for these State Subclasses, no manageability concern arise from the disparity in limitations period.

[6] *See* fn 5 above.

- **Issue Four:** Whether Fluidmaster is barred from asserting an affirmative defense to any claim from an acetal coupling nut failure based on "over tightening" because the coupling nut cannot withstand the 12 ft-lbs of installation torque.

- **Issue Five:** Whether Fluidmaster possessed knowledge of the defect in workmanship and material of the acetal coupling no later than 2003; and therefore, all warranty periods are tolled as of that date.

- **Issue Six:** Whether the No-Burst Lines are defective because of the flaws in the design of the lines, including the material selection of EPDM rubber or Santoprene for the inner hose body in combination with a braided stainless steel sheath that can corrode when exposed to chlorine and chlorides.

- **Issue Seven**: Whether Fluidmaster possessed knowledge of the defect in workmanship and material of the No-Burst Lines designed with an EPDM rubber or Santoprene inner hose as of no later than 1998; and therefore, all warranty periods are tolled as of that date.

- **Issue Eight:** Whether the No-Burst Water Lines were expected to and did reach the user or consumer without substantial change in the condition in which it was sold.

- **Issue Nine:** Whether the No-Burst Lines performed as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner

- **Issue Ten:** Whether on balance the benefits of the No-Burst Lines as designed outweigh the risks of danger inherent in the design.

- **Issue Eleven**: Whether the No-Burst Lines were dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics.

- **Issue Twelve:** Whether Fluidmaster had a duty to warn of the design defects inherent in the No-Burst Lines.

- **Issue Thirteen:** Whether Fluidmaster breach its duty to warn of the design defects inherent in the No-Burst Lines.

- **Issue Fourteen:** Whether the affirmative answer to any (or all) of the Issues above, renders Fluidmaster strictly liable for damages proximately caused by the failure of the No-Burst Lines for members of the State Sub-Classes.

- **Issue Fifteen:** Whether the affirmative answer to any (or all) of the Issues above, renders Fluidmaster negligent and liable for damages caused by the failure of the No-Burst Lines for members of the State Sub-Classes.

- **Issue Sixteen:** Whether the affirmative answer to any (or all) of the Issues above, constitutes a breach of the express warranty provided by Fluidmaster to members of the State Sub-Classes.

- **Issue Seventeen:** Whether the affirmative answer to any (or all) of the Issues above, constitutes a breach of the implied warranties provided by Fluidmaster to members of the State Sub-classes.

## COMMON EVIDENCE

There is a single, central, common issue of liability: whether the FM No-Burst Lines are defective. Two separate defects are alleged, hose body and coupling nut, and liability under the CLRA, breach of warranties, negligence or strict liability will be established against FM should a jury determine either defect existed in the No-Burst Lines.

The FM witnesses who will testify at trial live or through videotaped deposition are the same for both defects because each witness is knowledgeable about the No-Burst Lines. These witnesses include, at a minimum: Michael Morgan (Senior Manager – Global Risk Management for FM), Chris Coppock (Senior Engineer), Steve Maple (Former Vice President of Engineering); and Kent Goessling (Former Engineer). These same witnesses are among the witnesses FM will rely upon to challenge the alleged defects. Each of these witnesses will testify about the design of the No-Burst Line and FM's experiences and knowledge about the alleged defects with the hose body and coupling nut. These witnesses will discuss the warranty terms, claims experiences and risk management assessments that did, and did not, occur internally at FM. The factual evidence surrounding the defect claims asserted by the proposed Classes and FM's affirmative defenses to those claims is common.

While the expert testimony is common, it naturally has two themes because of the two defects alleged.

A. Hose Body. To testify about the defects in the hose body, Plaintiffs will likely call as experts Timothy A. Osswald, Ph.D. and David P. Pope, Ph.D. Dr. Pope will testify as to the material properties of the braided stainless steel and offer opinions concerning its propensity to fail when exposed to chlorine and chlorides. Dr. Osswald will testify as to the material

properties of the rubber tubing FM used, Santoprene and EPDM, while offering opinions as to its inability to withstand water pressure of a normal home without reinforcement.

   B. Coupling Nut. To testify about the defects in the coupling nut, Plaintiffs will likely call as experts: David O. Kazmer, Ph.D., Michael Bak, Ph.D., Timothy A. Osswald, Ph.D., and Walter J. Fallows. Dr. Kazmer will provide testimony about plastic design, structural analysis and process control when manufacturing with plastics while offering his opinions as to the design of the FM coupling nut on the No-Burst Lines. Dr. Bak is an expert in finite element theory and has performed a finite element analysis and prediction on the FM coupling nut revealing the failures of its design once a load in applied during installation and the impact of that stress on the coupling nut itself. Dr. Osswald will testify about the material properties of the types of acetal FM chose to use when manufacturing the coupling nut and the rubber used in the washer, showing their inability to support application in the design for the coupling nut. Mr. Fallows performed a root cause analysis on each of the Plaintiffs' coupling nut and will offer his opinions that the cause of the signature circumferential fracture present in the FM coupling nut failures is creep.

   C. Damages. To prove pecuniary damages, Plaintiffs will submit the expert opinions of Melissa Pittaoulis, Ph.D., and Frank Bernatowicz. Dr. Pittaoulis shall testify that her conjoint study provides a way to estimate the increase (or decrease) in value associated with FM's representations that its No-Burst Lines will be covered by a 10-year warranty, and that they will not burst. The results of Dr. Pittaoulis's analysis will then be used by Plaintiffs' economist, Frank Bernatowicz, to determine each individual class member's damages via the use of a common formula. Beyond these damages, where the No-Burst Lines failed, the damages for the

proposed Rule 23(b)(3) classes include the damages caused by the failure. The calculation of these damages is a ministerial calculation.

While FM will challenge some or all of these experts on their opinions, those challenges again relate to the common design applicable to the classes. Furthermore, FM has made clear in discovery that its central affirmative defense to Plaintiffs' defect claims is "that over 99.9+% of the parts at issue have not failed." Although stated as a factual matter in response to interrogatories, such an analysis must be offered by an expert using supporting data. But, again, this expert testimony is common evidence to the classes contemplated in the Plan.

## THE TRIAL

The single product at issue in the proposed classes is the No-Burst Lines, including *both* the hose body and coupling nut defect allegations. This Plan contemplates a single trial of all claims on liability and damages for violations of the Consumer Legal Remedies Act, Cal. Civil code § 1780, *et seq.* ("CLRA"), and breaches of warranty (Phase I), followed by a claims processing phase whereby damages are allocated to individual Class members either by formula or special master (Phase II). Specifically, in Phase I, evidence of liability and damages common to all Class members will be presented to the jury.[7]

The common evidence presented in Plaintiffs' case-in-chief will drive the liability conclusions for the proposed classes and claims in one-stroke, including::

> For the coupling nut: (1) Whether FM's choice of plastic material for the coupling nut was improper; (2) Whether FM's coupling nut design includes sharp indentations concentrating stress; (3) Whether FM's coupling nut design accounted for creep and creep rupture; (4) Whether FM's labels and warnings regarding "over tightening" the coupling nut were adequate; (5) Whether "over tightening" the coupling nut was reasonably foreseeable requiring FM to apply an adequate safety factor and account for it in the design; and (6) Whether FM fraudulently concealed the defect.

---

[7] *See* Fed. R. Civ. P. 52.

For the hose body: (1) Whether FM's selection of Santroprene and EPDM for the No-Burst connectors inner lining was improper; (2) Whether type 300 stainless steel knowingly corrodes when placed near household cleaners; (3) Whether FM knew its No-Burst lines would corrode; and (4) Whether FM's warnings regarding corrosion were adequate; and (5) Whether FM fraudulently concealed the defect.

As it relates to the nationwide class pursuant to the CLRA, these questions go to the heart of the elements of that claim that Plaintiffs must prove: Fluidmaster engaged in a transaction intended to result or which resulted in the sale or lease of goods or services through unfair or deceptive acts or practices, in violation of the CLRA; and, as a result, Plaintiffs suffered damage. *See* Cal. Civ. Code §§ 1750, 1761, 1770, 1780. Similarly, the proof will go toward showing that Plaintiffs have demonstrated the existence of an express warranty (or implied in Tennessee) that FM breached by selling the defective No-Burst Lines, which resulted in damage to the State Subclasses under the parameters of state law.

Additionally, under theories of negligence and strict liability, jury findings as to the particular issues certified pursuant to Rule 23(c)(4) will resolve the liability questions under these theories of liability for all time. Because these failures continue to occur on a regular basis, including over 1,100 new claims reported to FM between August 2014 and March 2016 for coupling nut failures alone, adjudication of liability on this common evidence will prove to efficiently resolve the future claims as to the defective No-Burst Lines.

Plaintiffs have also proposed a methodology for the computation of damages at Phase I[8]—as detailed in the attached expert reports of Dr. Melissa Pittaoulis and Frank Bernatowicz.

---

[8] Although the damages methodology is straightforward and easy to apply on a classwide basis, the Seventh Circuit has noted that "If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

As it relates to damages pursuant to the CLRA, Mr. Bernatowicz's formula properly measures the difference between what each class member paid for, and what each class member received.[9]

The trier of fact will consider such evidence as it relates to claims decided, and the Court will address the award of damages either on an aggregate class basis or for each class member. The Court will then be asked to direct entry of a final judgment reflecting the results of the trial. Plaintiffs anticipate that Phase I of the trial will require approximately 8 full trial days.

After concluding the Phase I trial, the Plan recommends a Phase II allocation proceeding. This allocation proceeding would process the distribution of individual damages based upon the formula for CLRA and warranty-based damages, and complete the calculation necessary for the determination of class member damage for No-Burst Lines that failed. The Plan recommends this Phase II be handled through the appointment of a Special Master with experience in adjusting insurance claims pursuant to Rule 53. With the jury finding of liability, no consent pursuant to Rule 53(a)(1)(B) is required and the Special Master may also address any issues of proximate cause or damages for the State Subclasses under negligence or strict liability theories certified pursuant to Rule 23(c)(4).[10] It is common for courts to have follow-on proceedings

---

[9] *Wiener v. Dannon Co.*, 255 F.R.D. 658, 670 (C.D. Cal. 2009) ("the Court has 'very broad' discretion to determine an appropriate remedy award as long as it is supported by the evidence and is consistent with the purpose of restoring the plaintiff to the amount that the defendant wrongfully acquired"); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 558 (S.D. Cal. 2012); *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663 (Cal. Ct. App. 2006) (an award of the "difference between the actual value of that with which the defrauded person parted and the actual value of that which he received"). The breach of warranty analysis properly focuses on the loss of the benefit of each class member's bargain. *Wiener*, 255 F.R.D. at 670 ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted.") (citation omitted).

[10] *See United States v. City of New York*, 847 F. Supp. 2d 395, 432 n.14 (E.D.N.Y. 2012).

regarding allocation and/or individual damages claims, or "prove up" proceedings, which can also be handled by a claims administrator.[11]

## AMENDMENT OF PLAN

Plaintiffs' proposed Plan is preliminary, and may be amended in accordance with the needs of the case as discovery develops, and in light of any changes in the law, reports from experts, and other orders from the Court.

---

[11] *See, e.g., In re Polyurethane Foam Antitrust Litigation*, 10 MD 2196, 2015 U.S. Dist. LEXIS 94785, at *24 (N.D. Ohio July 21, 2015) ("Allocating damages to each plaintiff will not require 'mini-trials;' rather, it will require a claims administration process where each plaintiff will have to substantiate their claim with evidence that they purchased a product containing foam manufactured by a Defendant."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 181 (S.D.N.Y. 2008) ("Although the damages, if any, owed to each individual class plaintiff who succeeds on his or her claims will vary, that fact does not defeat certification if the method of calculating damages is common to the class.")