**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: FLUIDMASTER, INC., WATER | ) | Case No. 14-cv-5696 |
| CONNECTOR COMPONENTS PRODUCTS | ) | MDL No. 2575 |
| LIABILITY LITIGATION | ) | Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' motions to exclude Defendant's experts [378; 379; 381; 382; 384; 387; 390], Plaintiffs' motion to strike declarations submitted by two of Defendant's experts [446], Defendant's motions to exclude Plaintiffs' experts [334; 336; 337; 339], and Plaintiffs' motion for class certification [284; 286]. For the reasons set forth below, Plaintiffs' motions to exclude Defendant's experts [378; 379; 381; 382; 384; 387; 390] are granted in part and denied in part, Plaintiffs' motion to strike [446] is granted in part and denied in part, Defendant's motions to exclude Plaintiffs' experts [334; 336; 337; 339] are granted in part and denied in part, and Plaintiffs' motion for class certification [284; 286] is denied. The Courtroom Deputy will contact the parties to arrange a mutually agreeable time for the next status hearing before Judge Dow and Magistrate Judge Gilbert, at which time the parties may raise any issues regarding discovery, motions for reconsideration, and future motion practice before either of the assigned judges.

## I.      Background

This MDL is about a plumbing product. Defendant Fluidmaster, Inc., a California company, manufactures and designs water supply lines or "connectors" used to transport water from a supply pipe to a plumbing fixture like a toilet or a kitchen sink faucet. The product at issue here consists of a flexible inner tubing made of EPDM or Santoprene (types of polymers or rubbers), an outer braided wire made of stainless steel, and a coupling nut used to connect the

supply line to a plumbing fixture. For a period of time, Defendant's toilet connector used a coupling nut made of acetal (a kind of plastic). Its other connectors use a metal coupling nut. Defendant's connector sells for about $10, and Defendant has sold more than 153 million water connectors since the 1980s.

Plaintiffs allege that Defendant's product has two design defects. First, the toilet connector's acetal coupling nut contains a notch or sharp indentation, which is a focal point for any stress that builds on the coupling nut over time. According to Plaintiffs, Defendant's design causes thin cracks known as "crazing" to form on the coupling nut. As the crazing spreads over time, the coupling nut can fail—a process known as "creep rupture." Defendant contends that the vast majority of coupling nut failures result from the improper use of a wrench or similar tool during the toilet connector's installation, which "overtightens" and places excessive stress on the coupling nut, eventually causing the connector's failure.

Second, Plaintiffs argue that the hose body comprised of a stainless steel braid plus inner tubing was defectively designed. According to Plaintiffs, the inner tubing is insufficient to withstand ordinary water pressure, which is why Defendant relies on the stainless steel braid. However, the stainless steel is thin and can degrade in the presence of chlorine. Chlorine is common in many household products. Thus, although Defendant labels its product "NO BURST," Plaintiffs contend that the hose body bursts because of the insufficient strength of the inner hose body and the propensity for the braided sheath to corrode. Defendant responds that the vast majority of hose failures occur because of improper exposure to corrosive materials, either because homeowners fail to properly close their cleaning products stored under their sinks or because they improperly clean their hoses with chlorine-containing products.

The Plaintiffs here are people who experienced property damage after Defendant's connector failed, people who did not experience any failure of Defendant's product, and subrogated insurers. Most of the Plaintiffs did not personally buy Defendant's product. Some bought a home with Defendant's product already installed. Some relied on a plumber to choose which connector to buy. At least one relied on her friend to purchase Defendant's connector. Some, however, purchased and installed Defendant's product on their own.

Plaintiffs filed a motion for class certification [284; 286], seeking to certify a nationwide class and various state law subclasses related to these two alleged design defects. Plaintiffs seek a nationwide class under California's Consumers Legal Remedies Act ("CLRA"), which prohibits "unfair methods of competition and unfair or deceptive acts or practices" in transactions for the sale or lease of goods to consumers. Cal. Civ. Code § 1770(a). They also seek six state law subclasses for breach of warranty claims (Pennsylvania, Vermont, Alabama, Minnesota, Arizona, and Tennessee) as well as eleven state law issue subclasses for negligence and strict liability claims (Pennsylvania, Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California, and New Hampshire) involving seventeen issues. In response to this class certification motion, Defendant filed two motions to exclude Plaintiffs' experts. Plaintiffs returned the favor by filing five motions of their own plus a motion to strike. The Court held a four-hour oral argument on all of the pending motions on February 22, 2017.

## II.    Legal Standard

### A.    *Daubert*

Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. See *Gayton v. McCoy*,

593 F.3d 610, 616 (7th Cir. 2010).[1]  Rule 702 permits the admission of expert opinion testimony

if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand

the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

Trial courts are "tasked with determining whether a given expert is qualified to testify in

the case in question."  *Gayton*, 593 F.3d at 616.  "Whether a witness is qualified as an expert can

only be determined by comparing the area in which the witness has superior knowledge, skill,

experience, or education with the subject matter of the witness's testimony."  *Carroll v. Otis*

*Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).  "[A] court should consider a proposed expert's

full range of practical experience as well as academic or technical training when determining

whether that expert is qualified to render an opinion in a given area."  *Smith v. Ford Motor Co.*,

215 F.3d 713, 718 (7th Cir. 2000).

Trial courts are also obligated to act as gatekeepers to ensure that the expert testimony is

both relevant and reliable.  See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49

(1999); *Daubert*, 509 U.S. at 589.  To establish relevance, the proponent must show that the

expert's "reasoning or methodology properly can be applied to the facts in issue," and "the

testimony will assist the trier of fact with its analysis of any of the issues involved in the case."

*Daubert*, 509 U.S. at 593; *Smith*, 215 F.3d at 718; Fed. R. Evid. 702.

To establish reliability, the proponent must show that the expert's testimony is based on

"sufficient facts or data," that it is "the product of reliable principles and methods," and that

those methods have been "reliably applied * * * to the facts of the case."  Fed. R. Evid. 702.

District courts have "latitude in determining not only how to measure the reliability of the

---

[1] Seventh Circuit precedent on *Daubert* governs here.  See *McMasters v. United States*, 260 F.3d 814, 819 (7th Cir. 2001) (holding that, with respect to cases transferred under 28 U.S.C. § 1404(a), "the transferee court is usually 'free to decide [federal issues] in the manner it views as correct without deferring to the interpretation of the transferor circuit'" (citation omitted)).  Just like the Federal Rules of Civil Procedure, the Federal Rules of Evidence were "not intended to be geographically non-uniform."  *Id.*

proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton*, 593 F.3d at 616. *Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. "[T]he test of reliability is flexible," however, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation marks omitted). The overriding purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152). Expert testimony may not be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). And "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

Thus, in evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the Court considers whether the proffered expert (1) is qualified, (2) has employed a reliable methodology, (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications, and (4) presents testimony on a matter that is relevant to the case at hand. See *Kumho Tire*, 526 U.S. at 151–53; *Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 589–93; *Walker v. Soo Line R. R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## B.     Federal Rule of Civil Procedure 23

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and one of the three alternative requirements in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).   Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if:  (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).  "[A] proposed class must always meet the Rule 23(a) requirements."  *Messner*, 669 F.3d at 811.  "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily we * * * begin there and only turn our attention to Rule 23(b) after we [are] certain that all of Rule 23(a)'s requirements ha[ve] been met."  *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

When certification is sought under Rule 23(b)(3), as it is here, the proponents of the class must also show that:  (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the controversy ("superiority").  *Messner*, 669 F.3d at 811.  Moreover, the class must also meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that the class is "defined clearly and based on objective criteria."  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).[2]

---

[2] The circuits have split over the correct legal standard for ascertainability.  See *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) (summarizing the current landscape as the First, Second, Third, and Fourth Circuits require a showing of "administrative feasibility" to satisfy ascertainability while the Sixth, Seventh, Eighth, and Ninth Circuits do not).

Plaintiffs bear the burden of proving that they are entitled to class certification. *Messner*, 669 F.3d at 811. Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *id.*, the Court does not presume that all well-pleaded allegations are true for purposes of deciding the certification question. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001). Rather, before the Court allows a case to proceed as a class action, it "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811. The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. See *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

## III. Analysis

Both parties have filed several *Daubert* motions in connection with Plaintiffs' motion for class certification.[3] "[A] district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification," including *Daubert* motions. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010). Here, Plaintiffs have moved to exclude Scott Meek, Dr. Sanjay K. Rao, Dale Edwards, Dr. Vijay Gupta, and Brian Palmer, Ph.D. Defendant has moved to exclude five of Plaintiffs' technical experts and two of their experts who opine on issues related to damages. The Court begins with Plaintiffs' motions.

---

[3] Portions of nearly all of these motions and their appendices were filed under seal. Both parties agreed that this Court could freely quote their contents without requiring this opinion to be redacted or placed under seal.

### A. Plaintiffs' *Daubert* Motions

#### 1. Scott Meek

Defendant retained Scott Meek to opine on the technical design of the coupling nut, whether that design is defective, and the stresses that could cause the coupling nut to fail. Meek holds a Bachelor of Science in Mechanical Engineering and a Bachelor of Arts in Materials Science. He is one of the owners of Forensic Engineering Consultants, which performs failure analyses in the field of mechanical engineering and material sciences. [386-1, at 3.] Meek has served as a consultant performing failure analyses of various products for the last 40 years, the last fifteen of which "have largely involved analyzing failures in connection with the plumbing industry." [339-15, at 3.] In that capacity, he has "evaluated hundreds of plumbing component failures on behalf of the plumbing industry and over two thousand plumbing component failures on behalf of the insurance industry." *Id.* He is a Registered Professional Engineer with the State of Texas and a member of the Society of Plastics Engineers.

Despite this extensive, highly specialized experience, Plaintiffs argue that Meek lacks the "specialized knowledge" needed to assist the jury for two reasons. [385, at 3.] First, Plaintiffs argue that Meek is "not an expert in the field of elastomers"—that is, polymers with elastic properties such as rubber. This argument rests on a single exchange from Meek's deposition:

> Q: Do you consider yourself an expert on elastomers?
>
> A: Probably not elastomers per se because I haven't done much failure analysis with those.

[386-1, at 32:8–12.] Because Meek's opinions are premised in part on the interactions between Defendant's cone washer (made of an elastomer) and its coupling nut, Plaintiffs contend that Meek's lack of qualifications precludes him from offering his opinions. Second, Plaintiffs argue that Meek cannot opine on plastic design because he lacks "formal education in plastics design,"

"has never taken any college level classes in plastic design," "has never designed a plastic part himself," and has never published on plastic design. [386, at 5.] Plaintiffs seek to exclude "any opinion in his report related to the design or failure of [Defendant's] coupling nut." *Id.*

These qualifications challenges are without merit. Plaintiffs do not question Meek's qualifications as an expert in the broader field of material sciences, which encompasses polymers like elastomers. Their only argument is that he is not "an expert in the more specialized field of elastomers"—a "subset" of material sciences. [432, at 3.] "Ordinarily, courts impose no requirement that an expert be a specialist in a given field." *Gayton*, 593 F.3d at 618 (citation omitted). "The fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016).

Here, Defendant does not offer Meek as an "elastomers expert" and Plaintiffs never explain why specialization in the component parts underlying Meek's failure analysis is necessary to admit his opinions. In other words, apart from this single deposition answer, Plaintiffs offer no reason to believe that Meek's relevant education and four decades of experience with material sciences and mechanical engineering would not qualify him to opine on a particular application of that education and experience to the facts of this case. Meek's unwillingness to accept Plaintiffs' framing and reluctance to describe himself as an expert in elastomers "per se" despite his extensive relevant experience with plastics and polymers is fodder for cross-examination, not a basis for exclusion under Rule 702.[4]

---

[4] Meek's directly relevant experience with plastics and polymers distinguishes him from the experts excluded in the cases cited by Plaintiffs. See *Ancho v. Pentek Corp.*, 157 F.3d 512, 517 (7th Cir. 1998) (affirming exclusion of "mechanical engineer" who was "without any experience in the field of architectural design relating to plants of this nature" or "familiar[ity] with the operation of this type of [machine]"); *Wintz, By & Through Wintz v. Northrop Corp.*, 1995 WL 758114, at *3 (N.D. Ill. Dec. 22, 1995) (concluding that toxicologist who lacked qualifications to offer a medical causation opinion after he

The same is true regarding Meek's qualifications to offer design opinions. In evaluating his qualifications under *Daubert*, this Court must "consider [Meek's] *full range* of experience and training." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (emphasis added). Yet, Plaintiffs' motion largely consists of asking this Court to focus narrowly on one alleged gap in Meek's resume and ignore the rest of his experience. For example, Plaintiffs assert that Meek lacks a "formal education in plastics design," but omit any of discussion of the fact that his "formal education in material science * * * encompasses plastics," "much of his college level [training] dealt with design, engineering and material science," and he has attended "probably 20 seminars" since college involving plastics, some of which addressed design. [386-2, at 125:24–128:1.] Likewise, Plaintiffs stress that Meek "has never designed a plastic part himself" [385, at 5], but never grapple with the fact that Meek spent the last forty years analyzing the failure of products he did not personally design. While Plaintiffs dismiss as "conclusory" the claim that "assessing the conditions under which products fail inherently involves analysis of their design" [432, at 5; 415, at 13], Plaintiffs do not explain why that intuitively obvious statement is wrong. Moreover, Meek testified that his mechanical engineering and plastics background qualify him to opine on issues connected to plastic design. [See 386-1, at 31:4–13.] That Plaintiffs elicited this answer but chose not to explore his claim any further does not render this testimony "conclusory." It makes it unrebutted.

An expert may be qualified based on experience alone. See *Trustees of Chi. Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates

admitted he was not expert in bromides, birth defects, or the specific genetic disorder at issue, had not "dealt extensively with bromide exposure throughout his career," and his testifying experience was largely from drunk driving cases).

the admission of testimony by experts whose knowledge is based on experience." (citations and quotation marks omitted)). And "[t]he notion that [*Daubert*] requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Meek's opinions regarding the reasons for the coupling nut's failure (misuse rather than design) appear to be well within the scope of his forty years of experience working in failure analysis, material sciences, and mechanical engineering. Plaintiffs' bare assertion that Meek cannot opine on design-related issues without possessing specialized design-related formal education and particularized experience "designing plastic parts for manufacture" [386, at 5] is inconsistent with the requirements of Rule 702 and *Daubert*. Plaintiffs fail to explain why the experience that Meek actually possesses is insufficient to qualify him to offer his opinions, and that failure dooms their *Daubert* challenge.

Plaintiffs' motion to exclude Meek's opinions and testimony [385] is denied.

## 2. Dr. Sanjay K. Rao

Defendant retained Dr. Sanjay K. Rao to assess the efficacy of Plaintiffs' proposed conjoint survey sampling plan and design, which would be used to calculate classwide damages. Conjoint analysis is a statistical technique used to determine how consumers value the different individual attributes of a product. See *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014). Dr. Rao is a Vice President in Life Sciences at the consulting firm Charles River Associates and oversees the practice group's strategic marketing research, including survey modeling, design, and execution. He received his Ph.D. in Marketing from the Wharton School of the University of Pennsylvania, and his doctoral dissertation was titled, "An Empirical Appraisal of Conjoint Choice Simulators," which "studied alternative methods for

simulating consumer choices and market shares from their evaluations of product features and concepts."  [334-7, ¶ 2.]

Plaintiffs do not challenge Dr. Rao's qualifications.  Instead, they raise two objections to the substance of Dr. Rao's opinions.  First, they argue that his report is "replete" with "*ipse dixit* conclusions."  [380, at 2.]  Here is one example of what Plaintiffs characterize as *ipse dixit*:

> Factors such as advertising, product availability in a store, the type and amount of shelf space given to it, in-store price discounting and product promotions have an impact in influencing product choice at the actual point of purchase.  Such factors are especially important to consider when a product is not directly sold to a customer by the manufacturer, but finds its way to him/her through a distribution network comprising of wholesalers and retailers, who also engage in valid marketing practices including, but not limited to, price mark ups, discounting and non-price promotional programs.  These factors become so much more important in influencing customer choice at the store when the product category contains several competing brands all vying for the same customer's choice.  The more differentiated a product is perceived to be relative to its competition, for example, the lower the role of product price (compared to competitors) in influencing product choice.

[334-7, ¶ 13.]  Second, Plaintiffs challenge Dr. Rao's statements using the phrase "common knowledge" (or some variant) as offering improper expert testimony because they "do not provide something more than what is obvious to the layperson."  [380, at 6.]  This is one of the representative examples that Plaintiffs highlight:  "It is commonly understood that conjoint analysis is a preference scaling methodology, i.e. it is designed and best utilized to understand respondent preferences for components of a product as presented to them through concise and realistic descriptions in a research setting."  [334-7, ¶ 13.]  Plaintiffs argue that Dr. Rao "does not explain how he knows this information to be 'common knowledge,'" and that this "common knowledge" is really his own knowledge.  [380, at 4.]

As both examples show, Plaintiffs' arguments miss the mark by a wide margin.  In an *ipse dixit* opinion, the expert asserts a "bottom line" conclusion, but lacks any articulable facts to substantiate that conclusion or completely fails to explain the reasoning or methods employed to

reach that conclusion.  *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) ("[Expert's] testimony that the photos met the definition of child pornography was a bare conclusion that provided nothing but the bottom line, i.e., that [defendant] possessed illegal photos.  Had [expert] provided some basis for this explanation, perhaps her testimony would have been of some use for the jury.  But she did not do so.  She, in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so.'"); *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) ("[Expert] asserts that banks just don't accelerate the principal indebtedness because of shortcomings of the kind [borrower] displayed.  Apparently we are supposed to take this on faith, because [expert] did not gather any data on the subject, survey the published literature, or do any of the other things that a genuine expert does before forming an opinion[.] * * * [A]n expert's report that does nothing to substantiate this opinion is worthless, and therefore inadmissible.").  Some *ipse dixit* opinions are merely subjective assertions that are impermeable to challenge and incapable of repetition by anyone other than the professed expert.  See, *e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) ("Asked repeatedly during his deposition what methods he *had* used to generate projections, [expert] repeatedly answered 'my expertise' or some variant ('my industry expertise', '[my] awareness,' and 'my curriculum vitae')—which is to say that he either had no method or could not describe one.").  Others are simply bare conclusions with "no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected."  *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989).  In all cases, the "gap between the data and the opinion proffered" is connected only by the expert's say-so, making it insurmountable.  *Joiner*, 522 U.S. at 146.

This bears no resemblance to Dr. Rao's opinions here. Dr. Rao amply explains the reasons he finds the proposed survey design insufficient to achieve its desired result. [334-7, ¶¶ 8–21.] In the example above, Dr. Rao articulates differences between estimating consumer behavior in retail versus research settings, such as "factors" that may be important influences on in-store purchasers, but less important when a product is not sold directly to customers. After listing these factors, Dr. Rao concludes that "[a]t no point in the [Plaintiffs' expert's] Report does [she] mention these factors, let alone discuss how she would respect their influence on the two classes of customers" in her analysis. *Id.* ¶ 13. He further critiques the groups included and excluded from the survey plan (*id.* ¶¶ 8–9, 11), the failure to disclose information related to sample size calculations (*id.* ¶ 10), gaps in how the survey will address a survey respondent's familiarity with the product or attributes (*id.* ¶¶ 14–15), the survey's omission of product attributes and failure to ensure proper measurement of trade-offs between attributes (*id.* ¶¶ 16–20), and the failure to incorporate market level data to inform the survey design (*id.* ¶ 21). In other words, Dr. Rao critiques the survey design by identifying *specific* flaws in that design and connecting those flaws to his conclusion. To assert his opinions are "devoid of analysis" [433, at 4] misapprehends the substance of Dr. Rao's report and the requirements of Rule 702.

In large part, Plaintiffs' motion appears to conflate the requirement that an expert support his or her conclusions with reasons and the concept that each sentence in an expert report should have a citation. [380, at 5 ("The majority of Dr. Rao's declaration consists of numerous statements devoid of citation or substantiation.").] Rule 702 imposes no minimum citation requirement. That principle has particular purchase here because (1) many of Dr. Rao's survey critiques can be found in the Federal Reference Manual on Scientific Evidence—a source of generally accepted principles of survey research that courts routinely rely on to evaluate expert

opinions;[5] (2) Dr. Rao's list of reliance materials cites a Journal of Choice Modeling article, which discusses many of the same conjoint analysis issues Dr. Rao raised [347-7, at 32]; (3) Dr. Rao wrote his doctoral dissertation on conjoint analysis; and (4) Plaintiffs do not argue that *any* of these "unsupported" statements is contrary to well-established survey principles. *See Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 965 (N.D. Ill. 2001). Dr. Rao's relative lack of inline citations does not make his survey design critiques "subjective" or *ipse dixit*. If Plaintiffs believe his critiques are misplaced, they can attempt to show that through cross-examination.

The same result is required for Plaintiffs' challenge to Dr. Rao's "common knowledge" statements. Even a cursory reading of these statements [see 380, at 3–4] shows that Dr. Rao uses "common" or analogous language to mean generally understood by survey design experts. [See, *e.g.*, 334-7, ¶ 13 ("It is commonly understood that the results from a conjoint analysis conducted in such a setting should not be extrapolated to the real world setting such as a retail store."); *id.* ¶ 14 ("It is intuitive and reasonable to expect that consumers participating in a survey-based exercise designed to collect raw data for conjoint analysis are familiar with product brand names and other product attributes to which they are expected to respond.").] The phrase "common knowledge" is not a talismanic incantation that, when invoked, unthinkingly mandates an expert's exclusion. Plainly, these opinions derive from Dr. Rao's specialized knowledge related to survey design and are not commonplace observations governed by Rule 701.

---

[5] See, *e.g.*, *Wintz*, 110 F.3d at 513 (citing the manual); accord *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 246 (S.D. Ill. 2015); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 2010 WL 3397358, at *5 (N.D. Ill. Aug. 24, 2010); *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 2010 WL 1687883, at *3 (N.D. Ill. Apr. 26, 2010); *DeKoven v. Plaza Assocs.*, 2009 WL 901369, at *6 (N.D. Ill. Mar. 31, 2009); *In re Fedex Ground Package Sys., Inc., Employment Practices Litig.*, 2007 WL 3027405, at *5 (N.D. Ind. Oct. 15, 2007); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003); *Nat'l Football League Properties, Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 669 (E.D. Wis. 1999).

Plaintiffs' focus on Dr. Rao's statement that, "It is common knowledge that products such as water supply lines and toilet connectors are purchased by professional plumbing specialists who are called upon by homeowners and residents to install new supply lines or connectors, or to fix damaged lines or connectors, in their places of residence" (*id.* ¶ 9) is equally misplaced. The Court does not read this prefatory statement as Dr. Rao's expert "opinion." It is a background premise to set up why Dr. Rao believes Plaintiffs' sampling plan is flawed—an opinion that turns on the application of his specialized knowledge and experience to the facts of this case.[6] This premise also appears to be undisputed, as Dr. Rao cites in his report a June 2009 survey of plumbers "actively purchasing water supply lines" that was relied on by Plaintiffs' expert. See *id.* ¶ 13 n.2. This is not an instance where the "subject matter [of Dr. Rao's opinions] *as a whole* is obvious to a lay person." *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 205 (7th Cir. 1982) (emphasis added). And this "court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension." *Hall*, 93 F.3d at 1342. Thus, the fact that some of the underlying premises of Dr. Rao's opinions may, in part, be derived from generally known facts does not remove his opinions from the "specialized knowledge" encompassed by Rule 702.

Plaintiffs' motion to exclude Dr. Rao's opinions and testimony [378; 379] is denied.

### 3. Dale Edwards, P.E.

Defendant retained Dale Edwards to analyze eight of Plaintiffs' failed water connectors, and opine on the causes of those failures. He performed a "non-destructive" examination of these connectors that included digital photography, dimensional measurements, scanning

---

[6] Plaintiffs note that plumbers are not part of the proposed class, which they argue means that some of Dr. Rao's criticisms are "invalid." [380, at 7.] Defendant responds that plumbers' willingness to pay for certain attributes is relevant for assessing the premium passed on to consumers. [417, at 15 n.5.] The persuasiveness of an expert's critiques is not a basis for exclusion. *Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

electron microscopy, and electronic dispersive x-ray spectroscopy. Edwards's original expert report describes the physical characteristics of each of the connectors and the results of his analysis, concluding that all of the connectors exhibit some corrosion from chlorine or chloride on the surfaces of the stainless steel wire braids. [339-20, at 2–9.] He opines that the failure of the connectors was "due to exposure to corrosive chlorine-containing chemicals." *Id.* at 10.

The conclusion section of his report, however, goes significantly further. Edwards also opines that (1) all of the connectors were permanently deformed from "excessive bending" that occurred during "improper installation"; (2) the corrosion on the water connectors "would have been clearly visible for months or possibly even years," which means "the majority of the failures, which are an extremely small percentage of the number of connectors in the field, could have and should have been detected by normal inspections"; (3) "[p]eople normally understand that they should exercise care for their stainless steel appliances by not subjecting them to corrosive cleaners or environments"; and (4) the faucet connectors that Edwards examined "were properly designed for their intended use and would not have failed in the manner observed if proper care had been exercised during their installation and use." *Id.* at 9–10. All of these opinions purport to be based on a "reasonable degree of scientific and engineering certainty." *Id.* at 10. Except for the third opinion, Edwards does not elaborate on these conclusions elsewhere in his report. Regarding the third point, Edwards includes the following discussion:

> It is clear that the presence of chlorine on the surfaces of the connectors was likely due to improper exposure of the connectors to corrosive chlorine-containing products that were improperly stored under the sinks where the connectors were installed. The exposure may have been due to storage of open containers that caused a corrosive atmosphere in the sink cabinet or in some cases, may have been improperly applied directly to the connectors. Improper storage or application of such corrosive chlorine-containing products to the connectors for cleaning or otherwise, would contradict common warnings and/or instructions on such products. In fact, warnings on the packaging of many of these chlorine-containing cleaning products relate to it being a corrosive material and that,

among other things, contact with metals should be limited to avoid pitting and corrosion. Exposure to these corrosive chemicals is not something that the product was designed for and a corrosive environment is one that should not be expected. Properly closed containers of cleaning products would not have caused contamination of the stainless steel connector surfaces and would not have led to the failures that occurred.

*Id.*

Edwards also submitted a rebuttal report to respond to one of Plaintiffs' experts, Dr. Tim A. Osswald. [339-21.] Edwards's rebuttal report largely attempts to qualify Dr. Osswald's conclusions by pointing out why alternative materials were not superior to the materials Defendant used or, at least, do not show that the materials that Defendant used are inadequate. Edwards also analyzes the literature relied on by Dr. Osswald, which Edwards claims actually reinforces these two points.

Plaintiffs move to exclude Edwards's opinions on two grounds. First, they claim that the "great majority" of the opinions in his original expert report "lack foundation, lack a scientific basis, and are unreliable under Rule 702." [392, at 7.] Second, they claim that Edwards's rebuttal opinions are not true rebuttal and are *ipse dixit*. *Id.* at 11–13. Defendant's response brief focuses almost entirely on Edwards's qualifications (which, other than a cursory attempt to label him as a "professional expert" (*id.* at 6–7), were not seriously questioned) and the reliability of his inspection methodology (which appears not to have been challenged at all (*id.* at 10–11)). Defendant also explains how Edwards's opinions substantively "rebut" Dr. Osswald's conclusions, such as by pointing out how Dr. Osswald's comparisons are "misleading and irrelevant from an engineering perspective." [419, at 13.] The defense of the *relevance* of Edwards's other opinions in his original report about improper installation, inspection, and chemical storage—all purportedly "based on his vast experience"—is limited to one paragraph. *Id.* at 12. Defendant makes no attempt to defend the *reliability* of these opinions.

### i.    Edwards's Original Report

The Court agrees that many of Edwards's opinions in his original expert report are unsupported and therefore unreliable. "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Here, there is a striking disconnect between the "Laboratory Investigation" section of the report and the "Conclusions" section. The investigation section includes photographs, measurements, and descriptions of the physical characteristics of the connectors as well as the chlorine measurements detected. At least three of Edwards's conclusions have no discernable link to this investigation.

First, Edwards concludes, "The faucet connectors that I examined were properly designed for their intended use and would not have failed in the manner observed if proper care had been exercised during their installation and use." [339-20, at 10 ("Conclusion 5").] Edwards's report does not say *how* he concluded that the connectors were "properly designed" or "would not have failed" had "proper care been exercised." He does not identify a method for determining a "proper" versus improper design, how he applied that method here, or even what specific facts, literature, or experience he relied on to conclude the design was proper. He does not explain how he ruled out the possibility that the connectors would still have failed even with proper care. He simply asserts this conclusion to be true without any support. Rule 702 demands more.

Second, Edwards concludes, "The majority of the failures, which are an extremely small percentage of the number of connectors in the field, could have and should have been detected by normal inspections of the connectors." *Id.* at 10 ("Conclusion 3"). Edwards analyzed *eight* connectors, not a "majority of the failures" that occurred in the field, and thus has no factual basis to conclude whether the majority "could or should have" been uncovered through

inspection. To the extent that Edwards really meant a majority of the eight connectors, this conclusion fares no better.[7] Edwards does not indicate what "normal inspections" are or how he determined what "could or should have" been uncovered by them. If this conclusion is based on Edwards's experience, he never explains "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Fed. R. Evid. 702, Advisory Committee note on 2000 Amendments.

In connection with Conclusion 3, Edwards also states that "[m]any of the failures that were examined were grossly corroded along the entire length of the connectors and this would have been clearly visible for months and possibly years before the failures occurred." [339-20, at 10.] An opinion about the degree of corrosion on the connectors that he analyzed is within the scope of his expertise and supported by the inspection, measurements, and testing that Edwards performed. Plaintiffs do not contend otherwise. However, Edwards does not explain how he can conclude that this corrosion "would have been clearly visible for months and possibly years." Without *any* support, this opinion is unreliable under Rule 702 and cannot be considered.[8] See, e.g., *Threet v. Correctional Health Care Mgmt. of Okla., Inc.*, 2009 WL 3335596, at *5 (W.D. Okla. Oct. 15, 2009) ("[I]t does not suffice for an expert to say, in effect, 'I have 30 years

---

[7] According to Plaintiffs, the only factual basis for Edwards's conclusion about what percentage of Defendant's connectors failed in the field is (1) Dr. Palmer's opinion, which is excluded as described below; and (2) a prior conversation with Defendant. [392, at 10 (citing 392-1, at 69:19–71:6).] The cited testimony also indicates that Edwards relied on his "prior knowledge" of the "failure rates or claim rates for these products." [392-1, at 70:16–21).] Defendant makes no effort to argue that Edwards has a reliable basis to offer this opinion independent of Dr. Palmer, and because Dr. Palmer cannot opine on failure rates, Edwards cannot do so either. See Fed. R. 702(b).

[8] Such an opinion, in theory, could have been based on Edwards's experience. For example, he could have opined (with factual support) that he has conducted X number of inspections, he typically examines Y features during inspections, his inspections are typical of other inspections, he has observed chlorine corrosion during those inspections, corrosion takes Z months to build up and become visible, and chlorine corrosion would be visible and detected based on the standard manner and frequency in which inspections are performed. His report offers nothing close to this level of substantiation for this opinion.

experience in the field.  So trust me, the answer is X.'  That formulation is the classic *ipse dixit* approach foreclosed by [the Supreme Court].").

Third, Edwards concludes that "[p]eople normally understand that they should exercise care for their stainless steel appliances by not subjecting them to corrosive cleaners or environments.  The same level of care should be used with any stainless steel product including stainless steel braided water supply connectors."  [339-20, at 10 ("Conclusion 4").]  Unlike Dr. Rao, Edwards advances this kind of opinion as his "conclusion."  It is not apparent how this conclusion is based on any "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702(a).  At his deposition, Edwards testified that this opinion is "based on [his] own use of stainless steel appliances," and he has "no specific data" regarding what people normally understand about such care, "other than just conversations through the years that I've had with people and seeing the instructions that come with these products."  [392-1, at 71:13–74:7.] Defendant does not argue that such undescribed hearsay conversations "through the years" with unknown people are a sufficiently reliable basis to offer expert testimony about the public's general understanding of the proper care for stainless steel appliances.  Nor does Defendant argue that Edwards, with his decades of experience and materials and forensic engineering background, is representative of what "[p]eople normally understand."  Whether his opinion is unsupported or offers nothing more than a lay opinion, it is inadmissible under Rule 702.

This is also true of Edwards's opinions about improper chemical storage, which are not listed as "Conclusions" but appear in the report's terse "Discussion" section.  As noted, Edwards concludes that "[i]t is clear that the presence of chlorine" was due to improperly stored chlorine-containing products "under the sinks where the connectors were installed," which may contradict the warnings on the products.  [339-20, at 10.]  Edwards offers *no* factual basis for this

conclusion, let alone any reason to believe this conclusion is "clear." "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort." *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010) (citation omitted). And, again, if this opinion is an inference from Edwards's experience, his report does not explain what specific experience supports his conclusions or how that experience has been reliably applied here. Such unsupported speculation falls short of the reliability required under Rule 702.[9]

This leaves only two of Edwards's opinions with a connection to his laboratory analysis: his unchallenged opinion regarding chlorine-caused corrosion on the connectors [339-20, at 10 ("Conclusion 1")] and the conclusion that the "kinking" and "excessive bending" on the connectors indicate "improper installation" (*id.* at 9–10 ("Conclusion 2")). Edwards's installation opinion, however, must fall too. His report is silent as to how he determined that the bending occurred during installation rather than at some other point in time. He does not describe any tests performed, interviews conducted, testimony reviewed, specific experience relied upon, or *any* other facts or data that could lead him to exclude any other events (*e.g.*, the bursting of the connector) and time periods (*e.g.*, breakdown of the connector over time) as a cause of the kinking or bending. See *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013) ("[A] court may consider '[w]hether the expert has adequately accounted for obvious alternative explanations.'" (citation omitted)). This opinion is little more than *ipse dixit*.

Accordingly, Plaintiffs' motion to exclude Edwards's opinions and testimony [390] is granted with respect to Conclusions 2, 3, 4, and 5, including the opinions contained in the Discussion regarding improper storage, but denied as to the remainder of his original report.

---

[9] This is not to say that an expert like Edwards would be prohibited from opining that the corrosion is consistent with improper chemical storage based on his experience once a factual predicate for such testimony is established by other witnesses. But what an expert *cannot* do is what Edwards did in his report: speculate about possible ways the connectors "may have been" exposed to chlorine, unmoored from any reliable factual foundation. [339-20, at 10]; see *Myers*, 629 F.3d at 645.

### ii. Edwards's Rebuttal Report

Plaintiffs' arguments about Edwards's rebuttal report are somewhat in tension. On the one hand, they argue that Edwards does not "actually rebut" Dr. Osswald's conclusions because Edwards agrees that certain facts are "true" or "undisputed." [392, at 11.] On the other hand, they claim that Edwards "criticize[s]" Dr. Osswald's conclusions in what amounts to "cross-examination material," but those criticisms are without sufficient support. *Id.* at 12–13. Neither argument withstands scrutiny.

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) (citation omitted). Testimony offered under the guise of a rebuttal expert report that simply provides additional support for the expert's original opinions is improper. *Id.* Here, Dr. Osswald opines that an alternative material (polyvinyl chloride or PVC) could have been used to make the water connector's hose and that PVC's properties are superior to the materials used by Defendant. Edwards attempts to "impeach" or "diffuse" these opinions in several ways. He opines on the ways in which PVC is inferior to Defendant's materials, such as temperature resistance, flexibility, and potential negative health effects. [339-21, at 2–3.] He explains that the literature relied on by Dr. Osswald concerns the wrong product (that is, not plasticized PVC). *Id.* at 4. He also includes a "detailed" section of the report analyzing the literature relied upon by Dr. Osswald, pointing out how those sources show PVC is not superior to Defendant's materials on various metrics or could be offered to support the use of Defendant's materials. *Id.* at 4–6.

Plaintiffs are correct that Edwards agrees in passing with Dr. Osswald on certain characteristics of PVC (such as its availability, its higher short-term tensile strength, and its

acceptability as a product). However, Edwards does so to contextualize Dr. Osswald's opinions and explain why these conceded facts are less important, distinguishable, or irrelevant to assessing the defectiveness of the materials used by Defendant. See, *e.g.*, *id.* at 3 ("While *it is true* that plasticized PVC has been around for several decades and has been used in various hose applications, many of these applications were not NSF-61 (National Sanitation Foundation-61) compliant for use with potable water." (emphasis added)). This is standard rebuttal.

Unlike Edwards's original report, his rebuttal report is not *ipse dixit*. Again, Plaintiffs fixate on counting citations, not on whether Edwards provided reasons for his conclusions and those reasons are sufficiently reliable.[10] Plaintiffs overlook the fact that Edwards's purpose is to use the same "handbooks and other literature" that Dr. Osswald cites to rebut his opinions. *Id.* at 5–7. In doing so, Edwards does not simply assert that Dr. Osswald is wrong, but explains why. For example, Edwards includes a page of technical reasons why he believes Defendant's materials "maintain their strength to much higher temperatures" than PVC. *Id.* at 4. His literature critiques similarly explain how, for example, some of Dr. Osswald's sources "have little to do with potable water applications that must be tested for extraction of plasticizers and other chemicals due to long-term exposure" because they relate to only "propane and butane gas, farming applications, heating oil, gasoline and pharmaceutical applications." *Id.* at 6. Plaintiffs' belief that Edwards should have cited something else *in addition to* the sources cited by Dr. Osswald is not a valid *Daubert* challenge, since "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718. Edwards provides

---

[10] [See 392, at 5 ("Edwards makes exactly zero citations to his own scientific sources – none."); *id.* at 12 ("no citation to any source"); *id.* ("Nor is there any citation or authority"); *id.* ("completely without citation to authority"); *id.* (not "supported by citation to scientific data analysis, to any contradictory literature, or to any authority"); *id.* ("unsupported by citation to actual facts or authority").]

an independent analysis of sources relied on by an opposing expert and an explanation as to why those sources undermine the conclusions reached by that expert. Cf. *Amari Co. v. Burgess*, 2012 WL 5389787, at *15 (N.D. Ill. Nov. 2, 2012) ("Rather than independently analyzing the data to provide an alternative conclusion, the experts simply criticize [plaintiff's expert]."). This is not *ipse dixit*. See *Mid-State*, 877 F.2d at 1339; *Zenith*, 395 F.3d at 419. Accordingly, Plaintiffs' motion to exclude Edwards's rebuttal opinions and testimony [390] is denied.

### 4.     Dr. Vijay Gupta

Defendant retained Dr. Vijay Gupta to opine on the existence of design, material, or manufacturing defects in the 1-304 coupling nut used in Defendant's toilet connector and whether creep rupture would occur if the coupling nut was properly installed. [423, at 4.] Dr. Gupta is a Professor of Mechanical and Aerospace Engineering at the University of California Los Angeles, with a Ph.D. in Mechanical Engineering and a M.S. in Structural Engineering. According to his expert report, "At age 31, [he] became one of the youngest Full Professors with tenure in the US, only 5 years after receiving [his] Ph.D. degree." [339-17, ¶ 2.] He has "lectured on applied mechanics, fracture mechanics, materials science, biomechanics, mechanical engineering design, and manufacturing-related courses and topics for over 25 years." *Id.* ¶ 3.

Plaintiffs move to exclude Dr. Gupta's opinions on two grounds. First, they argue that Dr. Gupta "tested the wrong product" because he brought the wrong coupling nut to his deposition. [389, at 2.] Second, they claim that Dr. Gupta's conclusions are unreliable because at his deposition, he testified that one part of his analysis was based on a "back-of-the envelope" calculation. *Id.* The Court takes the second argument first.

### i. Dr. Gupta's "Back-Of-The-Envelope" Statement

Plaintiffs argue that Dr. Gupta "conceded the crudeness of his calculations" to generate the "failure analysis data he relied upon in forming his opinions." [389, at 8.] Here is the relevant exchange from Dr. Gupta's deposition:

Q: What was involved in the failure analysis?

A: Well, the first step in the failure analysis is to – for whether or not the hand tightening can result in the failure, would be to look at what levels of torque one can generate using their hand. And that was the first step. Then you estimate what kind of axial force you're going to generate inside the coupling nut assembly by understanding the mechanism by which the force is generated. And then you look at what is the maximum stress you're going to generate inside the body of the nut. And then you compare that with some failure limits of the material to come to a conclusion whether or not the hand tightening torques can result in the failure of the material or not.

Q: And did you do all that in connection with your assignment for Fluidmaster?

A: I did.

Q: Is that included – are the results of your failure analysis included in your report which you filed in this case?

A: Yes, it is.

Q: Were there any other written documents created as a result of your failure analysis?

A: No.

Q: Was there data generated?

A: No. I did a back-of-the-envelope calculation, and it is something you can just do it just using a calculator. And those numbers are all within less than 800 PSI as the highest stress levels which you will generate inside the body of the coupling nut. And so there was no calculations I provided on a piece of paper, but that is something I can do just on –

Q: The back of an envelope?

A: – the back of an envelope.

Q: Okay. How much time have you spent on you assignment for Fluidmaster since you were retained?

A:   I have not added all the hours, but it is definitely well beyond 200 hours.

[389-4, at 26:8–27:23.]  Plaintiffs did not seek to clarify what Dr. Gupta meant by the phrase "back-of-the-envelope," content to rest their entire *Daubert* argument on any potential ambiguity that could be read into that phrase.

The Court is not persuaded.  Dr. Gupta testified that the results from his failure analysis are in his report, which is filled with charts, figures, formulas, calculations, and cited sources. Plaintiffs do not point to any specific analysis in his report that is "crude" or "off-the-cuff" [437, at 11] because his detailed, complicated calculations unquestionably are not.  As the context from deposition questions shows, Dr. Gupta's answers are about written documents and data that are *not* in his report.  To claim, as Plaintiffs do, that Dr. Gupta "conceded he generated *no* data or even a single document" (*id.* at 10) when he spent "well beyond 200 hours" preparing a fifty-page report is a patent misreading of his testimony.

Here, Dr. Gupta referenced one calculation he made that is not in his report, which he views as "something you can just do * * * using a calculator."  [389-4, at 27:10–13.]  The fact that a Mechanical and Aerospace Engineering Professor found the calculation of pressure per square inch simple enough to do on a calculator (or even the back of an envelope) does not— without significantly more—suggest his opinions are "the antithesis of scientifically reliable expert opinion testimony."  [389, at 9.]  Plaintiffs did not ask him to perform those calculations or otherwise challenge his PSI calculation.  They do not identify an alternative, purportedly more rigorous method for calculating PSI that they claim should have been employed here.  Nor do they explain precisely how calculating PSI on a calculator, even assuming it was a rough calculation, fatally undermines the reliability of his conclusions.  Plaintiffs simply seize on Dr.

Gupta's word choice—which they opted not to explore further at his deposition—and then proclaim his opinions are entirely unreliable.[11] Such a *Daubert* challenge lacks merit.

## ii. Dr. Gupta's Deposition Mistake and Subsequent Declaration

Plaintiffs' first *Daubert* argument appears to be mainly a factual dispute. Dr. Gupta was asked to bring to his deposition the physical materials that he tested in connection with his June 29, 2016 supplemental expert report. [437, at 4.] At the deposition, he agreed that the materials he brought were representative examples of what he used in his experiments. [373-3, at 76:10–17.] The hose that Dr. Gupta brought to the deposition, however, has a "Made in China" label. *Id.* at 85:3–6, 103:18–23. The coupling nut that is relevant to this litigation—the 1-304 coupling nut—was not made in China. In 2010, Defendant started outsourcing production of its coupling nut to Coastal, a manufacturer in China, which produced a "two-winged design comprising acetal" that looks different than the 1-304 coupling nut. [389, at 5.] Plaintiffs conducted the remainder of Dr. Gupta's deposition apparently thinking that Dr. Gupta had tested the wrong coupling nut, making the opinions in his 2016 supplemental report irrelevant.

Following the deposition, Defendant did not revise Dr. Gupta's report or otherwise indicate there was any error in Dr. Gupta's testimony. Dr. Gupta submitted an errata sheet making only two minor changes to his deposition testimony, but neither correction related to the

---

[11] Plaintiffs rely on *Henry v. St. Croix Alumina, LLC*, 572 F. App'x 114 (3d Cir. 2014), but the only similarity between Dr. Gupta and the experts in *Henry* is the phrase "back-of-the envelope." In *Henry*, the plaintiffs' experts concluded that "160,000 pounds of particulates escaped" from a refinery, of which bauxite residue was a "preponderance." *Id.* at 118. Each expert, however, used a "unique, qualitative methodology to reach these conclusions." *Id.* One expert admitted that this "isn't an estimate or emission rate that you would want to take to the bank" and was not "the kind of number that he would typically include in a report like this." *Id.* at 118 n.4. The other stated that he determined the bauxite residue was a "preponderance" of the dust that escaped based on a "simple, back-of the envelope kind[] of thing." *Id.* Dr. Gupta's claim to calculate PSI with a calculator is in no way comparable to experts offering an admittedly unreliable estimate of proportions of dust particles based on a "qualitative methodology."

materials brought to the deposition. As a result, Plaintiffs filed their *Daubert* motion, leading off with an argument challenging this seemingly significant error in Dr. Gupta's analysis.

Defendant responds that Dr. Gupta "accidentally caused" "confusion" at his deposition by bringing the wrong product with him. [423, at 7 n.3.] Defendant attaches a declaration from Dr. Gupta dated September 9, 2016, in which he states, "I checked my laboratory records and files and confirm[ed] that I inadvertently brought the wrong hose body to the deposition." [423-1, ¶ 4.] The hose he brought to the deposition "belongs to a Coastal toilet connector that [he] had taken apart and examined at a different time and which was not the subject of [his] supplemental expert report." *Id.* Dr. Gupta reiterated that "[t]he tests [he] conducted, and which are the subject of [his] 2016 Supplemental Expert Rebuttal Report, were performed only on Fluidmaster 1-304 coupling nuts, the acetal coupling nut that is at issue in this case." *Id.* ¶ 5. His declaration includes photographs of the 1-304 coupling nut and the Coastal coupling nut and states that a "visual inspection" shows that the two products are "readily distinguishable." *Id.* ¶ 7. According to Defendant, then, "the evidence confirms that the correct and representative product was analyzed and tested" by Dr. Gupta, and Plaintiffs' Daubert arguments must fail. [423, at 11–12.]

Plaintiffs cry foul. They claim the fact that Dr. Gupta "mixed-up the hoses and coupling nuts" means he "did not maintain the parts he tested in any particular manner" and it is impossible to know which products, in fact, Dr. Gupta tested. [437, at 8–9.] They also argue that Dr. Gupta's failure to "maintain chain of custody" and "sloppy" lab practices show that all of his opinions are unreliable. *Id.* at 9. Plaintiffs note that they "previously requested exemplar plastic nuts from [Defendant] for their own testing" but were informed none existed, which means that either Dr. Gupta tested the wrong product or Defendant violated its discovery obligations. *Id.* at 6–7. Plaintiffs also filed a motion to strike Dr. Gupta's new declaration,

claiming it is a new untimely "expert report" submitted in violation of Federal Rule of Civil Procedure 26.[12]  [See 450.]  As a remedy for this alleged misconduct, Plaintiffs seek exclusion of Dr. Gupta's declaration and his supplemental report or, alternatively, discovery of all documents referenced in his new report, all correspondence between Defendant's counsel and Dr. Gupta, another deposition of Dr. Gupta, and for Defendant to pay the fees and costs for Dr. Gupta's original deposition, any additional document discovery, and the *Daubert* motion.  *Id.* at 16.

Defendant offers several responses.  First, it points out two important facts that it neglected to emphasize in its *Daubert* response brief:  (1) Dr. Gupta "clearly brought" the correct 1-304 *coupling nut* to the deposition, just not the correct *hose* [460, at 6–7]; and (2) "Dr. Gupta provided several videos and photos of the testing on the Fluidmaster 1-304 coupling nuts (clearly without 'wings'), which were produced to Plaintiffs prior to Dr. Gupta's deposition" (*id.* at 7).  Thus, Dr. Gupta's declaration confirming that he tested the correct coupling nut was not a "new" expert opinion.  Second, Defendant argues that parties may submit declarations attached to *Daubert* response briefs that offer limited responses to points raised by the opposing party's motion (or, alternatively, such declarations are permissible supplementation under Federal Rule of Civil Procedure 26(e)).  *Id.* at 9–10, 12–13.  Third, Defendant claims that there is no prejudice or unfair surprise to Plaintiffs and no bad faith by Defendant, and thus additional discovery and striking the declaration are unwarranted.

The Court finds this dispute to be significantly overstated.  If Dr. Gupta brought the correct coupling nut to the deposition and Defendant disclosed video and photos of him testing the correct coupling nut, then that should be sufficient to resolve whether Dr. Gupta, in fact, tested the correct coupling nut.  Plaintiffs do not contend that these videos and photos [see 464, at 2–5] show Dr. Gupta tested the Coastal coupling nut.  While Plaintiffs assert in their reply that

---

[12] This same motion pertains to a declaration submitted by Dr. Brian Palmer, which is discussed below.

Defendant does not present "evidence" that Dr. Gupta brought the correct coupling nut to the deposition [466, at 6], this fact should be *easily* verifiable. Either the plastic bag of "exemplars" from the deposition—which apparently was not marked as a deposition exhibit—has the 1-304 coupling nut in it or it does not. If Plaintiffs do not have the bag, they could look at the video of Dr. Gupta's deposition [437, at 4] or talk with someone who attended the deposition to confirm this fact. The Court finds it inconceivable given the volume of paper that has been filed on this issue that, if Plaintiffs were correct and Defendant had misrepresented to the Court that Dr. Gupta brought the 1-304 coupling to his deposition, Plaintiffs would not present *something*—a picture of the bag, a close-up screenshot from the deposition video, a declaration from a deposition attendee—to show that this was a lie. The fact that Plaintiffs do not is telling; it suggests that there is no genuine dispute over the fact that Dr. Gupta brought the correct coupling nut to his deposition.

In other words, Plaintiffs' *Daubert* challenge seeks to extrapolate from the fact that Dr. Gupta admittedly and mistakenly brought the wrong hose to the deposition to mean that Dr. Gupta tested the wrong coupling nut, his lab is in disarray, and all of his opinions are unreliable. Other evidence (*e.g.*, the photographs and video contemporaneous with his testing, the references to the 1-304 coupling nut in his report, the 1-304 coupling nut he brought to the deposition, and his declaration) refutes those inferences. Except for this all-but immaterial mistake, Plaintiffs do not otherwise seriously challenge the reliability of Dr. Gupta's methodology. They cite no authority holding that Dr. Gupta's opinions are unreliable unless he performed a "material analysis" on Defendant's coupling nut to verify it was "the same as the 1-304 coupling nuts at issue." [389, at 6.] And Rule 702 does not require experts to second guess whether the attorneys who retained them have supplied them with relevant materials to analyze absent some reason to

believe these materials are incorrect. See *Tuf*, 223 F.3d at 591; *Walker*, 208 F.3d at 588. If Plaintiffs wanted to challenge Dr. Gupta's "chain of custody" or preservation of evidence practices, they easily could have done so during his deposition. They did not. Plaintiffs cannot layer speculation upon speculation—*e.g.*, this concession "raises more questions than it answers" [437, at 9]—to successfully challenge an expert's reliability, and doing so falls well short of persuading this Court to strike Dr. Gupta's entire 2016 supplemental report.

Nor does Dr. Gupta's short September 2016 declaration clarifying factual issues constitute a "new" expert report that violates the expert disclosure rules. Supplemental declarations from experts that merely respond to specific *Daubert* criticisms or "harmlessly repeat information provided in the earlier reports" do not violate Rule 26. *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006). Such clarifying declarations from experts are a routine part of *Daubert* motions.[13] Here, Dr. Gupta responds to factual issues raised at his deposition that serve as the basis for Plaintiffs' motion—namely, whether he tested the coupling nut associated with the hose he brought to the deposition. Such clarification of a factual mistake does not trigger mandatory sanctions under Federal Rule of Civil Procedure 37.

But this entire course of events was avoidable. After reviewing Plaintiffs' *Daubert* motion, Defendant should have contacted Plaintiffs, explained the mistake, and offered to have Dr. Gupta sit for limited deposition on this issue. Plaintiffs should have agreed and withdrawn their *Daubert* motion, enabling them to reevaluate whether to raise a reliability challenge based on Dr. Gupta's additional deposition testimony. Instead, the parties have wasted their time on a

---

[13] See, *e.g.*, *In re Washington Mut. Mortg. Backed Sec. Litig.*, 2012 WL 2995046, at *7 (W.D. Wash. July 23, 2012); *Bryant v. Wyeth*, 2012 WL 11924298, at *3 (W.D. Wash. July 19, 2012); *Pritchard v. Dow Agro Scis.*, 263 F.R.D. 277, 285 (W.D. Pa. 2009); *City of Owensboro v. Kentucky Utilities Co.*, 2008 WL 4542706, at *2 (W.D. Ky. Oct. 8, 2008); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 725 n.3 (E.D. Wis. 2008); see also *E*Trade Fin. Corp. v. Deutsche Bank AG*, 2008 WL 2428025, at *1 n.1 (S.D.N.Y. June 13, 2008) (undisclosed expert declarations offered on summary judgment); *Murata Mfg. Co. v. Bel Fuse, Inc.*, 2008 WL 656045, at *4–5 (N.D. Ill. Mar. 5, 2008) (same).

declaration from Dr. Gupta, a *Daubert* response and reply, and a full round of motion to strike briefing debating the range of possible sanctions.

The Court will order what should have been obvious and agreed upon by everyone: Dr. Gupta must sit for another deposition. This deposition will be limited to 60 minutes and the deposition's topic is limited to issues raised by Dr. Gupta's mistake in bringing the wrong hose to his August 5, 2016 deposition, including his laboratory protocols and how Dr. Gupta confirmed from his laboratory files that he tested the correct coupling nut. In advance of that deposition, Dr. Gupta will be required to produce all documents that he relied on to determine that he tested the correct coupling nut (subject to any applicable privilege or protection). Defendant must produce to Plaintiffs the 1-304 coupling nut(s) that Dr. Gupta tested. No fees and costs will be awarded.[14]

Before moving on, the Court addresses one issue raised mainly by Plaintiffs' motion to strike. Dr. Gupta's declaration tacks on a response to another issue that arose at his deposition: whether he reviewed a rebuttal report from Plaintiffs' expert, Dr. Michael Bak. Dr. Gupta stated that following his deposition, he "reviewed [his] files," found a copy of Dr. Bak's report, and confirmed that he had previously reviewed it. [408, ¶ 9.] He stated, "Nothing in the Bak Rebuttal Report changes my opinions rendered in this case," and his previously submitted report "rebuts the points made in the Bak Rebuttal report." *Id.* ¶¶ 9–10.

Plaintiffs claim prejudice, arguing that Dr. Gupta completely changed his deposition testimony in his declaration. Here is how Plaintiffs present Dr. Gupta's testimony in their brief: Dr. Gupta "was questioned at his 2016 deposition and *confirmed he did not consider* Dr. Bak's

---

[14] Subject to Plaintiffs showing otherwise, the Court does not see a reason to permit supplemental rebuttal expert reports based on what should be a limited deposition. While Plaintiffs are free to file another *Daubert* motion limited to issues arising from the deposition, Plaintiffs should think seriously about the merits of this challenge and if it will be a good use of the parties' and the Court's time and resources.

report:  Q:  So you didn't consider that [October 2014 report] in preparing your supplemental report, then?  A:  That's correct."  [437, at 7–8 (emphasis added).]

Here is Dr. Gupta's actual testimony:

Q:  And with respect to the 2014 expert report of Michael Bak, is that the September 2014 expert report which would be the expert report that you had before you prepared your first report?

A:  Yes.

Q:  Okay. Are you aware that there's a second report by Dr. Bak?

A:  These are – and I may have missed that report.  I remember there was a report submitted toward the end of – after my deposition, and so I don't have a good recollection whether I saw it or not.  Yeah.

Q:  So you didn't consider that in preparing your supplemental report, then?

A:  That's correct.

Q:  Okay.  Do you have – but – do you have any information or – let me start over.  Do you have any recollection about what Dr. Bak addressed in the second report?

A:  I have a – if I had read it, then I will – I don't have a recollection of that.

Q:  And I will tell you that the report was filed in October 2014 –

A:  Okay.

Q:  – and it was subsequent to your deposition.  And it is entitled, 'The Rebuttal Report of Michael Bak, Ph.D.'

A:  Okay.

Q:  But you didn't consider it in connection with your supplemental report, correct?

A:  If I read that report at some point and – because of all the opinions I've written over here are basically based on all information I have, you know, remembered from my last deposition and everything I've considered in this case.

Q:  Okay.  But it wasn't something you've told your lawyers to put on this list, correct?

A: This is correct. So if I read it – because there is a lot of – so even if I read it and there were certain opinions he may have expressed and if those opinions did not change my opinion, then I basically thought there was no reason to bring that in in this particular list here.

[437-3, at 54:14–56:8.]

The Court should not have to fact-check whether the parties' representations are accurate. Only by ignoring all of the surrounding testimony could Plaintiffs represent that Dr. Gupta "stated clearly and unequivocally that he did not consider Bak's rebuttal report." [466, at 7.] Dr. Gupta testified repeatedly that he could not recall whether he looked at this report. He indicated that if he had and it did not change his opinions, he would not have put it on his reliance list. In his declaration, Dr. Gupta stated that he had, in fact, received the report and it did not change his opinions. Dr. Gupta's declaration is not a "new" opinion—after all, he says his opinions are unchanged—or even inconsistent with his deposition testimony. Plaintiffs opted not to ask further questions about Dr. Bak's rebuttal report despite Dr. Gupta's uncertainty about whether he had read it. [See 437-3, at 55:25–56:12.] Plaintiffs cannot manufacture "prejudice" by offering snippets of testimony that misrepresent the testimony's substance as a whole. Questions about Dr. Bak's rebuttal report are off-limits at Dr. Gupta's next deposition.

Plaintiffs' motion to exclude Dr. Gupta's opinions and testimony [387] is denied, and Plaintiffs' motion to strike Dr. Gupta's September 9, 2016 declaration [446] is denied in part and granted in part.

### 5. Dr. Brian Palmer

Defendant retained Dr. Brian Palmer, a Vice President of Charles River Associates with a Ph.D. in economics from the Massachusetts Institute of Technology, to "analyze Fluidmaster's claims data and other related information to assess the failure rate of Fluidmaster's 1-304 coupling nut used in connection with toilet connectors." [383-1, ¶ 1.] Plaintiffs raise a host of

methodological challenges to Dr. Palmer's opinions, arguing that these flaws collectively undermine the reliability and relevance of Dr. Palmer's conclusions.

To start, Plaintiffs explain that a "failure rate" (*i.e.*, the number of products that fail divided by total sales) is not the same as a "claims rate" (*i.e.*, the number of claims filed with a company about a product's failure divided by the total sales). At his deposition, Dr. Palmer agreed that these are "two different things"—the claims rate will almost always be smaller than the failure rate. [383-3, at 17:7–17, 21:2–5.] Nevertheless, Defendant euphemistically characterizes Dr. Palmer's claims rate opinion as the "known failure rate" and insists that a claims rate is the "best proxy" for a failure rate. [411, at 5, 9.] Defendant offers no statistical, economic, scientific, or otherwise reliable basis to support that claim. Neither could Dr. Palmer at his deposition. "[A]n inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590. "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). Defendant is likely correct that, "statistically speaking, there would need to be drastically more failures in the field than reported for any difference in the failure rate and claims rate" to matter. [411, at 10.] But that does not mean Dr. Palmer can simply assert these measures are the same without a reasoned basis for doing so. Dr. Palmer has not measured and cannot opine on the "failure rate" of Defendant's product.

Next, Plaintiffs challenge whether Dr. Palmer's "claims rate" methodology is reliable, attacking both the calculation of total sales (the denominator) and total claims (the numerator). With respect to total sales, Plaintiffs identify three alleged errors: (1) Dr. Palmer used *manufacturing* data, not sales data, to estimate total sales—meaning that he assumed that every

manufactured product was sold and installed; (2) Dr. Palmer included roughly 4.6 million toilet connectors with Coastal coupling nuts, inflating his total sales of the 1-304 coupling nut by 14%; and (3) to determine the amount of United States sales, Dr. Palmer used the ratio of U.S. to non-U.S. sales in 2010 and then applied that same ratio for every year between 1993 to 2009. With respect to total claims, Dr. Palmer eliminated 22% of coupling nut claims and 13% of hose burst claims—without any decrease in total sales—because of missing data associated with those claims. Thus, Plaintiffs claim that Dr. Palmer manipulated his methodology to deflate his numerator and inflate his denominator, creating an artificially and unreliably low "claims rate."

In an effort to place Plaintiffs' criticisms in context, Defendant attaches a declaration from Dr. Palmer to its response brief. [See 411-1.] Dr. Palmer's declaration states that even if he accepted all of Plaintiffs criticisms, his analysis would be materially unchanged—mainly because the size of the denominator (total sales) is so large that it dwarfs the impact of these changes. Dr. Palmer's report indicates that the claims rate for plastic nut claims is 0.0050% and the rate for hose bursts is 0.0047%. [339-22, ¶ 4.] In other words, 99.995% and 99.9953% of products manufactured did not result in a filed claim. According to Dr. Palmer, even if he (1) assumed that 40% of the manufactured water connectors were never sold; (2) removed all of the Coastal coupling nuts claims and sales; and (3) added back in the previously excluded 22% of coupling nut claims and 13% of hose burst claims, it would only change his analysis by roughly .004% for plastic nut claims and .003% for hose burst claims. [411-1, ¶ 5.] Thus, even accepting Plaintiffs' criticisms, 99.99% of Defendant's products did not result in a filed claim.

Defendant also attempts to explain why Dr. Palmer's methodological choices are reliable. Defendant argues that Dr. Palmer used "the best data available" to reach his conclusion because this is the data that Defendant uses in the ordinary course of business. [411, at 11–12.] Dr.

Palmer, in fact, used actual sales data for 2003 through 2015 and only used manufacturing data for 1993 to 2002. Regardless, "it simply defies reason and the company's profit motive to believe that Fluidmaster would manufacture goods and not sell them." *Id.* at 15. With respect to the Coastal coupling nuts, Defendant takes a position inconsistent with its argument concerning Dr. Gupta, arguing that Coastal coupling nut sales are properly counted because that product is part of the class definition. *Id.* at 7. Dr. Palmer also explained why he excluded certain claims, including that they fell outside the relevant time period or the basis for the claim was irrelevant (*e.g.*, failures caused by "abuse" or "electrical").[15]

The Court largely agrees with Plaintiffs' criticisms of Dr. Palmer's calculations. It is highly improbable that *every* product that Defendant manufactured was sold, and Defendant offers no reason to believe this occurred here. If the 2003 through 2015 sales data was available, Defendant could have compared those figures with the manufacturing data from those years to justify the use of manufacturing data (or some appropriate ratio) for prior years. Instead, Defendant simply assumes they are same. The fact that a party asserts data is the "best available" does not mean, absent more, it is sufficiently reliable for any purpose for which it is used. Likewise, Defendant cannot seriously contend that the Coastal coupling nuts are part of this case given the lengths it went through to avoid exclusion of Dr. Gupta's opinions when he was thought to have tested the Coastal coupling nut (rather than the 1-304 coupling nut). Moreover, Defendant never attempts to justify why it was reliable to use the 2010 domestic to foreign sales ratio across the entire time period of sales at issue.

---

[15] Defendant argues that Plaintiffs do not present "expert testimony" to challenge Dr. Palmer's methodology and "Plaintiffs' attorneys are neither statisticians nor persons who otherwise possess education and experience to qualify them to opine on the reliability of Dr. Palmer's data or methodology." [411, at 6.] That is a non-sequitur. It is *Defendant*'s burden to show the reliability of its expert's methods. *Lewis*, 561 F.3d at 705. Rule 702 does not require the moving party to offer expert testimony to challenge the admissibility of an opposing party's expert, and whether a party's attorneys are "statisticians" is not part of the Court's analysis.

At the end of the day, however, these criticisms do not meaningfully impact whether Dr. Palmer's conclusions are admissible. *Daubert* demands reliability, not perfection. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. As Dr. Palmer's declaration shows, Plaintiffs' identified errors, if credited, cumulatively result in a less than .005% change in the estimated claims rate.[16] The Court does not agree that errors of this scale render his methodology fatally unreliable under Rule 702. Fluctuations at the outer margins of the claims rate do not obscure the point of Dr. Palmer's opinions: well over 99% of Defendant's products sold during the relevant time period did not result in a filed claim. Plaintiffs do not undermine the reliability of *that* conclusion (which, taking a step back, is really the level of generality that matters), and thus attacks on the precise claims rate (99.995% versus 99.991%) go to weight, not admissibility. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) ("We adhere to the rule that an expert's lack of absolute certainty goes to the weight of his testimony, not to its admissibility.").

Finally, Plaintiffs also seek to exclude Dr. Palmer's opinions about the percentage of claims that were filed within Defendant's 10-year warranty period. To determine the start date of the warranty period, Dr. Palmer relied on information supplied by one of Defendant's employees, a senior manager of Global Risk Management. That employee indicated that he "believes that the connectors are generally sold * * * within a month or two of the manufacturing dates." [339-22, at 6 n.5.] Based on that information, Dr. Palmer estimated the commencement of the warranty period as within 1 month, 6 months, and 12 months from the date of

---

[16] As with Dr. Gupta, the Court declines to strike Dr. Palmer's declaration. This five-paragraph declaration plainly does not offer "new opinions" or amount to a "wholesale revision[]" of his analysis [450, at 7], but merely responds to the few specific methodological arguments raised by Plaintiffs in their *Daubert* motion. Plaintiffs do not suffer unfair prejudice simply because Dr. Palmer explains why the criticisms that they raised, even if accepted, are insignificant. No additional discovery is warranted.

manufacture. *Id.* Plaintiffs argue that calculations resting on an employee's "belief" are too speculative because there is no "scientific basis for this analysis." [435, at 10.]

These arguments miss the mark. "[E]xperts may rely on data and other information supplied by third parties." *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007). This is true "even if the data were prepared for litigation by an interested party." *Id.*; see also *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1148 (N.D. Cal. 2003) ("[W]hen the parties' experts rely on conflicting sets of facts, an expert may testify on his party's version of the disputed facts. The proper way for a party to challenge an expert in such a situation, reasoned the court, is through cross-examination of the expert."). Here, Dr. Palmer's warranty opinions are based on assumptions about when the warranty period began. "It is not improper for an expert witness to assume as true some fact that will be presented during the trial even if that fact is hotly disputed. Indeed, such happens all the time." *Wilson v. Gen. Motors Acceptance Corp. (GMAC)*, 2008 WL 2593792, at *2 (E.D. Tenn. Apr. 3, 2008). "As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility." *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005); accord *Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact."). Plaintiffs can attempt to undermine the persuasiveness of Dr. Palmer's conclusions by showing these assumptions are erroneous. But that does not render the methodology accepting those assumptions unreliable. *In re Se. Milk Antitrust Litig.*, 2010 WL 8228838, at *2 (E.D. Tenn. Dec. 8, 2010) ("[P]laintiffs are free to show that [expert] is wrong and his data flawed. This is not, however, a *Daubert* issue."); *Smith v. Bankers Life & Cas Co.*, 2008 WL 2845081, at

*6 (S.D. Iowa Mar. 3, 2008) ("Indeed, Defendants' only argument is that Plaintiff will be unable to prove at trial the premise on which [expert's] report is based[.] * * * That question, however, is a factual one for the jury to decide and, simply put, does not bear on the methodology employed by [expert] in reaching his conclusions or on the reliability of his opinions and conclusions.").

Plaintiffs' motion to exclude Dr. Palmer's opinions and testimony [381; 382] is denied in part and granted in part, and Plaintiffs' motion to strike Dr. Palmer's declaration [446] is denied.

### B. Defendant's *Daubert* Motions

#### 1. Plaintiffs' "Technical" Experts

Defendant filed an omnibus motion to exclude Plaintiffs' five "technical" experts: Dr. Michael Bak, Dr. David Kazmer, Walter J. Fallows, Dr. Timothy Osswald, and Dr. David Pope. These experts opine on the various ways that Defendant's coupling nuts and hoses were defectively designed. Defendant raise one challenge common to all five experts and several others specific to each expert. The Court starts with the common *Daubert* argument.

##### i. Consideration of the "Failure Rate"

Defendant argues that all five experts' defectiveness opinions are "rendered unreasonable by the directly contradicting infinitesimal failure rate." [337-1, at 9.] According to Defendant, the "failure rate" is an "indisputable record fact[]" refuting any conclusion that its product was defective and these experts' failure to account for the "failure rate" in their opinions "amounts to 'cherry-picking' facts which fails to satisfy the scientific method." *Id.* at 10. Plaintiffs argue (again) that there is no evidence of a failure rate and the claims rate is "irrelevant and unreliable," spending roughly 20 percent of their response brief repeating the same arguments from their motion to exclude Dr. Palmer. [See 375, at 8–10.]

As explained above, the Court agrees that there are no "indisputable" record facts establishing a failure rate. Defendant identifies a claims rate, not a failure rate. Moreover, Defendant never explains how a claims rate is directly germane to the reliability of an opinion on, for example, how stresses impact the design and materials comprising Defendant's connectors. Said differently, a claims rate does not "contradict" whether the product's design causes sufficient stress to "exceed the creep rupture limits." *Id.* at 3. It is simply evidence that few claims were reported. The kind of impermissible data "cherry picking" in the cases that Defendant cites involve experts who arbitrarily pick and choose among the same kind of scientific data when formulating their opinions.[17] Nor is there any obvious inconsistency between a defectively designed product and a low claims rate: a defective design could make the possibility of catastrophic failure significantly more likely without either triggering an actual failure or the filing of a claim. Defendant is certainly free to argue that the claims rate is important evidence of non-defectiveness, but a low claims rate is not a silver bullet that renders any expert who concludes a product was defective unreliable and unreasonable under Rule 702, and Defendant offers no authority to the contrary.

### ii. Dr. Michael Bak, Ph.D.

Plaintiffs retained Dr. Bak to conduct a finite element analysis (a computer-based model to evaluate how a product performs under various conditions) to opine on how Defendant's coupling nut performs during its installation and over its life cycle. Dr. Bak concludes that a

---

[17] See *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("Dr. Hynes relied on weather data, but he rejected some weather data that contradicted his opinion."); *Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, 2003 WL 1797844, at *2 (N.D. Ill. Apr. 3, 2003) (excluding expert who purportedly relied on "numerous testing reports and data," but "failed to familiarize himself with existing data and research from prior tests regarding paint failure and to account for conclusions in such reports opposite to his own" and "could not point to one single test conducted by anyone else in support of his theories"); *LeClercq v. The Lockformer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert who, without reason, ignored 17 wastewater samples that detected no containments and conflicted with his opinion that certain chemicals had contaminated the groundwater).

particular feature of the coupling nut's design causes high stress concentration that leads to creep rupture. He also concludes that stress in a coupling nut can result in rupture based on hand tightening alone.

Defendant challenges these opinions in three ways. First, Defendant claims that visible evidence of tool marks on the coupling nuts means they were installed with a tool, which contradicts and refutes Dr. Bak's conclusion that "simple hand tightening" can cause failure. [337-1, at 11.] The Court does not see how these are mutually exclusive. Dr. Bak's conclusion that the lesser amount of stress from hand tightening can cause failure does not preclude the possibility that even greater stress from using a tool would also cause failure. Even accepting that Plaintiffs' coupling nuts reveal evidence of tool marks, this does not undermine the reliability of a computer model showing that significantly less stress would still cause Defendant's product to fail.

Second, Defendant claims that Dr. Bak's model is "based on incorrect parameters" that inflate the amount of stress on the coupling nut. *Id.* at 11–12. In particular, Defendant states that Dr. Bak ignores significant stress relaxation in the cone washer and coupling nut and overestimates the pre-load stress by using the wrong friction coefficient values. *Id.* at 12. Defendant's sole support for these critiques comes from Dr. Gupta's expert report. *Id.* In response, Plaintiffs point to Dr. Bak's October 2014 rebuttal expert report, which responds to Dr. Gupta's criticisms [see 375-3]. In particular, Dr. Bak explains (1) how his model accounts for stress relaxation in the coupling nut, (2) why Dr. Gupta's cone washer stress relaxation estimate is "illogical" and inconsistent with "hyperelastic material law," and (3) how he researched friction coefficients of acetal materials. *Id.* Moreover, Dr. Bak's report cites the material sciences and engineering textbooks that served as the foundation of his analysis. In reply,

Defendant argues that Dr. Bak ignores Dr. Gupta's 2016 supplemental report, which allegedly refutes Dr. Bak's findings.

"In essence, the defendants are asking the [C]ourt to determine which [party's stress relaxation] model is *most* accurate, which is ultimately a merits decision." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009). The Court will not accept—especially at the class certification stage—this invitation to resolve a battle between Dr. Gupta and Dr. Bak over how to properly calculate and model coupling nut stress relaxation. See *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 170–71 (S.D. Ind. 2009); *In re Sulfuric Acid Antitrust Litig.,* 2007 WL 898600, at *8 (N.D. Ill. Mar. 21, 2007) (holding that class certification is not "the right time to engage in a 'battle of experts'"). "In a case of dueling experts * * * it is left to the trier of fact * * * to decide how to weigh the competing expert testimony." *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008). Defendant's arguments about the correctness of Dr. Bak's "parameters" are really about the correctness of his conclusions, not the reliability of his methodology. *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013) ("[A]rguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury."); *In re Zimmer Nexgen Knee Implant Prod. Liab. Litig.*, 2015 WL 3669933, at *25 (N.D. Ill. June 12, 2015) ("Rule 702 does not permit 'the district court to choose between * * * two [competing] studies at the gatekeeping stage' or evaluate the quality of an expert's data, inputs, or conclusions." (citation omitted)). But this Court's inquiry under *Daubert* is "solely on principles and methodology, not on the conclusions they generate." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).

Third, Defendant argues that Dr. Bak erroneously "selects a single factor, the notch sensitivity of acetal" in reaching his conclusions about stress concentration. [337-1, at 12.] Defendant claims that Dr. Bak should have also considered other factors, such as "the absolute value of the impact strength at a given root radius," again citing Dr. Gupta's expert report for support. *Id.* "Our case law has recognized that experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Carl A. Nelson & Co.,* 211 F.3d 1008, 1020 (7th Cir. 2000). Defendant makes no serious attempt to show that any reliable methodology *must* include these factors, let alone articulate how Dr. Bak's methodology is unreliable because he did not consider these factors. Simply providing a "laundry list of factors" allegedly missed by an expert does not, by itself, suggest that the expert's methodology is unreliable. *Tilstra v. Bou-Matic, LLC*, 2014 WL 4662483, at *7 (W.D. Wis. Sept. 19, 2014) (holding that expert's factors "all affect the weight" of the expert's opinion, not the reliability of the "method to calculate the result he reached"). Absent a significant link to the reliability of the expert's methodology, this is plainly a matter for cross-examination, not a basis for exclusion.[18] *Daubert*, 509 U.S. at 596; *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 745 (N.D. Ill. 2005) ("[Plaintiff's] quarrels with [expert's] inclusion or rejection of certain factors or calculations (such as grip strength), implicate his conclusions and are thus properly left for exploration through cross-examination.").

### iii.    Dr. David Kazmer, Ph.D.

Plaintiffs retained Dr. Kazmer to opine on how the coupling nut's design affects its long-term performance. Dr. Kazmer concludes that (1) the coupling nut has a sharp corner that acts as

---

[18] Because the Court will not exclude Dr. Bak's opinions, the Court rejects Defendant's argument that Dr. Kazmer's, Mr. Fallows's, and Dr. Osswald's opinions must be excluded because of their reliance on Dr. Bak's conclusions [337-1, at 13].

a stress concentrator; (2) the coupling nut was not designed for long-term creep, and (3) Defendant used inferior materials to make its coupling nut.

In an attempt to exclude these three opinions, Defendant argues that Dr. Kazmer "cherry-picks" facts and ignores "conflicting data." [337-1, at 14.] In connection with the first opinion, Defendant argues that Dr. Kazmer cited an irrelevant cantilever beam article in his report, used the wrong design guideline, and ignored that Defendant's thread radius is already the widest allowed by industry standards. Defendant never explains why Dr. Kazmer's mere citation to a cantilever article as an "example" of stress concentration in plastics product design renders his opinion inadmissible. See *Loeffel Steel*, 372 F. Supp. 2d at 1119 (noting that questions about the "bases and sources" of an opinion go only to weight, not admissibility). In addition, Defendant does not indicate where in Dr. Kazmer's report he used the wrong design guideline (or how this impacted his opinions) or opines on the thread radius. Defendant's only "support" for these two critiques is a citation to three paragraphs of Meek's Supplemental Report that actually relates to Fallows's opinions.

For the second opinion, Defendant argues that Dr. Kazmer failed to consider whether other factors like age or exposure to corrosive chemicals could cause failure and did not take into account the stress relaxation of the cone washer. As with Defendant's challenge to Dr. Bak's opinions, Defendant does not explain how failure to consider these factors shows Dr. Kazmer's opinions are unreliable. See *Daubert*, 509 U.S. at 596; *Cooper*, 211 F.3d at 1020; *Tilstra*, 2014 WL 4662483, at *7. Nor does Defendant explain how Dr. Kazmer's opinions that Defendant failed to design for long-term creep is inconsistent with the possibility that other factors might *also* cause failure.

For the third opinion, Defendant argues that Dr. Kazmer considered the wrong type of acetal material—Celcon M90—which Defendant used for only a year in 1989. Defendant submits a declaration from one of its managers attesting to this point. [339-23.] According to Defendant, not only is there "nothing wrong with using Celcon M90" but its limited use "far outside any applicable warranty period" means "analysis of Celcon M90 has limited, if any, relevance." [337-1, at 9.] None of these are meritorious *Daubert* arguments. The fact that an expert's opinion has "limited" relevance does not mean it is irrelevant. Nor does simply asserting there is "nothing wrong" with the materials Defendant used demonstrate that an expert's methodology arriving at a contrary conclusion is flawed. *Paul v. Holland Am. Line, Inc.*, 2006 WL 3761368, at *3 (W.D. Wash. Dec. 21, 2006) ("[A]n opinion is not inadmissible simply because defendants disagree with its conclusion."). Finally, Plaintiffs argue that the documents attached to Defendant's employee's declaration show that Defendant switched *to* Celcon M90 in 1989 and used it until 1995. This kind of factual dispute bearing on how many putative class members would have received a coupling nut made of Celcon M90 goes to the weight of Dr. Kazmer's opinions, not their reliability under *Daubert*. *Smith*, 215 F.3d at 718; *Loeffel Steel*, 372 F. Supp. 2d at 1119.

In addition, Defendant seeks to exclude two of Dr. Kazmer's "ancillary non-technical opinions" based on his lack of qualifications. Dr. Kazmer states in his report that there were a "vast array of product failures in the field." [339-3, ¶ 21.] When asked about this line at his deposition, Dr. Kazmer responded that, based on his experience, "for every failure that's reported, there is typically several that are not. So if there is 3,000 reported failures, it could be much higher than that." [339, at 24:1–24.] Dr. Kazmer's opinion is essentially the flipside of Dr. Palmer's opinion that the claims rate and failure rate are the same. Neither expert's

conclusion is supported by anything other than speculation. *Clark*, 192 F.3d at 759 n.5. Dr. Kazmer's lack of "qualifications" as a "consumer behavior" expert is really another way of saying that he has no basis to speculate about the vastness of Defendant's product failures in the field. Merely prefacing a deposition answer with the phrase "based on my experience" does not save a completely unsupported opinion from exclusion. *Zenith*, 395 F.3d at 419.

Finally, Defendant seeks to exclude Dr. Kazmer's opinion that Defendant's "decision to develop and outsource a new design indicates that the previous design was inadequate." [339-3, ¶ 52.] Plaintiffs make no attempt to save this opinion, and the Court agrees that it is improper. Dr. Kazmer's engineering background gives him no expert insight into the motivations, intent, and state of mind of a corporation. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004); *Klaczak v. Consol. Med. Transp. Inc.*, 2005 WL 1564981, at *8 (N.D. Ill. May 26, 2005). The jury will not be aided by Plaintiffs' expert speculating about why Defendant made design changes and outsourcing decisions. Fed. R. Evid. 702(a).

### iv.     Walter J. Fallows

Plaintiffs retained Fallows, a Mechanical Engineer with more than 35 years of experience, to test whether Defendant's coupling nut would fail from creep rupture by conducting a visual examination, photo microscopy, and scanning electron microscopy analysis of the coupling nuts. Fallows concludes that the coupling nuts consistently fail due to creep rupture. He then goes somewhat further and opines, based on Dr. Bak's and Dr. Kazmer's opinions, that this creep rupture-related failure was a caused by a "design defect."

Defendant seeks to exclude Fallows's design defect causation opinions as the "unsupported parroting of another expert's opinion." [337-1, at 16.] Plaintiffs respond that Fallows "concluded that all of the Plaintiffs' [coupling nuts] were under stress and failed as a

result of creep and creep rupture," [375, at 15] but do not otherwise attempt to explain how Fallows can opine "to a reasonable degree of engineering certainty that each [coupling nut] failed as the result of defective design" [339-5, ¶ 37]. Fallows was not retained as an expert on structural analysis, finite analysis, or the design specifications of Defendant's product. Plaintiffs never explain how Fallows is qualified to testify about the analyses underlying Dr. Bak's and Dr. Kazmer's opinions or how Fallows did anything more than merely repeat their conclusions as his own. While an expert can rely on another expert's findings or opinions in developing his own opinions, he cannot simply adopt wholesale the ideas of another expert without any independent analysis. See *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that 'an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts,' such expert must make some findings and not merely regurgitate another expert's opinion." (internal citations omitted)). This kind of impermissible bolstering is neither helpful to the trier of fact nor is it based on sufficient facts or data. *Town of Wolfeboro v. Wright-Pierce, Inc.*, 2014 WL 1806843, at *2 (D.N.H. Apr. 2, 2014) ("To the extent Moore simply parrots the conclusions of other experts' reports in his report, those are not his opinions based on facts or data appropriately relied on in his field."). Fallows cannot opine on the coupling nut's design and whether the connectors fail because of that design.

Defendant also seeks to exclude Fallows's opinions about the cause of the creep and creep rupture on the grounds that he fails to account for overtightening as a possible alternative cause. Fallows repeatedly testified that it was impossible to measure if a coupling nut failed due to overtightening or to assign a level of torque based on tool markings on the product. According to Fallows, tool marks could be left whether the coupling nut was overtightened, tightened just right, or undertightened, and thus such marks are "meaningless." [339-8, at 46:3–

15.]  Defendant points out that Fallows reached the opposite conclusion in another case, concluding that tool marks on a coupling nut designed for hand installation and significant compression on the cone washer indicated improper installation.  [See 339-26, at 9–11.]

This is all fodder for cross-examination.  Fallows indicated that he did not believe tool marks by themselves were indicative of overtightening, and Defendant identifies no objective source showing that viewpoint is unreliable.[19]  "[U]nless the expert can offer 'no explanation' as to why he concluded an alternative cause was not the sole cause," arguments about alternative explanations typically go to weight, not admissibility.  *Troutner v. Marten Transp., Ltd.*, 2006 WL 3523542, at *4 (N.D. Ind. Dec. 5, 2006) (citation omitted).  Defendant does not, for example, show that Fallows ignored the standard level of torque recognized by mechanical engineering experts that should be assigned if tool marks are present.  Nor does Defendant point to any universally recognized methodology for assessing tool marks.  Defendant's belief that Fallows ignored "visible tool marks" on Plaintiffs' coupling nuts provides grounds to cross-examine him on the support for his conclusions.  See *Pruitt v. BROC, LLC*, 2014 WL 5089115, at *3 (W.D. Va. Oct. 9, 2014); *Voter Verified, Inc. v. Election Sys. & Software, Inc.*, 2011 WL 2580786, at *3 (M.D. Fla. June 29, 2011).  Simply put, Defendant's only evidence that Fallows ignored an alternative cause is the opinions offered by its own expert, Meek.  The purpose of Rule 702's gatekeeping function is not to empower the Court to pick Meek's methodology over Fallows's.  The fact that each party's expert reaches different conclusions about the presence and significance of tool marks on Plaintiffs' coupling nuts is a matter for the trier of fact to resolve.

---

[19] Fallows's expert report from the prior case seems to focus on washer deformation as much as the presence of tool marks to conclude that "a large amount of compression force was developed with a tool during installation."  [339-26, at 11.]  This report also opines merely that a tool was used, not that the tool marks showed "overtightening" as opposed to an appropriate amount of tightening with a tool.

### v.     Dr. Tim A. Osswald, Ph.D.

Plaintiffs retained Dr. Osswald to analyze the properties of the materials used to manufacture Defendant's coupling nut and hose.  According to Dr. Osswald, Defendant selected "a weak, sub-standard material" based on its notch sensitivity, and "the failures of the coupling nuts * * * could have been avoided with the use of a stronger material."  [339-9, ¶¶ 34–36.] Moreover, Dr. Osswald concludes that alternative "superior" materials were available for Defendant to use to manufacture its hose.

Defendant advances a series of short arguments for excluding Dr. Osswald's coupling nut opinion.  Defendant claims that Dr. Osswald "ignores other possible reasons" for the coupling nut's failure, such as age or exposure to corrosive chemicals.  Just like its challenges to Dr. Kazmer, Defendant does not explain how Dr. Osswald's failure to consider these factors renders his opinions unreliable.  See *Daubert*, 509 U.S. at 596; *Cooper*, 211 F.3d at 1020; *Tilstra*, 2014 WL 4662483, at *7.  The fact that chlorine exposure might make Defendant's product fail does not preclude the possibility that Defendant's product is made of substandard materials. Defendant further argues that Dr. Osswald erroneously bases his conclusion on tests of the Celcon M90, but the Court has already explained that this kind of factual dispute does not go to the reliability of an expert's opinion under Rule 702.  *Loeffel Steel*, 372 F. Supp. 2d at 1119.

Defendant also claims somewhat vaguely that Dr. Osswald "merely compared a few specific properties of acetal to polypropylene" but "did not test his conclusion" and "cites no scientific literature showing that acetal was an improper material for this application."  [337-1, at 17–18.]  Dr. Osswald's entire report offers detailed, substantive reasons (with sources) to show that the notch sensitivity of Defendant's acetal makes it "sub-standard."  Defendant never states how the methodology that Dr. Osswald actually used—his comparison of a "few specific

properties"—is unreliable, what "test" he should have performed to verify his conclusion (or why that test was required as a precondition of admissibility under Rule 702), or why the literature that he does cite is insufficient to support his conclusions. Defendant is free to probe Dr. Osswald's conclusions by cross-examining him with the tests or literature that it believes he should have considered. *Smith*, 215 F.3d at 719; *Loeffel Steel*, 372 F. Supp. 2d at 1119.

With respect to Dr. Osswald's hose opinion, Defendant argues that Dr. Osswald only compared the component parts of Defendant's product "in isolation," not the combined product as Defendant "actually used them." [337-1, at 19.] According to Defendant, this is not an "apples to apples" comparison, and thus lacks reliability. *Id.* Dr. Osswald, however, compares the same types of data about tensile strength for Defendant's materials and plasticized PVC to conclude that PVC is stronger "on its own" than either material used by Defendant. [339-11, ¶¶ 2–5; 375, at 15.] Defendant does not articulate how the data Dr. Osswald relies on to make this comparison is dissimilar. While the *relevance* of Dr. Osswald's comparison may be debatable,[20] Defendant's challenge to the *reliability* of his methodology goes, at best, to weight.

Defendant also challenges Dr. Osswald's hose opinion on the grounds that he "failed to consider other critical factors such as health concerns with using plasticized PVC." [337-1, at 20.] Plaintiffs note that Dr. Osswald's report discusses how health concerns with PVC largely disappeared by the early 1980s [see 339-11, ¶¶ 23–24]. Thus, Dr. Osswald did consider this criticism and found it inapplicable. To the extent that Defendant believes Dr. Osswald should have considered other health concerns or evidence suggesting these concerns did not dissipate in the 1980s, Defendant can expose the shakiness of his conclusions on cross. Defendant also

---

[20] If Defendant's connector appears in the field as a combination of stainless steel braids over the hose lining, then it is unclear how Dr. Osswald's comparison of the "strength" of the hose's component parts in isolation is helpful to the trier of the fact—especially if these parts, when combined, are stronger than PVC. But Defendant does not directly challenge this opinion's relevance, and the Court cannot say at this juncture that this opinion lacks any tendency to make a fact of consequence more or less probable.

argues that Dr. Osswald "did not consider the relative manufacturing ease of the different materials" [337-1, at 20], but (again) does not explain why his opinion is unreliable for not doing so. That Defendant wishes Dr. Osswald would have emphasized different factors or looked at additional evidence does not mean his methodology fails Rule 702. *Smith*, 215 F.3d at 718.

**vi.      Dr. David P. Pope, Ph.D.**

Plaintiffs retained Dr. Pope to opine that Defendant's use of a braided stainless steel sheath is a design defect because stainless steel will corrode when it comes in contact with chlorine and chlorides, which are commonly found in household products such as table salt. Defendant does not dispute the first premise (*i.e.*, chlorides will corrode stainless steel), but challenges Dr. Pope's conclusion (*i.e.*, a product is defective for failing to account for such corrosion) as entirely unsupported and speculative. The Court agrees.

Dr. Pope's analysis boils down to this: it is "virtually certain that some fraction of the supply lines in service will come in contact with chlorine," the stainless steel sheaths "will be compromised," and the line "will burst" if the inner lining of the hose is "insufficiently strong." [339-13, at 5–6.] Therefore, he concludes, Defendant's products were "defectively designed by not anticipating and accounting for corrosion of the braided stainless steel sheath." *Id.* at 6. Dr. Pope never indicates what "fraction" of supply lines will have chlorine contact, how this contact occurs, how much exposure to chlorine is needed to "compromise[]" the sheath, how much time it takes to compromise the sheath's integrity, how he determined whether or what percentage of Defendant's hose lining would be "insufficiently strong," or the relative costs or feasibility associated with switching to a different design. Dr. Pope employs no discernable methodology for distinguishing a product that fails because of a design defect rather than consumer misuse or any other reason. His conclusion that "some [unknown] fraction" of supply lines "will burst"

because of an unknown amount chlorine contact for an unknown amount of time based on an unknown reason means *ipso facto* Defendant's product was defectively designed bears no resemblance to the relevant test for determining whether a product's design is defective. See, *e.g.*, *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002) (explaining California's "consumer expectation test" and "risk-benefit test" for proving design defects). This *ipse dixit* conclusion is neither helpful nor reliable and will be excluded.

Defendant also seeks to exclude Dr. Pope's alleged opinions about "homeowner behavior," including whether homeowners fail to follow the labels on certain cleaners by using them on Defendant's connectors. [337-1, at 19.] These opinions do not appear in Dr. Pope's report. Rather, *Defendant* elicited these opinions during Dr. Pope's deposition. If Defendant did not think he was qualified to offer such opinions, it should not have directly asked him to do so. [See 339-14, at 132:10–14 (Q: "So would you expect a homeowner to use this [cleaner] to clean a connector." A: Again, we're getting out of my area of expertise, but I would not be surprised if a homeowner did do that.").] The Court will not strike such deposition testimony simply because Defendant does not like his answers.

Accordingly, Defendant's motion to exclude Plaintiffs' technical experts' opinions and testimony [337] is denied in part and granted in part.

### 2.    Dr. Melissa Pittaoulis and Frank Bernatowicz

Plaintiffs retained Dr. Melissa Pittaoulis to develop a conjoint study to assess the impact that two attributes—the "NO BURST" representation and 10-year warranty—have on consumers' willingness-to-pay ("WTP") for Defendant's product. [377, at 4.] Dr. Pittaoulis' conjoint study will include 400 participants who bought a water supply line within the past year or intend to do so next year. [318, ¶ 16.] Her survey targets ordinary consumers, not plumbers

or other professionals. Survey respondents will be shown a set of products, each described in terms of five "attributes" or product characteristics, and asked to select which product they would be likely to purchase. *Id.* ¶ 12. Dr. Pittaoulis aims to measure how consumers trade-off different features of Defendant's product, so that one can "estimate the increase (or decrease) in value associated with" these attributes. [377, at 5.] These attributes will, in theory, serve "as a proxy to measure consumers' perceived difference in value between defective and non-defective connectors." *Id.* at 4–5.

Dr. Pittaoulis has not carried out her planned study yet, but once she does, Frank Bernatowicz will then use the WTP measurement that results from Dr. Pittaoulis' study to calculate the damages. Specifically, Bernatowicz will use the average WTP coefficient for the warranty and no-burst attributes to determine how much a consumer "overpaid" for products that did not have these attributes, and multiply that number by the total number of connectors sold. [336-1, at 8.] Under this measurement, every purchaser of Defendant's product was injured when they received a defective product "without regard to later manifestation of the defect" [71, ¶ 37] and thus "damages" are the "difference between the market value of the products as promised (i.e. – non-defective) versus the value of the products as delivered at the point of sale (i.e. – defective)" [377, at 6]. Plaintiffs rely on this Pittaoulis–Bernatowicz combination to show that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

Defendant raises two main challenges to Dr. Pittaoulis's conjoint study: (1) it does not measure damages for any relevant or legally cognizable theory of liability, and thus fails to satisfy *Comcast*; and (2) its methodology and assumptions are unreliable under *Daubert*. [See 334.] Defendant also contends that Bernatowicz's calculation incorrectly assumes that damages

for a "defective" product would be the absence of these attributes at the point of sale. The Court defers discussion of Defendant's first and third arguments, which are more appropriately directed to Plaintiffs' class certification motion, and instead turns to Defendant's methodological challenge to Dr. Pittaoulis's proposed study. See *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015) (discussing how *Comcast* arguments are not *Daubert* arguments).

"Courts have generally found consumer survey evidence admissible under *Daubert* if a qualified expert testifies that the survey was conducted according to generally-accepted principles of survey research." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003). A court assessing whether a survey employs a reliable methodology examines whether "(1) the 'universe' was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (N.D. Ill. 2009) (citation omitted). "Although these criteria generally address the weight a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant—and thus inadmissible." *Id.*; *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007) ("[S]urvey evidence in debt-collection as in trademark cases must comply with the principles of professional survey research; if it does not, it is not even admissible."). Nonetheless, only in "rare" situations will a proffered survey be "so flawed as to be completely

unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

Because Dr. Pittaoulis's survey has not been conducted yet, most of these metrics do not apply to assessing the reliability of her proposed study.[21]  Defendant's methodological challenge focuses on the first two of these metrics.  First, Defendant argues that Plaintiffs' survey selects an unrepresentative sample of respondents because it measures only ordinary consumer preferences.  It is undisputed that the vast majority of Defendant's products are purchased by plumbing professionals for subsequent installation in the end-user's home or business.  Specifically, from 2009 to 2015, "approximately 66 to 76 percent of the U.S. connector sales were made in the wholesale channel."  [334-8, ¶ 13.]  Ten out of the fourteen class representatives did not purchase Defendant's products directly—instead purchasing a home with Defendant's product already installed or relying on a plumber to purchase the product for them.  [340, at 29.]  Because the majority of consumers purchase Defendant's products "indirectly through a plumber," a survey directly measuring the price premium that an ordinary consumer might pay for a "missing attribute" is unrepresentative and irrelevant.  [403, at 9.]

Plaintiffs respond by arguing that professional plumbers are not part of the proposed class definition—only "consumers" are—and so Dr. Pittaoulis plans to survey only ordinary consumers "who have or will purchase" Defendant's products.  [377, at 9.]  Plaintiffs argue that these consumers are the correct population to sample "because it is consumers who are the

---

[21]  To the extent Defendant challenges Dr. Pittaoulis's survey as unreliable because she "has not performed a survey or even conducted any preliminary testing to ensure that the survey she designed will be meaningful" [336-1, at 7], the Court disagrees that *Daubert* imposes such a requirement.  See *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *9 (C.D. Cal. July 24, 2014) ("*Daubert* does not require plaintiffs to actually run their damages models to make [expert's] testimony admissible for purposes of class certification."); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) ("[T]he Court disagrees with Defendant that [expert] must have already performed his proposed conjoint analysis for the Court to consider the proffered methodology.").  If the survey, once conducted, does not generate a WTP coefficient for these attributes, then this fact will go to the merits of Plaintiffs' claims.

ultimate users of the products and consumers who bear the burden of the defects." *Id.* Thus, Defendant's concerns are "highly academic" and irrelevant. *Id.*

The Court disagrees. "For a survey to be valid, 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.'" *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) (citation omitted). If Dr. Pittaoulis is seeking to "examine the trade-offs that consumers make among different features *when buying a product* or service," then she needs to identify a representative sample of those who buy Defendant's products. [334-3, ¶ 11 (emphasis added).] In the clear majority of cases, that purchaser is a plumber, plumbing professional, or wholesale buyer. Just because end-users will "bear the burden" of any alleged defect does not make their preferences representative if 99 percent of the time a plumber with potentially different preferences is making the purchasing decision.[22] Dr. Pittaoulis does not evaluate whether the preferences of plumbers and ordinary consumers are the same or account for any differences if they are not. She simply ignores the majority of typical purchasers in her survey. That significantly undermines the relevance of her survey.[23] See *LG Elecs.*, 661 F. Supp. 2d at 952 ("A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant." (citation omitted)); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010) (finding survey's relevance "greatly harmed" by "failure to focus the study on the consumers in the market at issue in this case").

---

[22] [See, *e.g.*, 334-4, at 178:8–18 (Q: "If 99 percent of the actual purchasers are professionals, all you're measuring in your survey is the one percent, correct? A: My survey results apply to just that one percent of consumers." Q: "And did you do anything to determine whether the group you proposed studying is one percent of the market, ten percent of the market, 50 percent of the market? A: No.").]

[23] Plaintiffs argue that Dr. Rao "conceded" at his deposition that plumbers did not need to be surveyed. [377, at 9.] Dr. Rao was asked—confusingly—if plumbers "should" be the "target" of a survey if they were "not part of the class definition" [380-2, at 58:3–8], which is not the same as asking if a survey that entirely excludes plumbers is reliable. The question seems to presume that the class definition establishes whose preferences matter. It does not speak to the test for admissibility under Rule 702, and the Court is not persuaded that this single answer from Dr. Rao satisfies Plaintiff's burden under *Daubert*.

Nor do Plaintiffs explain how a conjoint study will reliably measure the WTP for consumers who indirectly acquire a toilet connector through a third-party. In fact, Plaintiffs' class certification motion relies heavily on the fact that Defendant sells predominately to wholesalers and "does not sell 'No Burst Connectors' directly to consumers." [See 371, at 16–18 (arguing that California law should apply nationwide).] All of the cases cited by Plaintiffs on conjoint studies involve products that almost always are directly purchased by consumers.[24] Plaintiffs never explain why the WTP of a consumer purchasing a home with hundreds of products already installed (including a toilet connector) is comparable to a consumer making an isolated purchase of a toilet connector presumably for home repairs.[25] Likewise, Plaintiffs offer the Court no reason to equate the WTP of a consumer who directly purchases a toilet connector with one who outsources that decision to a plumber but never personally evaluates the significance of the "NO-BURST" statement or warranty. While it is possible that the price

---

[24] See *ConAgra*, 90 F. Supp. 3d at 939 (cooking oil); *Sanchez-Knutson*, 310 F.R.D. at 533 (automobiles); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1072 (D. Minn. 2015) (anti-virus software "download insurance"); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 724, 730 (N.D. Ohio 2014) (washing machines); *Guido*, 2014 WL 6603730, at *1 (hair care products); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020 (N.D. Cal. 2013) (video players and video game consoles); *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1112 (W.D. Wash. 2012) (video game consoles); *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 368 (N.D. Cal. 2010) (beverages).

[25] When asked at oral argument for Plaintiffs' best case where a court admitted a conjoint study that measured the "preferences" of the "ultimate users of the products" who were not direct users [486, at 1 (Question 4)], Plaintiffs offered *Intel Corporation v. Advanced Micro Devices, Incorporated*, 756 F. Supp. 1292 (N.D. Cal. 1991). This microprocessor trademark infringement case analyzes whether end users or direct purchasers are the appropriate group of purchasers to test "purchaser perception on the issues of purported genericness." *Id.* at 1293. The court chose the direct purchasers (the "usual buyers"). *Id.* at 1294–95. Thus, Plaintiffs' best case does not address the survey's admissibility under Rule 702 (it predates *Daubert*), it does not test consumer preferences, and it comes out in favor of surveying the direct purchasers rather than the ultimate users. Furthermore, the court in *Intel*'s reasoning was that a microprocessor is "an ingredient of another product" like a computer and not "a single product" that passes unchanged to the consumer (which *Intel* reasoned could warrant measuring the end user). Defendant's connector is much more like a microprocessor than a "single product, complete in itself" like a Teflon frying pan. *Id.* at 1294. Most consumers buy a finished product (a new house, a remodeled bathroom, a fixed toilet, etc.) that contains Defendant's product as a component part, just like a microprocessor is a component part of the computer purchased by the consumer.

premium that a plumber paid for that attribute was not absorbed by the plumber and was passed along undiluted to the ultimate consumer, Plaintiffs have no reliable basis for making this assumption.  The failure to address *any* of these methodological issues raises reliability and relevance concerns under Rule 702.

Second, Defendant advances several challenges to whether Dr. Pittaoulis's survey will reliably measure purchasers' WTP.  Most of Defendant's arguments—the survey's small sample size,[26] unrepresentative sample composition,[27] whether the results of conjoint studies can be adequately extrapolated to the retail setting, whether "price" is an appropriate attribute to measure, and whether her study adequately accounts for various supply side factors like shelf space, market share, competition, and retailer discounts—go to weight, not admissibility.  One other aspect of Dr. Pittaoulis's survey design, however, merits further discussion.

Dr. Pittaoulis plans to measure five attributes:  brand name, tubing material (*e.g.*, PVC, copper, stainless steel), package phrase (*e.g.*, "No Burst"), warranty length, and total price.  [334-3, ¶ 21.]  Her report does not state why she chose these particular attributes.  Cf. *ConAgra*, 90 F. Supp. 3d at 954 ("Contrary to [defendant's] suggestion, moreover, [expert] does explain why she

---

[26] Defendant argues that the 400-person sample size of Pittaoulis's study is too small to provide meaningfully reliable results.  Plaintiffs respond that sample size challenges go to weight, courts have admitted conjoint studies with sample sizes as small as 309 respondents, and Dr. Pittaoulis asserts that her survey population "is large enough that the results will be statistically meaningful."  [377, at 9.]  While the Court is not required to take Dr. Pittaoulis's assertion "on faith," *Minasian*, 109 F.3d at 1216, and Dr. Pittaoulis does not explain how she selected a 400-person sample size, how she verified this will produce statistically meaningful results, or how she confirmed that splitting her sample into two groups of 200 respondents will still produce statistically meaningful results, the Court cannot say that Defendant's sample size challenge goes to more than the weight of Dr. Pittaoulis's opinions.

[27] While Dr. Pittaoulis's survey design states that "[g]ender and age quotas will be used to ensure that the sample does not over or under-represent any particular gender or age category" [334-3, ¶ 18], Defendant argues that 70 percent of homeowners who purchase plumbing parts are male (while 92 percent of plumbers are male and between 25 and 64 years old).  [336-1, at 11 n.7.]  Dr. Pittaoulis testified at her deposition, however, that she meant that the starting pool of 4,800 respondents would be balanced through gender and age quotas, and she would rely on the survey screening questions (such as whether they are likely to purchase a water supply line) to determine the ultimate age and gender makeup of the 400-person sample.  [334-4, at 85:2–20.]  Defendant does not explain why that methodology is unreliable.

chose to limit her analysis to six attributes and why she chose the attributes she did."). Plaintiffs simply assert—without support—that this proposed study "contains a sufficient number and appropriate mix of product attributes." [377, at 10.] Dr. Pittaoulis's report indicates that "[t]o the extent that there is any other feature that may have an impact on consumers' preferences for water supply lines (other than size specifications), I will consider adding a sixth attribute." [334-3, ¶ 21 n.21.] Neither Dr. Pittaoulis nor Plaintiffs explain how she how she will identify this "feature" or ultimately decide whether to add another attribute.

In other conjoint analyses cases, experts first "ask[] respondents to prioritize 18 attributes of each accused product to come up with a list of six attributes that have similar values," and then attempt to estimate an attribute's relative value through a second survey. See *TVI*, 929 F. Supp. 2d at 1021; see also *Oracle Am., Inc. v. Google Inc.*, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012) (finding that expert performing a conjoint analysis "had no reasonable criteria for choosing the four non-patented features to test; instead, he picked a low number to force participants to focus on the patented functionalities, warping what would have been their real-world considerations"). Here, two of the studies on Dr. Pittaoulis's reliance list state that factors influencing the purchasing decisions for water supply lines include "quality, strength/durability, appearance, specificity in product specifications/features, promotions, counter recommendations, * * * ease and quickness of installation, reliability, universal fit, availability in a variety of lengths, ability to stop leaks, corrosion resistance material, and easy to follow instructions." [334-7, ¶ 17.] One of those studies indicates "quality, availability, and accessibility are more important reasons for purchase than price." *Id.* ¶ 13 n.2.

In response, Plaintiffs argue that "several" of these metrics "do not translate into concrete features" [377, at 11]—a point they immediately undermine by stating that terms like "No Burst"

or a warranty serve as "proxies that customers may use to gauge" these features (*id.*). Dr. Pittaoulis does not indicate how she decided these other attributes were unimportant, how she determined they could not be measured, or whether she attempted to come up with a proxy for these other attributes. It appears she simply disregarded them.[28] By selecting these four non-price attributes without determining if they play an important role in real-world consumers' preferences, Dr. Pittaoulis's survey potentially elevates the two attributes linked to Plaintiffs' damages claims and inflates respondents' WTP estimate for these attributes.

While any one of these methodological issues, standing alone, might not be fatal, the Court is sufficiently concerned that their combination renders Dr. Pittaoulis's proposed survey unreliable. Asking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages. Indeed, Plaintiffs conceded at oral argument that asking the wrong people the wrong questions would pose admissibility issues under *Daubert*. While the Court does not hold that no reliable conjoint study could be developed here, Plaintiffs have failed to show that Dr. Pittaoulis's proposed study as presently designed is sufficiently reliable to satisfy Rule 702. Accordingly, Defendant's motion to exclude Dr. Pittaoulis's proposed survey [334; 336] is granted.

### C. Preliminary Issues Regarding Class Certification

In their motion for class certification [284], Plaintiffs seek to certify a Rule 23(b)(3) class with the following definition:

---

[28] Plaintiffs argue that Defendant "fails to present any credible evidence—other than Dr. Rao's personal opinion—that the attributes Dr. Rao suggests are somehow more important than the ones proposed by Dr. Pittaoulis." [377, at 11.] That largely misses the point. Defendant is arguing that Dr. Pittaoulis arbitrarily and unreliably chose which attributes she would measure. *Plaintiffs* have the burden to show why Dr. Pittaoulis's selection of certain attributes makes her methodology sufficiently reliable.

- <u>Class 1 - Nationwide class under California CLRA</u>:  All persons who purchased or leased a No-Burst Line, not for resale, or sustained damage from the failure of a No-Burst Water Supply Line, between April 24, 2011, and the date of certification

[286, at 27.]  Plaintiffs also propose three state subclasses:

- <u>Subclass 1</u>:  Pursuant to Rule 23(b)(3), breach of warranty on behalf of all persons who purchased or acquired a No-Burst Line, or sustained damage from the failure of a No-Burst Line, between April 24, 2004, and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, and Tennessee.

- <u>Subclass 2</u>:  Pursuant to Rule 23(c)(4), negligence on behalf of all persons who sustained damage from the failure of a No-Burst Line, between April 24, 2012 [or applicable statute of limitation], and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California and New Hampshire.

- <u>Subclass 3</u>:  Pursuant to Rule 23(c)(4), strict liability on behalf of all persons who sustained damage from the failure of a No-Burst Line, between April 24, 2012 [or applicable statute of limitation], and the date of certification in Pennsylvania, Vermont, Alabama, Minnesota, Arizona, Illinois, North Dakota, Georgia, Maine, California and New Hampshire.

*Id.*  Plaintiffs also seek certification of 17 issues for the state subclasses.  [See 286-72, at 5–7.]

Before the Court can turn to the viability of these classes, it must first address the choice of law issues presented by Plaintiffs' nationwide class and the application of the Federal Rules of Evidence to Plaintiffs' class certification motion.

### 1.      Choice of Law

Plaintiffs seek to certify a nationwide class based on violations of California's CLRA. The parties agree there is a potential conflict between the laws of California and other states. [286, at 28; 340, at 19–20.]  Accordingly, whether CLRA can apply nationwide turns on choice of law principles, which begs another question:  *Which* state's choice of law principles apply? "When cases are based on diversity of citizenship, the transferee court [in an MDL proceeding] must apply the state laws that the transferor forums would have, according to that forums' choice-of-law rules."  *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 852 (N.D. Ill.

2010); see also *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010). Here, there are five transferor forums: Arizona, California, Illinois, New Hampshire, and Pennsylvania. [See 35.] Neither party argues that any other forum's laws should be analyzed.

Plaintiffs' opening brief addresses choice of law principles from only four of these states, omitting New Hampshire. They then change course in their reply, arguing that their "initial choice of law analysis was over inclusive" because their CLRA class only has two class representatives: Steve Rensel, whose original forum was the Central District of California, and Karen Rhyne, whose original forum was the Northern District of Illinois. [371, at 13 n.23.] As a result, only Illinois's and California's choice of law rules should be considered. Plaintiffs cite nothing to show that the choice of law principles from only the class representatives' transferor fora should be analyzed to determine if one state's law may apply nationwide in a class action.

Nevertheless, the Court need not decide whether Plaintiffs are correct because Illinois's choice of law principles are effectively identical to Arizona, Pennsylvania, and New Hampshire. Both parties agree that Illinois, Arizona, and Pennsylvania adopt the choice of law analysis of the Restatement (Second) of Conflicts of Laws ("Second Restatement"). [See 286, at 28; 340, at 21.] The Second Restatement adheres to the "most significant relationship" test for torts involving property damage. Second Restatement § 147. That test, described in greater detail below, applies the "local law of the state where the injury occurred" unless another state "has a more significant relationship," which is determined by weighing seven factors. *Id.*

Although Plaintiffs ignore New Hampshire's choice of law rules, Defendant does not do much better. Defendant states that "the place of injury is the controlling factor" under New Hampshire law. [340, at 24.] The New Hampshire Supreme Court case that Defendant cites for that proposition shows that the law is exactly the opposite: "[T]his court has *rejected* the

traditional *lex loci delicto* rule that the law of the forum where the injury occurs is paramount."

*LaBounty v. Am. Ins. Co.*, 122 N.H. 738, 741 (1982) (emphasis added). Instead, New Hampshire applies a five factor "choice influencing" test: "(1) the predictability of results; (2) the maintenance of reasonable orderliness and good relationships among the States in the federal system; (3) simplification of the judicial task; (4) advancement of the governmental interest of the forum; (5) and the court's preference for what it regards as the sounder rule of law." *Id.*

Numerous courts have recognized New Hampshire's test to be substantially similar to the "most significant relationship" test. See *Gray v. St. Martin's Press, Inc.*, 1999 WL 813970, at *1 (D.N.H. June 8, 1999); *Baum v. Centronics Computer Corp.*, 1986 WL 15784, at *5 (D.N.H. May 15, 1986); *Wise v. Kentucky Fried Chicken Corp.*, 555 F. Supp. 991, 994 (D.N.H. 1983); *Dunlap v. Aulson Corp.*, 90 F.R.D. 647, 650 n.5 (D.N.H. 1981). Others courts view these two tests as compatible, but continue to apply the five factor test. See, *e.g.*, *Glowski v. Allstate Ins. Co.*, 134 N.H. 196, 198 (1991). Still others apply the "choice influencing" test to tort claims and the "most significant relationship" test to contract claims. *See Aftokinito Properties, Inc. v. Millbrook Ventures, LLC*, 2010 WL 3168295, at *3 (D.N.H. Aug. 9, 2010); *Smith v. Morbark Indus., Inc.*, 733 F. Supp. 484, 487 (D.N.H. 1990). The Court agrees with those who have treated New Hampshire's test as similar to the Second Restatement test. To the extent there are any differences, the Court will discuss them in the context of its analysis below.

### i.      The "Most Significant Relationship" Test

The parties agree that Section 147 of the Second Restatement is the starting point for a choice-of-law analysis under Illinois's choice of law rules. Section 147 states that:

> In an action for an injury to land or other tangible thing, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant

relationship under the principles stated in § 6 to the occurrence, the thing and the parties, in which event the local law of the other state will be applied.

The same test applies "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received." Second Restatement § 148.

These sections raise a "rebuttable presumption" that "'the law to be applied is that of the state where the injury occurred.'"[29] *Fed. Ins. Co. v. J.K. Mfg. Co.*, 933 F. Supp. 2d 1065, 1074 (N.D. Ill. 2013) (citation omitted); *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 865 (7th Cir. 2010) (the "most significant relationship" test "points presumptively to the law of the jurisdiction in which the tort occurred" and "a tort can't be said to occur until an injury is produced—the place where the injury was inflicted."). In other words, "the Second Restatement contemplates a two-step process in which the court (1) chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule [such as Sections 147 or 148], and (2) tests this choice against the principles of § 6 in light of relevant contacts identified by general provisions like § 145 (torts)." *Townsend*, 227 Ill. 2d at 164.

In the instant case, Plaintiffs were injured in their respective home states—whether because this is the state where they acquired Defendant's product or where Defendant's product allegedly failed. Thus, for all putative class members who are not California residents, the

---

[29] To be clear, the Second Restatement does not follow the simpler "place-of-the-injury" rule. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 157 (2007) ("[T]he First Restatement of Conflict of Laws directed a court to apply the *lex loci delicti* to a choice-of-law issue in a tort case, regardless of the nature of the contacts the parties may have possessed with other states."); *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 61 (2007) ("We have jettisoned the *lex loci delicti* rule—also termed the place-of-the-injury rule—and do not merely count contacts, recognizing that other jurisdictions may have an interest in the controversy that are not adequately reflected by a simple tally." (internal citation omitted)). Nevertheless, the Second Restatement provides "specific presumptive rules" that give weight to the location of the injury. *Barbara's Sales*, 227 Ill. 2d at 62.

presumption is that their home state's law, not California law, should apply. "This presumption is a strong one that is difficult to overcome." *Fed. Ins.*, 933 F. Supp. 2d at 1074; see also *Townsend*, 227 Ill. 2d at 163 (rejecting the argument that this presumption is "'evanescent' and 'easily overcome' by any contact with another state"). It can be "overcome only by showing a *more* or *greater* significant relationship to another state." *Townsend*, 227 Ill. 2d at 163.

To see if this presumption is overcome, a court tests "the presumptive choice * * * against the principles of § 6 of the Second Restatement in light of the contacts identified in § 145(2) of the Second Restatement." *Fed. Ins.*, 933 F. Supp. 2d at 1074–75. The Court starts with Section 145(2), which states that the relevant contacts are the place where the injury occurred, the place where the conduct causing the injury occurred, "the domicil, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship, if any, between the parties is centered." Second Restatement § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* "Generally, in a tort case, the two most important contacts are the place where the injury occurred and the place where the conduct causing the injury occurred." *Miller v. Long-Airdox Co.*, 914 F.2d 976, 978 (7th Cir. 1990). The Court analyzes these contacts one at a time.

First, both sides agree that the "place of the injury" is each consumer's home state. Plaintiffs, however, argue that that this contact is irrelevant and the presumption in favor of applying the place of the injury should not apply "in light of the fortuitous nature of the place of injury." [371, at 17.] The Second Restatement states that there will be situations "where the place of injury will not play an important role in the selection of the state of the applicable law" because "the place of injury can be said to be fortuitous" or it otherwise "bears little relation to the occurrence and the parties with respect to the particular issue." Second Restatement § 145,

comment e. Plaintiffs argue that this situation is present here because "a large portion" of Defendant's sales were to wholesalers and Defendant has "no control over where the end of the distribution chain, where the ultimate retailer or where the ultimate consumer and subsequent injury would be," which means the place of a consumer's injury was "unpredictable and fortuitous." [371, at 16–17.] Thus, this case is not like *Townsend* or *Federal Insurance* because those cases involve products "directly sold to a single individual" and the parties "knew with certainty or could foresee where the product would be used." *Id.* at 17 n.32.

"Although there is indeed a line of cases dismissing the place of the injury as 'fortuitous,' these cases typically involve automobile or airplane accidents that occurred while the vehicle was in transit." *Hernandez v. Cottrell, Inc.*, 2014 WL 1292336, at *4 (N.D. Ill. Mar. 31, 2014) (collecting cases); accord *Labuda v. Schmidt*, 2005 WL 2290247, at *5 (N.D. Ill. Sept. 19, 2005) (discussing fortuity cases); *Fisher v. Brilliant World Int'l*, 2011 WL 3471222, at *2 (N.D. Ill. Aug. 4, 2011) ("Cases in which an injury's location was deemed merely fortuitous usually concerned accidents occurring during interstate travel.").[30]  This case has "none of the trappings of a 'flyover' case." *Jaurequi v. John Deere Co.*, 986 F.2d 170, 175 (7th Cir. 1993).  During oral argument, Plaintiffs were given an opportunity to identify cases applying this fortuity doctrine outside of the interstate travel context [see 486, at 2 (Question 12)].  They did not do so.

Plaintiffs and the products they bought have a "settled connection with the state" where the injury occurred.  Second Restatement § 147, comment e ("The local law of the state where the injury occurred is most likely to be applied when the injury is done to * * * a chattel that has a settled connection with the state, which means that it is located in the state for other than a temporary purpose.  The same law will usually be applied even though the chattel has no settled

---

[30] For that reason, Plaintiffs' reliance on car accident cases like *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 2012 WL 6964868 (Ill. App. Ct. Aug. 6, 2012), is misplaced.  [See 371, at 17 n.33.]

connection with the state, if the person seeking recovery * * * has a settled relationship to the state, either because he is domiciled or resides there."). Simply put, Plaintiffs live in the state where they were injured. See *Quaid v. Baxter Healthcare Corp.*, 392 Ill. App. 3d 757, 774 (2009) ("The fact that the injury occurred in California is not fortuitous, since that is where plaintiffs live."); *Hammond v. Sys. Transp., Inc.*, 2012 WL 3234865, at *12 (C.D. Ill. Aug. 6, 2012) ("[T]he place of injury here is not fortuitous: decedents were driving on the roads of their home state when their Jeep was struck."). They also purchased and installed the connector in their home states. *Townsend,* 227 Ill. 2d at 168. Nothing about Plaintiffs' injury from an allegedly defective product bought and used in their homes makes their home states "fortuitous."

Plaintiffs cite nothing to support their claim that the place of the injury is fortuitous (and thus less important) unless the defendant selling the product controls the entire distribution chain.[31] Plaintiffs pled that Defendant "conducts substantial business in Illinois and throughout the United States, including the sale and distribution of its water supply lines." [127, ¶ 95.] The fact that Defendant intended to sell its products to nationwide stores like "Home Depot, Lowe's, Menards, TrueValue, Walmart, and Ace Hardware" (*id.*) demonstrates that it intended to sell their connectors in states like Illinois where those stores were located. That Plaintiffs acquired Defendant's product through an intermediary in their home states does not make Plaintiffs' home states a fortuity.

The second contact—the place where the conduct causing the injury occurred—is a wash. When evaluating this contact, "[t]he Illinois Supreme Court instructs courts to consider 'all conduct from any source contributing to the injury,' including affirmative defenses." *Fisher,*

---

[31] Accepting Plaintiffs' argument that Defendant had "little, or no, reason to foresee that his act would result in injury in the particular state" [371, at 17 n.33] begs the question of whether any federal court outside of California could exercise specific personal jurisdiction over Defendant in a consumer product defect case. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ("[D]efendant [can]not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts.").

2011 WL 3471222, at *3 (quoting *Townsend,* 227 Ill. 2d at 169). Plaintiffs argue that Defendant's "decisions regarding the design, manufacture, distribution, and labeling" of its products occurred in California. [286, at 29.] Defendant argues that Plaintiffs' comparative fault during installation and alleged misuse occurred in their respective homes. [340, at 23.]

To avoid this outcome, Plaintiffs responded in their briefs that contacts based on affirmative defenses "should have no bearing" in cases dealing with a latent defect. [371, at 17.] They offer no support for that rule—likely because the law is otherwise. See, *e.g.*, *Fed. Ins.*, 933 F. Supp. 2d at 1075.[32] Plaintiffs also sought to emphasize California's significance at oral argument by describing this case as one where "all of the key decisions * * * emanate from the State of California" and there is "absolute and truly undisputed centralization of conduct emanating from the state of California." For this reason, according to Plaintiffs, this is a "unique case where you can thread the needle" on choice of law issues to find for Plaintiff. The Illinois Supreme Court has rejected this very argument. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 189 (2005) ("The appellate court's conclusion that a scheme to defraud was 'disseminated' from [defendant's] headquarters is insufficient."); see also *Barbara's Sales*, 227 Ill. 2d at 70 ("Plaintiffs' further attempt to tie this case to California law because Intel's representation emanated from there does not accord with any previous precedent of any Illinois court."). No "state has applied a uniform place-of-the-defendant's-headquarters rule to products-liability cases." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016 (7th Cir. 2002).[33]

---

[32] At oral argument, counsel for Plaintiffs acknowledged that "the Court does get to take affirmative defenses into account" in its choice of law analysis.

[33] This one-size-fits-all choice of law rule could exist, of course. It is just not the Second Restatement's rule. While Plaintiffs believe that this rule would aid consumers in this case, such a one-way ratchet could just as easily harm consumers in the next one, depending on the defendant's headquarters.

Indeed, the fact that Plaintiffs describe their *own* claims as requiring needle threading shows just how shaky their choice-of-law argument is.

The third contact—the parties' domicile or place of business—is also a wash. Plaintiffs emphasize that Defendant is headquartered and incorporated in California, where it conducts its "sales, marketing, product development, engineering, and research, for the products at issue." [286, at 30.] Defendant has "more employees" in California than other states, "all of the design and labeling decisions" are made in California, the department that responds to customer complaints is located in California, and Defendant either manufactured or oversaw the manufacturing of its product from California. *Id.*[34] According to Plaintiffs, "No conduct concerning [Defendant's] potential liability occurred outside of California." *Id.* Plaintiffs, however, ignore the respective domiciles of the putative class members, which are also the states where each class member purchased, installed, used, and maintained Defendant's product. Both Plaintiffs' and Defendant's contacts matter in the Court's analysis. *Townsend*, 227 Ill. 2d at 169.

The fourth relevant contact is where the relationship between the parties is centered, but this factor is less important in a case like this one. "[P]roduct liability arises out of the most casual 'relationship' imaginable, the one-time purchase and sale of the product." *Ness v. Ford Motor Co.*, 1993 WL 996164, at *3 (N.D. Ill. July 20, 1993). "The relationship between the Plaintiff and Defendant is, at best, second-hand and impersonal." *Piska v. Gen. Motors Corp.*, 2004 WL 2423830, at *6 (N.D. Ill. Oct. 28, 2004). Whether one accepts that the relevant relationship "arise[s]" from each Plaintiffs' acquisition of Defendant's product, *Townsend*, 227 Ill. 2d at 169, or that the alleged injury "was caused by an act done prior to any relationship formed," [286, at 30], the Court does not view this factor as significant in the instant case.

---

[34] The evidence on this last point is somewhat in conflict. [Compare 340-2, ¶ 5 (stating Defendant manufactured its products in Mexico from 2001 to 2010), with 286, at 30 ("[Defendant] also manufactured the defective products in California until 2010").]

In sum, the place of the injury favors the Plaintiffs' respective home states, the place of the conduct and location of the parties are a wash, and the center of the parties' relationship is a non-factor. None of these factors points to California having a more significant relationship to this case than Plaintiffs' home states.[35] But courts should not simply "count contacts." *Barbara's Sales*, 227 Ill. 2d at 61. Instead, they must consider those contacts in light of the principles of Section 6 of the Second Restatement. *Townsend*, 227 Ill. 2d at 169.

The principles identified in Section 6 direct the Court to consider: (a) the needs of the interstate systems; (b) the forum's relevant policies; (c) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue"; (d) "the protection of justified expectations"; (e) "the basic policies underlying the particular field of law"; (f) "certainty, predictability and uniformity of result"; and (g) "ease in the determination

---

[35] Neither side invests much effort in analyzing Second Restatement Section 148, which Plaintiffs invoke in their opening brief. [See 286, at 28.] That may be because Section 148 does not apply "where the false representations result in physical injury to * * * tangible things," deferring to Section 147. See Second Restatement § 148, comment a. Even so, Section 148 points more emphatically away from California. "[T]he Illinois Supreme Court has endorsed the Restatement's position that the plaintiff's domicile or residence is 'of substantial significance' because a financial loss usually will be of greatest concern to the state to which the person suffering the loss has the greatest relationship." *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 925 (N.D. Ill. 2016); *Barbara's Sales*, 227 Ill. 2d at 68 ("'[A] financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship. * * * The domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant.'" (quoting Second Restatement § 148, comment i)). The Illinois Supreme Court has also rejected the argument that the law of the defendant's headquarters controls simply because the "scheme to defraud" or misrepresentations "emanated" from there. *Barbara's Sales*, 227 Ill. 2d at 68. Moreover, "where a plaintiff relies on a representation in the same state where that representation was made and received, the law of that state applies." *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008). Any alleged injury here occurred in the state where each plaintiff received the alleged misrepresentation (Second Restatement § 148(2)(b)) and relied on it (*id.* § 148(2)(a)), which occurred when that plaintiff acquired Defendant's product (*id.* § 148(2)(e)). See also *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) ("If recovery for breach of warranty or consumer fraud is possible, the injury is decidedly where the *consumer* is located, rather than where the seller maintains its headquarters."); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 214–15 (E.D. Pa. 2000) (holding that the "putative class members' residence is a contact of greater significance than defendant's principal place of business" and concluding that "each putative class member's claim arises under the consumer fraud act of his or her state of residence or the state in which his or her [product] was purchased"). That means the Plaintiffs' home states have a more significant relationship to this action than California.

and application of the law to be applied." Second Restatement § 6(2). Three of these factors (b, c, and e) are most relevant in tort cases. *Fed. Ins.*, 933 F. Supp. 2d at 1076; *Fisher*, 2011 WL 3471222, at *4. The needs of the interstate system, the protection of "justified expectations," and the "predictability and uniformity" of the result have little relevance in product defect cases like this one. See *Dougherty v. Lincare, Inc.*, 2011 WL 1361553, at *3 (D. Ariz. Apr. 11, 2011) ("In this negligence case, it is highly unlikely that the parties gave any thought to the tort consequences of their transaction.").[36]

Defendant provides a nationwide survey of the consumer protection laws of all fifty states and the District of Columbia. [See 342-31.] "State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *Bridgestone*, 288 F.3d at 1018. All fifty-one jurisdictions' consumer protection laws differ significantly on procedural (length and accrual of the statute of limitations, statutory standing, and notice) and substantive (reliance, causation, state of mind, and remedies) dimensions. [See 342-31.]

"[T]he State with the strongest interest in regulating such conduct is the State where the consumers—the residents protected by *its consumer*-protection laws—are harmed by it." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) (applying the Second Restatement); *Clark v. Experian Info. Sols. Inc.*, 2005 WL 1027125, at *4 (N.D. Ill. Apr. 26, 2005) ("The primary purpose of consumer-protection statutes is to protect consumers from fraudulent sales. The focus of the statutes is protecting the consumer."). Plaintiffs' home states have "an interest in ensuring that safe products are used within [their] borders," "deterring the use of defective products within [their] borders," and "protecting [their] citizens * * * whose

---

[36] New Hampshire's choice of law analysis is the same here, see *LaBounty*, 122 N.H. at 742–43, effectively leaving "advancement of the governmental interest of the forum" and "the court's preference for what it regards as the sounder rule of law" as the only other two factors.

property is injured within [their] borders." *Fed. Ins.*, 933 F. Supp. 2d at 1076; see also *Jaurequi v. John Deere Co.*, 986 F.2d 170, 175 (7th Cir. 1993). "[T]here does not appear to be any interest on the part of Illinois in the application of its standards in preference or deference to California's standards to protect Illinois consumers." *Barbara's Sales*, 227 Ill. 2d at 63.

It is "undoubtedly true that California has an interest in regulating [Defendant], as its principal place of business is located there." *Id.* "[I]t is also true that California has a consumer-friendly consumer protection law * * * which may inure to the benefit of plaintiffs." *Id.* But California consumers can still sue Defendant in California and "neither California consumers, nor the interests of California in regulating [Defendant], will necessarily suffer" if other states apply their own laws in cases involving their own citizens and injuries that occurred in their own states. *Id.* "While, to be sure, [California] has an interest in deterring misconduct by corporations headquartered within its borders, it is far from clear that this interest would be sufficient to outweigh other significant contacts with a plaintiff's home state." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 210 (3d Cir. 2013) (applying Second Restatement).

Plaintiffs argue that "application of a single state's law to a nationwide class would be simple and ensure certainty, predictability, and a uniform result." [286, at 31.] But the relevant choice of law issue is whether the particular foreign state's law is easy to apply, not whether it is easier to apply one state's law rather than all fifty states' laws. See *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("Plaintiffs' argument that California law is the best choice for this nationwide class is based on a false premise that one state's law must be chosen to apply to all 44 jurisdictions."). A court cannot disregard federalism "in order to facilitate class treatment." *Bridgestone*, 288 F.3d at 1020. "Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be

overridden in a quest to clear the queue in court." *Id.*; *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 570–71 (1996). Here, "while use of California law may not be difficult, the use by a forum of its own laws does not present any further difficulty." *Barbara's Sales*, 227 Ill. 2d at 64. "California's stated interest in applying its laws outside of its borders does not override" the contacts of Plaintiffs' home states. *Clark*, 2005 WL 1027125, at *5.

While most of the Section 6 factors are either irrelevant or neutral in this case, one factor—the relevant policies of the forum—strongly suggests that each consumer's home state has a stronger interest in protecting its own consumers than California. In light of the Section 147 contacts described above, the Section 6 analysis also favors the consumer's home state.[37] Therefore, each Plaintiff's home state has the most significant relationship to his or her claims.

### ii. California's "Governmental Interest" Test

California undertakes a "two-step" choice of law analysis. *Arroyo v. TP-Link USA Corp.*, 2015 WL 5698752, at *3 (N.D. Cal. Sept. 29, 2015). Plaintiffs must first show that the application of California law comports with due process, meaning that "California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza*, 666 F.3d at 589 (citation omitted). Once that showing is made, "the burden shifts to the

---

[37] Plaintiffs cite several cases [see 286, at 31–32 nn.178–182], but none bear any resemblance to this one because they either do not apply the Second Restatement's test or their facts are not analogous. See *Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685, 695 (D. Ariz. 2006) (applying law of state where conduct causing injury occurred because most parties were located there, the parties' contractual relationship was based in that state, and there were no significant differences on the relevant liability issues between the various fora); *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 485 (N.D. Cal. 2011) (analyzing whether application of California law satisfies due process and applying the California choice of law test because "the parties have an agreement that another jurisdiction's law will govern their disputes"); *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1187–89 (applying California choice of law test and, ultimately, California law after concluding injuries occurred in California); *Clark v. TAP Pharm. Prod., Inc.*, 343 Ill. App. 3d 538, 547 (2003) (relying on analysis from *Avery v. State Farm Mut. Auto. Ins. Co.*, 321 Ill. App. 3d 269 (2001) that was subsequently reversed and vacated by the Illinois Supreme Court in *Avery*, 216 Ill. 2d at 189–190); *Donovan v. Idant Labs.*, 625 F. Supp. 2d 256, 70–71 (E.D. Pa. 2009) (finding contract claims weighed in favor of New York law, and then adopting the same conclusion with little analysis for tort claims).

other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Id.* at 590 (citation omitted). That second step is decided based on the three-factor "government interest" test, which directs a court to (1) determine if there are differences between the "potentially affected jurisdictions with regard to the particular issue in question"; (2) examine "each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists"; and (3) "compare[] the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* (citation omitted). Ultimately, the Court is to apply "the law of the state whose interest would be more impaired if its law were not applied." *Id.* (citation omitted).

Plaintiffs do not conduct any specific analysis of California's contacts for each class member's claims. [See 286, at 32.] At oral argument, Defendant conceded that this requirement was met (at least with respect to Defendant's due process rights). Defendant is headquartered and incorporated in California, its marketing, design, and labeling decisions occur there, and the alleged misrepresentations appear on Defendant's product itself, whose sale originated from California. *Id.* at 30. In these circumstances, "application of the California consumer protection laws would not be arbitrary or unfair to [D]efendant[]," and thus, constitutional due process is satisfied. *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010); accord *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 485 (N.D. Cal. 2011).

Moving to the second step, Plaintiffs do not dispute that Defendant comprehensively and "exhaustively detail[s]" the ways that all fifty-one jurisdictions' consumer protection laws differ. [340, at 18–19; 342-21]; *Mazza*, 666 F.3d at 591 (outlining the differences in consumer product statutes); see also *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1100 (C.D. Cal. 2012)

(summarizing the "differences among the states' consumer protection laws"); *In re Hitachi Television Optical Block Cases*, 2011 WL 9403, at *6 (S.D. Cal. Jan. 3, 2011) ("[T]here are material conflicts between California's consumer protection laws and the consumer protection laws of the other forty-nine states.").[38]  Nor do Plaintiffs dispute that these differences are material—involving the "essential requirements to establish a claim" and "the types of relief or remedies available to a plaintiff." *Gianino*, 846 F. Supp. 2d at 1102.  "Many of them will mean the difference between success and failure" for Plaintiffs' claims. *Id.*[39]

Likewise, Plaintiffs do not contest that there is a "true conflict" here between California and the interests of the other 49 states (plus the District of Columbia).  "[E]ach state has a strong interest in applying its own consumer protection laws to" the purchases of products within its borders. *Mazza*, 666 F.3d at 592; *Gianino*, 846 F. Supp. 2d at 1102.  "[E]ach state has an interest in setting the appropriate level of liability for companies conducting business within its territory" and "'assur[ing] individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future.'"  *Mazza*, 666 F.3d at 592–93

---

[38] The cases cited by Plaintiffs [286, at 32 n.186] all involve defendants who failed to offer any analysis of states' laws. *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 658 (C.D. Cal. 2014) (Defendants "fail to provide *any case-specific analysis* addressing the differences among the state laws at issue." (emphasis added)); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012) ("Defendants do not even discuss the differences between the consumer protection laws of [different states], let alone address whether these differences are material based on the facts and circumstances of *this* case." (emphasis in original)); *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 549–550 (C.D. Cal. 2012) (same).

[39] For example, "CLRA claims * * * benefit [from] the discovery rule[, which] * * * does not apply to delay commencement of the limitations period on Florida [or New York] consumer protection claims." *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 543–44 (C.D. Cal. 2012) (collecting cases).  Applying CLRA to "New York and Florida plaintiffs whose claims are time-barred under their own states' laws * * * would expand defendants' liability beyond the liability they would face if Florida and New York plaintiffs sued under the laws of those states." *Id.* at 544–45.  New York's consumer protection law also requires "proof of malfunction." *In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006).  As another example, Plaintiffs' "benefit of the bargain" damages theory fails to state a claim under Pennsylvania's statute because of the economic loss doctrine.  See *Whitaker v. Herr Foods, Inc.*, 2016 WL 4060127, at *9 (E.D. Pa. July 29, 2016).

(citation omitted). And each state has an interest in balancing "its duty to protect its consumers from injuries caused by out-of-state businesses with its duty to shield those businesses from what the state may consider excessive regulation or litigation." *Gianino*, 846 F. Supp. 2d at 1102. "These interests are squarely implicated in this case." *Mazza*, 666 F.3d at 593.

The only dispute here is over the nature and strength of each state's interest, which determines the state's interest that is most impaired. California law answers that question in Defendant's favor. Each consumer's home state "ha[s] a compelling interest in protecting their consumers from in-state injuries caused by an out-of-state company doing business within their borders, and in setting the scope of recovery for consumers under their own laws." *Darisse v. Nest Labs, Inc.*, 2016 WL 4385849, at *15 (N.D. Cal. Aug. 15, 2016). Although "California has a significant interest in applying its laws to the consumer transactions that took place within its borders," its "interest in applying its laws to residents of other states who purchased and used the [connectors] in those other states is much more attenuated." *Id.*; *Mazza*, 666 F.3d at 594 ("California's interest in applying its law to residents of foreign states is attenuated."). "[A]pplying California law to the claims of foreign residents concerning acts that took place in other states where [the connectors] were purchased or [acquired]" is not necessary to achieve California's interest in protecting its own citizens and regulating its own corporate citizen, Defendant. *Mazza*, 666 F.3d at 594.

Plaintiffs argue that because most of Defendant's sales were to "plumbers, contractors, and wholesalers," and "[a]ll of those sales were direct sales that occurred in California," the policies of foreign jurisdictions in balancing consumer protection and encouraging business are not served here. [371, at 15.] In other words, because Plaintiffs purchased Defendant's products through intermediaries in their home states rather than directly from Defendant, their home

states' interests in shielding an out-of-state business like Defendant from "excessive litigation" will not be impaired. *Id.* at 14–15 ("[T]he policies of foreign jurisdictions (to encourage commerce by enacting more lenient consumer protection statutes) is not served in this instance."). In contrast, California's interests in regulating its corporate citizens will be impaired if its law is not applied here. *Id.*

Even assuming that all of Defendant's sales to wholesalers and plumbers occurred in California—and Plaintiffs cite nothing to show that is true—Plaintiffs' argument actually emphasizes the weakness of California's interest. First, CLRA regulates only sales to a "consumer"—that is, one who buys a good for a "personal, family, or household purpose." Cal. Civ. Code § 1770(d). Thus, Defendant's direct sales to California wholesalers and plumbers are excluded from CLRA coverage. Whatever interest California has in regulating Defendant's sales to California plumbers, it is not a "consumer protection" interest and so that particular interest is not "impaired" by applying another state's consumer protection law.

Second, "California recognizes that 'with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest.'" *Mazza*, 666 F.3d at 593 (citation omitted). Under California law, the "place of the wrong" is the "state where the last event necessary to make the actor liable occurred." *Id.* at 593–94 (citing California case law showing that the "geographic location of an omission is the place of the transaction where it should have been disclosed" and the "place of the wrong" for a misrepresentation is the state "where the misrepresentations were communicated to the plaintiffs"). Here, no wrong implicated by a consumer protection law could have occurred until the consumer purchased Defendant's product in their home state. Cal. Civ. Code § 1770(a) (requiring a "transaction" to sue under CLRA). "These foreign states have a strong interest in the application of their laws to

transactions between their citizens and corporations doing business within their state." *Mazza*, 666 F.3d at 594. Since the requisite "transaction" that could trigger application of CLRA occurred outside of California and involved a non-California citizen, California's interest is, at best, attenuated. *Id.*

Third, the Court does not see why another state's interest in limiting excessive litigation is implicated only when a company sells products directly to the end-user in the state. As the Ninth Circuit in *Mazza* explained, "states may permissibly differ on the extent to which they will tolerate a degree of lessened protection for consumers to create a more favorable business climate for the companies that the state seeks to attract to do business in the state." *Mazza*, 666 F.3d at 592. If in-state intermediaries (like Home Depot) depend on products from a foreign supplier (like Defendant), then allowing the foreign supplier to be sued based on in-state sales through the intermediary would disincentive business in state. The foreign supplier might elect not to do business with the in-state intermediary (and thus in-state consumers) at all, raise its prices directly, secure an indemnity from the in-state intermediary, or purchase additional insurance. *Id.* ("More expansive consumer protection measures may mean more or greater commercial liability, which in turn may result in higher prices for consumers or a decrease in product availability."). All of these actions potentially undermine the state's interest in a "more favorable business climate." *Id.* Plaintiffs also fail to cite anything showing that—let alone explaining why—states would choose to offer "lessened protection for consumers" when buying a business's product directly rather than through an intermediary. And, even if Plaintiffs were correct, they pled that Defendant "conducts substantial business in Illinois and throughout the United States." [127, ¶ 95.] They offer nothing to explain why this "substantial business" is not

the kind of "business in the state" described by *Mazza* and undermined by their request to apply California law nationwide.

Plaintiffs also argue the Court should apply California law because "all consumers affected by [Defendant's] conduct will benefit from California's consumer protection law." [371, at 15.] However, a court cannot "'weigh' the conflicting governmental interests in the sense of determining which conflicting law manifested the 'better' or the 'worthier' social policy on the specific issue." *Mazza*, 666 F.3d at 593.[40] Instead, courts must "recognize the importance of federalism and every state's right to protect its consumers and promote those businesses within its borders." *Darisse*, 2016 WL 4385849, at *14. In similar circumstances, courts have found that consumers' home state laws should not be subordinated to California law.[41] As a

---

[40] This might be the one area where New Hampshire choice of law analysis differs, since the fifth choice influencing factor is "the Court's preference for what it regards as the sounder rule of law." *LaBounty*, 122 N.H. at 741. "It is not uncommon for a court to conclude after conscientious consideration, * * * 'that its local rules of law are wiser, sounder, and better calculated to serve the total ends of justice under law in the controversy before it than are the competing rules of the other state' involved in the case." *Benoit v. Test Sys., Inc.*, 142 N.H. 47, 53 (1997). The Court follows the same path here by deferring to the local laws of each consumer's home states rather than California's competing rules.

[41] See, *e.g.*, *Mazza*, 666 F.3d at 594 (vacating class certification order and holding that "each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place"); *Glenn v. Hyundai Motor Am.*, 2016 WL 3621280, at *9–10 (C.D. Cal. June 24, 2016) (explaining that "[w]hile it is true [Defendant] is headquartered in California, and Plaintiffs allege the fraudulent omissions originated in California, the transactions at issue took place in [other states and] * * * Plaintiffs are residents of those states" and thus "each of Plaintiffs' individual claims must be governed by the consumer protection laws of their home states," not CLRA); *Cover v. Windsor Surry Co.*, 2016 WL 520991, at *7–8 (N.D. Cal. Feb. 10, 2016) ("Although [Defendant's] marketing materials and warranty emanated from California, the company is headquartered in California, and it designs its products in California," the "last events necessary for liability in this case– the communication of the marketing materials, the purchase of the products, and product deterioration–all occurred in Rhode Island," which meant Rhode Island's interest outweighed California's interest.); *Davison v. Kia Motors Am., Inc.*, 2015 WL 3970502, at *3 (C.D. Cal. June 29, 2015) ("Plaintiff's home state of Washington and other states have a compelling interest in protecting their consumers from in-state injuries caused by a California corporation doing business within their borders and in delineating the scope of recovery for the consumers under their own laws."); *Frezza v. Google Inc.*, 2013 WL 1736788, at *7 (N.D. Cal. Apr. 22, 2013) (although Defendant was headquartered in California, "the last events necessary for liability—the communication of the advertisements to the plaintiffs and their reliance thereon in signing up for the trial period—took place in North Carolina, not in California," which meant North Carolina law applied over California law); *Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174

result, the Court concludes that for non-California class members, their home states' interests would be more impaired if California law were applied nationwide. Accordingly, each class member's claims must be governed by the laws of their respective home state.

### 2. Federal Rules of Evidence and Class Certification

Defendant attaches to its response brief a set of "objections" to the "Non-Expert Evidence" Plaintiffs cite in their class certification motion. Almost every single objection is that Plaintiffs mischaracterize the evidence. [See 342-1.] In addition, Defendant makes hearsay, personal knowledge, expert knowledge, authentication, and the rule of completeness objections. *Id.* They also object that Plaintiffs rely on deposition testimony that exceeds the scope of a Federal Rule of Civil Procedure 30(b)(6) topic (*id.* at 2), although they do not explain how that it is an evidentiary objection. Notably, Defendant does not cite a single case in support of its objections. Plaintiffs filed an opposition brief [372], responding to the "objections" and arguing that the Federal Rules of Evidence do not apply as strictly when considering a class certification motion. Saving any case law support until its reply (after Plaintiffs had responded), Defendant argues that strict application of the rules of evidence is necessary even for class certification motions [402].

The Court is not persuaded. Class certification must be decided "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1), often before merits discovery has occurred. Setting aside *Daubert* and Rule 702, a rigid application of the Federal Rules of Evidence for evaluating the

F.R.D. 332, 348 (D.N.J. 1997) (rejecting the argument that Michigan law applied under the governmental interest test, notwithstanding the fact that "Ford's headquarters are located in Michigan, the vehicles in question were manufactured there, decisions relating to the allegedly defective ignition switches were made there, and any misrepresentations, statements or advertisements regarding the Ford vehicles originated in Michigan," as well as that "Michigan has an interest in regulating Ford's behavior and in making sure that it adheres to minimum levels of care expected of Michigan corporations," because "[e]ach plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws").

authenticity and admissibility of deposition testimony and affidavits attached to a motion for class certification is not required, as numerous courts have found.[42]  The Seventh Circuit permits the same relaxation of the Federal Rules of Evidence for other preliminary motions, like preliminary injunctions.  See *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010).

Defendant argues that such a result ignores Seventh Circuit cases like *Messner* or *Szabo* [402, at 2–6], but those cases do not address the application of the Federal Rules of Evidence to class certification.  Defendant more properly directs the Court to *Mars Steel Corporation v. Continental Bank N.A.*, where the Seventh Circuit stated that "fairness hearings conducted under Fed. R. Civ. P. 23(e) are not among the proceedings excepted from the Rules of Evidence."  880 F.2d 928, 938 (7th Cir. 1989).  What Defendant leaves out is any context.  *Mars Steel* concerned whether the district court abused its discretion in imposing sanctions against the class's attorneys under Rule 11 for filing a motion to strike affidavits submitted at a fairness hearing.  The Seventh Circuit affirmed the sanction, but noted that simply because the attorneys "did not construct a plausible legal argument" does not mean they "couldn't have."  *Id.*  The Seventh Circuit then posited one such "plausible" argument:  the Federal Rules of Evidence apply to a fairness hearing.  *Id.*  The court stated, "No case of which we are aware holds that Rule 1101(d)

---

[42] See, *e.g.*, *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562 n.14 (8th Cir. 1982); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, 2016 WL 3579953, at *2 (E.D. Wis. June 24, 2016); *Flores v. Anjost Corp.*, 284 F.R.D. 112, 124 n.3 (S.D.N.Y. 2012); *Sherman v. Am. Eagle Exp., Inc.*, 2012 WL 748400, at *3 (E.D. Pa. Mar. 8, 2012); *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012); *Heffelfinger v. Elec. Data Sys. Corp.*, 2008 WL 8128621, at *2 n.18 (C.D. Cal. Jan. 7, 2008); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 279 (S.D. Ala. 2006); *Charleswell v. Chase Manhattan Bank, N.A.*, 223 F.R.D. 371, 378 (D.V.I. 2004); *Blihovde v. St. Croix Cty., Wis.*, 219 F.R.D. 607, 618 (W.D. Wis. 2003); *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 582 (W.D. Mich. 2001); *Vinson v. Seven Seventeen HB Philadelphia Corp.*, 2001 WL 1774073, at *20 n.28 (E.D. Pa. Oct. 31, 2001); *In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 597 (D. Minn. 1999); *Dicker v. Allstate Life Ins. Co.*, 1990 WL 106550, at *6 (N.D. Ill. July 12, 1990).  Courts in this Circuit have generally followed the same approach for evaluating Fair Labor Standards Act collective actions.  See *Quality Mgmt. & Consulting Servs., Inc. v. SAR Orland Food Inc.*, 2013 WL 5835915, at *3 (N.D. Ill. Oct. 30, 2013); *Howard v. Securitas Sec. Servs., USA Inc.*, 2009 WL 140126, at *3 (N.D. Ill. Jan. 20, 2009); *Molina v. First Line Sols. LLC*, 566 F. Supp. 2d 770, 788 n.20 (N.D. Ill. 2007); *Coan v. Nightingale Home Healthcare, Inc.*, 2005 WL 1799454, at *1 n.1 (S.D. Ind. June 29, 2005).

suspends the usual rules of evidence for fairness hearings; no case expressly holds that affidavits are admissible in such hearings, although several cases mention their use without deciding the propriety of that use." *Id.* From that context, it is clear the Seventh Circuit reached no "decision" that the Federal Rules of Evidence apply in full force to all issues related to class certification. Even if this statement were not dicta, *Mars Steel* did not hold that courts should rigidly apply the rules of evidence to a class certification *motion*, rather than a live hearing.[43]

That does not mean that the Court adopts a "mere pleading standard" to evaluate the parties' evidence submitted with class certification. *Comcast,* 133 S. Ct. at 1432 (citation omitted). As will be clear below, the Court has engaged in a "rigorous analysis" to evaluate if Plaintiffs have "affirmatively demonstrate[d]" compliance with Rule 23's requirements by a preponderance of the evidence. *Id.*; *Wal-Mart*, 564 U.S. at 350; *Messner*, 669 F.3d at 811. The Court has not presumed something is true merely because one party asserts it to be—a rule that applies equally to Defendant's assertions. And the volume of exhibits and deposition testimony attached to the briefs shows the parties have gone well beyond the four corners of any pleading. The Court has considered this evidence and given it appropriate weight, including by evaluating if the characterizations and interpretations of that evidence offered by the parties are supported by the evidence—which, again, relates to the bulk of Defendant's objections. To the extent Defendant intends its "objections" to serve as a motion to strike [see 342-1, at 2], it is denied.

### D. Class Certification

After much ado, the Court can now turn to class certification. Plaintiffs must meet the implicit requirement of ascertainability, the four Rule 23(a) prerequisites (numerosity,

---

[43] The Court notes that preliminary injunctions are not specifically excepted from Rule 1101(b) either. Moreover, the purpose of a class action fairness hearing is to reject or approve a settlement, which terminates the litigation. Cases are not terminated *ipso facto* by the grant or denial of class certification, since it is necessarily preliminary to and separate from deciding the merits of the underlying claim.

commonality, typicality, and adequacy), the two Rule 23(b)(3) requirements (predominance and superiority), and the requirements for issue certification under Rule 23(c)(4). Leaving nothing to chance (and as will surprise no reader by now), the parties dispute whether Plaintiffs have satisfied any of these requirements.

Based on the outcome of the Court's choice of law analysis, Plaintiffs cannot pursue a class action applying California CLRA nationwide and must instead apply the laws of all fifty states. As explained in greater detail below, this means that nationwide class certification must be denied. "[A] failure in any one of the requirements of Rule 23 results in a denial of class certification." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 644 (N.D. Ill. 2002). At a minimum, the different legal issues arising out of the claims of class members from all 50 states will eclipse any common issues of law or fact. Nevertheless, the Court will also address if Plaintiffs' proposed nationwide CLRA class could be certified had Plaintiffs prevailed in their argument that California law should be applied nationwide under choice-of-law principles. Likewise, the Court will address the various subclasses that Plaintiffs propose in their motion.

The Court starts with ascertainability, then takes the Rule 23(a) requirements in turn, followed by the Rule 23(b) requirements, and ends with the Rule 23(c) requirements.

### 1.      Ascertainability

To show ascertainability, the class must be "defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. "There can be no class action if the proposed class is amorphous or imprecise." *Id.* (citation omitted). A vague definition is problematic "because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Id.* at 660. "To avoid vagueness, class definitions generally

need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.*

### i.　　Nationwide Class of All Fifty States' Laws

Plaintiffs did not offer an alternative class definition in the event that all fifty states' laws had to be applied instead of California's CLRA. Each state's statute of limitations, applicability of the discovery rule, and definition of who can sue under the various consumer protection laws (individuals or businesses) all would impact how such a class should be defined. Because Plaintiffs bear the burden to show ascertainability, their failure to make this showing is fatal to their nationwide class action claim based on all fifty states' laws. *Messner*, 669 F.3d at 811.

### ii.　　Nationwide CLRA Class

Even if the CLRA class were viable, Plaintiffs' proposed class definition would need some tweaking. Plaintiffs' proposed nationwide CLRA class is defined as "[a]ll persons who purchased or leased a No-Burst Line, not for resale, or sustained damage from the failure of a No-Burst Water Supply Line, between April 24, 2011, and the date of certification." [286, at 27.] This definition identifies a particular group (all purchasers or leasers of a "No-Burst Line"[44] or all persons who sustained damage from the failure of this product), a particular time period (between April 24, 2011 and certification), and a particular location (nationwide). Defendant does not specifically argue that these requirements have not been satisfied. Instead, Defendant argues that this definition must be modified because it exceeds CLRA's scope.

Specifically, Defendant argues that (1) the definition "all persons who purchased" Defendant's products "not for resale" includes people who are not "consumers" under CLRA; (2) the definition "all persons who * * * sustained damage from the failure" of Defendant's

---

[44] The definitions of "No-Burst Lines" and "No-Burst Water Supply Lines" appear to be identical. [See 286, at 8.] Plaintiffs' inclusion of both phrases in their proposed class definition is (or at least could be) confusing. This appears to have been an oversight, not an attempt to delineate different products.

product includes anyone who was damaged regardless of whether they are "consumers" (such as a consumer's neighbor who suffered property damage when Defendant's product failed); and (3) those who purchased Defendant's product before April 2011, but were injured afterwards, should be excluded from the class definition. [340, at 14–15.] Plaintiffs respond that they "are open to an alternative class definition" and "do not seek more than what is permitted under California law." [371, at 11.] They also argue that putative class members injured after April 2011 are properly included in the class definition because the delayed discovery rule tolls the running of California's three-year statute of limitations until after the consumer discovered the defect, which could not have occurred before the connector failed. *Id.* at 12; see *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1141 (C.D. Cal. 2010).

Both sides' arguments have some merit here. Plaintiffs' class definition could be more precise regarding CLRA standing. And some class members whose connectors failed after April 2011 but were purchased before then may still recover from Defendant under the CLRA based on California's delayed discovery rule. *Yumul*, 733 F. Supp. 2d at 1141 (explaining that consumers pursuing CLRA claims can invoke the delayed discovery rule by pleading facts that "show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence"). But that does not mean a consumer whose connector failed in 2012 but purchased Defendant's product in the 1980s is properly included within the class. Plaintiffs' damages theory for its CLRA claim purports to measure and seek recovery for the price premium that consumers overpaid for a 10-year warranty. [336-5, ¶ 35.] Accordingly, only consumers whose connectors failed within the life of their 10-year warranty should be putative class members.

"[A] district court has the authority to modify a class definition." *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011); accord *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) ("Litigants and judges regularly modify class definitions."); *Streeter v. Sheriff of Cook Cty.*, 256 F.R.D. 609, 611 (N.D. Ill. 2009) ("A district court has broad discretion to certify a class and may modify a proposed class definition if modification will render the definition adequate."). In an effort to address Defendant's CLRA standing and overbreadth concerns, the Court proposes the following class definition, which it will use for assessing whether Plaintiffs have satisfied Rule 23:

> (1) All persons who purchased or leased a No-Burst Line for personal, family, or household purposes and not for resale ("Consumers"), between April 24, 2011, and the date of certification, and (2) all Consumers who sustained damage from the failure of a No-Burst Line between April 24, 2011, and the date of certification, if their No-Burst Line was acquired by the Consumer within ten years of the date of that failure.

Assuming Plaintiffs offer a definition of "No-Burst Line" that specifically and clearly delineates which of Defendant's products fall within and outside of the class,[45] this class definition provides the level of ascertainability required under *Mullins*.

### iii.    State Subclasses

Defendant does not challenge the ascertainability of the subclass definitions, and Plaintiffs did not devote any attention specifically to the ascertainability of the subclasses. The Court does not see any obvious problems with the ascertainability of the negligence or strict liability state subclass definitions, both of which turn on the failure of Defendant's product, the date, and require a person in that state to have sustained damage from the failure of the product.

---

[45] The closest they come is the first footnote of their opening brief [286, at 8 n.1], but even that definition includes other undefined terms (*e.g.*, "Toilet Supply Line") and appears to be further refined by qualifications referenced in their reply brief [371, at 18–19].

The Alabama, Arizona, Pennsylvania, Minnesota, Tennessee, and Vermont warranty subclasses are more challenging because so many issues are conflated in Plaintiffs' class definition. Like the CLRA class, the warranty subclasses includes people who "purchased or acquired" Defendant's product or those who "sustained damage" from the product's failure. As best the Court can tell, Plaintiffs pursue express warranty claims for all of these state subclasses except Tennessee and Pennsylvania. [286, at 27 n.160, 38–39; 371 at 27.] It is unclear whether the express warranty claims are based on the Uniform Commercial Code.[46]

Moreover, Plaintiffs seek two types of damages for their warranty claims: the "loss of the benefit of their bargain" and "property damage." [286, at 38.] The "benefit of the bargain" damages are economic losses—that is, they do not relate to personal injuries or damage to property other than the product itself, but concern a product not performing as expected. See, e.g., *Americoach Tours, Inc. v. Detroit Diesel Corp.*, 2005 WL 2335369, at *2 (W.D. Tenn. Sept. 23, 2005). These six states all vary on who can bring a warranty claim. In Tennessee, a breach of implied warranty claim requires privity of contract for an economic loss, but not other losses like property damage.[47] In Alabama and Vermont, there is no privity requirement.[48] In Arizona,

---

[46] [Compare 286, at 38 ("All of these states have adopted the U.C.C.'s definition of an express warranty."), with *id.* at 39 ("[T]he 'lack of privity between a manufacturer and retail purchaser does not preclude a claim *outside the U.C.C.* for breach of express warranty.'" (citation omitted))].

[47] *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 473 (Tenn. Ct. App. 2003) ("Tennessee law does not allow recovery of economic losses under a breach of warranty theory absent privity," but plaintiff "is entitled to pursue its claim for property damage under a breach of warranty theory in Tennessee even in the absence of privity.).

[48] *Hobbs v. Gen. Motors Corp.*, 134 F. Supp. 2d 1277, 1284 (M.D. Ala. 2001) ("non-privity consumer buyer must timely notify a remote manufacturer of alleged defects, at least when the buyer seeks recovery for economic loss" for an express warranty claim); *Vt. Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 280 (2d Cir. 1996) ("[P]rivity of contract is not required to recover contractual damages for breach of an express warranty when the manufacturer expressly warrants its goods to the consumer and the ultimate consumer brings an action for breach of express warranty under the Magnuson-Moss Warranty Act" but "[Vermont law] does not dispense with the need for privity" in other circumstances.).

89

it depends on whether the claims are based on the U.C.C. or not.[49]  In Minnesota, third parties can only bring an express warranty claim for economic losses if they have property damage.[50]  In Pennsylvania, "'[t]hird parties may enforce express warranties only under circumstances where an objective fact-finder could reasonably conclude that:  (1) the party issuing the warranty intends to extend the specific terms of the warranty to the third party (either directly or through an intermediary); and (2) the third party is aware of the specific terms of the warranty, and the identity of the party issuing the warranty.'"  *Am. Stores Properties, Inc. v. Spotts, Stevens & McCoy, Inc.*, 678 F. Supp. 2d 328, 332 (E.D. Pa. 2009) (citation omitted).

Plaintiffs' proposed subclass definitions do not address *any* of these issues.  Rather, their subclass definitions for each state would sweep in countless people who would never have standing to pursue a "warranty" claim on their own.  See *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (denying class certification where proposed class definition was "not sufficiently definite" because it included "millions who were not deceived and thus have no grievance under the ICFA"); *Messner*, 669 F.3d at 825 (distinguishing "between class members who *were not* harmed and those who *could not* have been harmed," and explaining that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant"); *In re McDonald's French Fries Litig.*, 257 F.R.D. 669, 673 (N.D. Ill. 2009) (denying certification for class that "is both overinclusive and too indefinite for certification").  Equally problematic, the subclass definitions do not weed out class members with products that lack a warranty or whose products failed after the warranty expired—a group

---

[49] *Flory v. Silvercrest Indus., Inc.*, 129 Ariz. 574, 580 (1981) ("No privity of contract [is] required for recovery based on * * * non-U.C.C. express warranties" but privity is required for economic losses for U.C.C. based claims.)

[50] *Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, 565 N.W.2d 16, 21 (Minn. 1997) ("Those who lack any such connection to the warranted goods must demonstrate physical injury or property damage before economic losses are recoverable.").

that Plaintiffs conceded at oral argument should not be able to recover damages. Defendant maintains that it did not offer any warranty between 2004 and 2007, and offered a five-year or ten-year warranty thereafter. [340, at 33–34.] Plaintiffs label that claim a "sham," and submit discovery responses from Defendant where it appears to state that some warranty remained in effect between 2004 and 2007. [371, at 10.] Whichever party is right, Plaintiffs do not explain how their warranty subclasses could properly include purchasers or acquirers with products not covered by any warranty or people who sustained damage from a product not covered by a warranty. Neither group is excluded from the subclass definitions.

In short, the Court does not know who Plaintiffs really intend to cover in these subclasses or which claims they intend to pursue, which prevents the Court from fashioning its own subclass definitions on Plaintiffs' behalf. Accordingly, the Court finds that Plaintiffs have failed to satisfy the ascertainability requirement for their warranty subclasses.

### 2. Numerosity

Numerosity is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'Impracticable' does not mean 'impossible,' but rather, extremely difficult and inconvenient." *Fields v. Maram*, 2004 WL 1879997, at *3 (N.D. Ill. Aug. 17, 2004) (citation omitted). "When determining whether joinder is impracticable, the court considers not only the size of the class, but also its geographic dispersion, the relief sought, and the ability of individuals to bring their own claims." *Id.* (citation omitted). "Generally, where the membership of the proposed class is at least 40, joinder is impracticable and the numerosity requirement is met." *Pope v. Harvard Banschares, Inc.*, 240 F.R.D. 383, 387 (N.D. Ill. 2006). "[A] plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good-faith estimates." *Barragan v. Evanger's Dog & Cat*

*Food Co., Inc.*, 259 F.R.D. 330, 333 (N.D. Ill. 2009). Courts rely on "common sense" to determine whether an estimate of class size is reasonable and estimates "may not be based on pure speculation." *Murray v. E\*Trade Fin. Corp.*, 240 F.R.D. 392, 396 (N.D. Ill. 2006).

### i. Nationwide Classes

Plaintiffs argue that they satisfy numerosity for their nationwide class because there are roughly 1,400 pending claims for damages related to Defendant's products. [286, at 33.] Defendant offers several responses. First, they argue that 99% of the filed claims are held by insurance companies. [340-2, ¶ 27(a).] Because, according to Defendant, "insurance companies cannot possess CLRA claims," and there are fewer than 10 open claims held by a non-insurance company, numerosity has not been satisfied. [340, at 24–25.] Plaintiffs respond that insurers who have paid part of an insured's loss are only subrogated to that part of the loss, while the insured remains the real party in interest for any unreimbursed losses. [371, at 19–20.] They also point out that insurers are subrogated to the rights of insured (here, consumer who acquired Defendant's product) and can seek to recoup their payments in tort directly against Defendant. *Id.* Defendant cites no case law showing that insurers subrogated to the rights of insured-consumers cannot pursue the consumer's claim under CLRA or that the hundreds of consumers with partial subrogation [see 371-1] should not be counted for numerosity purposes. And, given that Defendant has sold "more than 153 million water connectors" since 1980 [340, at 9], it is reasonable to estimate that there are more than forty purchasers of Defendant's product—including some who did not file claims—who would be members of a nationwide class.

Second, Defendant argues that Plaintiffs fail to satisfy numerosity for every "cause of action" asserted and "product type" that Defendant sold. [340, at 25.] Defendant states that there are six types of connectors (toilets, dishwashers, ice makers, washing machines, water

heaters, and faucets) that were "manufactured using different materials," with "different warnings," and made for "different use environments." [340, at 11.] But Defendant offers no reason why these differences defeat *numerosity*. Presumably, Defendant believes there must be separate subclasses for each product type for each cause of action for each state, which could theoretically raise numerosity issues for the subclasses. That, however, is not the class action that Plaintiffs seek to certify. Defendant does not identify a single court that has agreed with its approach or explain why these are sensible requirements to impose here. See *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 361 (7th Cir. 2012) (certifying class action despite the fact that defendant sold 27 different models that involved five design changes), *judgment reinstated*, 727 F.3d 796 (7th Cir. 2013). And, regardless, Defendant does not articulate how any design defects related to the coupling nut and hose or any owner misuse would vary by product type.

### ii.    State Subclasses

Third, Defendant argues that Plaintiffs fail to satisfy numerosity for their identified state subclasses for Alabama, Arizona, California, Georgia, Illinois, Maine, Minnesota, New Hampshire, North Dakota, Pennsylvania, Tennessee, and Vermont. "Subclasses must satisfy the class action requirements before they may be certified." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 599 (7th Cir. 1993). Defendant submits a declaration showing the number of open claims in Alabama is 10, Georgia is 17, Illinois is 9, Maine is 3, Minnesota is 17, New Hampshire is 7, North Dakota is 2, Tennessee is 17, and Vermont is 3. [340-2, ¶ 27(c).] Plaintiffs' opening brief makes no effort to satisfy numerosity for their subclasses, their reply fails to respond to Defendant's argument, and they made no specific showing at oral argument to address this issue. While the Court "may draw reasonable inferences about the size of the subclass" and the number of claims likely underrepresents the number of failures in the field, the

Court would only be speculating that there are sufficient class members to satisfy numerosity for every putative state subclass. *Gentry v. Floyd Cty.*, 2016 WL 4088748, at *4 (S.D. Ind. July 25, 2016); *Hill v. Gateway 2000, Inc.*, 1996 WL 650631, at *3 (N.D. Ill. Nov. 7, 1996). Because it is Plaintiffs' burden to show numerosity, their failure to do so for these particular state subclasses precludes certification for those subclasses.[51] The only exceptions relate to the Arizona, California, and Pennsylvania subclasses. Defendant omitted these states from its declaration [see 340-2, ¶ 27(c)] and the Court can readily determine that numerosity is satisfied based on Plaintiffs' exhibits on partial subrogation [see 371-1].

### 3.    Typicality

Claims of the class representative and the class members are "typical" if the class representative's claim "'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (citation omitted). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). It requires "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). While "some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims 'have the same essential characteristics as the claims of the class at large.'" *Oshana*, 472 F.3d at 514 (citation omitted).

---

[51] This outcome is more straightforward for the negligence and strict liability subclasses, which require proof of property damage. The warranty subclasses also include claims without property damage, but Plaintiffs raise so many distinct warranty theories that it is unclear who should be counted for numerosity. In theory, a subclass of purchasers without property damage whose warranties were breached at the time of sale (instead of, for example, when they requested but were denied a replacement product) and whose claims are still within the statute of limitations might satisfy numerosity. It is not clear which if any, of the warranty subclasses might fit this description and, again, Plaintiffs never made this showing.

### i.      Nationwide Class of All Fifty States' Laws

As a threshold matter, Plaintiffs makes no attempt to show that any class representative's claim could be typical for a nationwide class that applies every state's consumer protection law. See, *e.g.*, *Block v. Abbott Labs.*, 2002 WL 485364, at *5 (N.D. Ill. Mar. 29, 2002) (finding typicality not satisfied for nationwide class based on state consumer fraud statutes and describing such a class as a "logistical and procedural nightmare"). Accordingly, Plaintiffs have failed to show typicality for a nationwide class action claim based on all fifty states' laws.

### ii.      Nationwide CLRA Class

Plaintiffs do offer one brief paragraph in support of their contention that typicality is satisfied for its nationwide CLRA class and its state subclasses, stating that the named Plaintiffs' claims "are substantially the same as the classes' claims and arise from the same course of conduct" as the absent class members, and Defendant's "defenses to the claims are also the same: the No-Burst Lines are not defective and they only fail because of so-called misuse." [286, at 34.] Defendant challenges typicality for both the nationwide class and the subclasses.

With respect to the nationwide CLRA class, Defendant argues that the claims of the two class representatives—Steven Rensel (Arizona) and Karen Rhyne (Tennessee)—are not typical of *every* class member's claims because they experienced only a coupling nut failure, not a hose failure. [286, at 22-23.] The Court agrees. Plaintiffs allege "two" defects. *Id.* at 8.[52] They have not alleged "*a* defect common to all instances of a consumer product." *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) (emphasis added); *see also Baker v. Microsoft Corp.*, 797 F.3d 607, 611 (9th Cir. 2015) ("[R]egardless of when the premature tire

---

[52] Plaintiffs describe *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), as involving "a single product with two independent discernible defects" and claim this posed no obstacle to certifying a single class [286, at 33–34]. But the Seventh Circuit stressed that "this class action [in *Butler*] is really two class actions" and "the classes have different members and different claims." *Butler*, 727 F.3d at 797, 801.

wear was experienced, the fact remained that all class members at some point experienced the same injury *due to the same defect*." (emphasis added)). In fact, Plaintiffs' opening brief sorts their class representatives by defect under the headings "Coupling Nut" or "Hose Burst." *Id.* at 21–25. Even Dr. Pittaoulis divides her 400-person sample size into a "toilet connectors" group (for coupling nut issues) and a "water supply lines" group (for hose failure issues). [334-3, ¶ 18.]

Each defect involves different parts (coupling nut versus hose), different materials (plastic versus rubber and stainless steel), different flaws (creep rupture versus corrosion), different environments (an open area versus an enclosed cabinet), and different labels tailored to different warnings (overtightening versus exposure to corrosive chemicals). [340, at 26–27.] These are not minor factual differences. These claims lack the "same essence," and do not "stand or fall" together. Cf. *Suchanek*, 311 F.R.D. at 255, 257 (claims "all * * * stand or fall on the issue of whether a reasonable consumer was likely to be misled by the overall packaging, not any one particular attribute or omission").

Plaintiffs seek to overcome that obstacle by arguing that "all Class Members were injured in the same way * * * when they were relieved of their money by [Defendant's] deceptive conduct."[53] [371, at 23.] But not every class member claims to have experienced the *same* deceptive conduct. Rensel's and Rhyne's hoses did not fail. [286, at 22–23.] They have not suffered property damage from a defective hose. *Id.* They do not claim to have relied on hose-related representations or omissions or that these representations or omissions caused their actual losses. *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1145 (N.D. Cal. 2005) ("Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof."). Their claims do not depend on the accuracy of labels regarding

---

[53] In the next paragraph, Plaintiffs chastise Defendant for "'urg[ing] the Court to focus on the injury' caused by the defective connectors," claiming that this "is not what typicality requires." [371, at 23.]

exposure to corrosive materials. Nor do Defendant's defenses concerning improper cleaning or chemical storage impact Rensel's and Rhyne's recovery. If the factfinder concludes that the coupling nut was not defective, Rensel and Rhyne cannot merely swap out their defective design claims for an entirely unrelated alleged defect. The incentive that Rensel and Rhyne have to show the coupling nut was defective does not sufficiently overlap with consumers who were injured only by a hose failure. See *Czuchaj v. Conair Corp.*, 2016 WL 4272374, at *3 (S.D. Cal. Aug. 15, 2016) ("[Plaintiff's] claims are not typical of unnamed class members who suffered a cord defect because the evidence needed to prove her coil claim is not probative of unnamed class members' cord claims. [Plaintiff] does not need to present evidence of the cord defect to prevail on her coil claim. She never had a cord defect and could not have had a cord defect. Therefore, [Plaintiff] has no incentive to represent unnamed class members who suffered from cord defects."). Therefore, while Rensel's and Rhyne's coupling nut claims are typical of absent class members who experienced coupling nut-related failures (and Defendant does not argue otherwise), they are not typical of the absent class member with hose-related claims.[54]

### iii. State Subclasses

Defendant raises a similar objection to the putative state subclass representatives: they suffered either a coupling nut failure or a hose body failure, but not both, and cannot represent subclass members with a different defect. [340, at 28.] And, for the same reasons regarding the proposed nationwide class, the Court agrees. Subclass representatives asserting one defect type are only typical of absent class members claiming the same alleged defect.

---

[54] Plaintiffs asserted at oral argument that any of the other subclass representatives (with one exception) could serve as named representatives of the nationwide CLRA class in place of Rensel or Rhyne. However, the time for identifying class representatives for the instant motion was before oral argument.

One unique exception involves Minnesota.[55]  It is undisputed that the only proposed class representative for a Minnesota subclass, Steve Larson, has not experienced any product failure. [286, at 22.]  Minnesota's "economic-loss doctrine precludes 'product defect tort claim[s]' alleging damage to a defective product unless the product caused harm to the buyer's additional personal property or real property."  *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 815 (Minn. Ct. App. 2010).  Because he has suffered no property damage, Larson plainly cannot pursue strict liability or negligence claims under Minnesota law, and thus he cannot satisfy typicality for any Minnesota negligence or strict liability subclass.

Plaintiffs argue that "Larson's role in the negligence and strict liability claims is solely for purposes of issue certification pursuant to Rule 23(c)(4)."  [371, at 25.]  But Rule 23(c)(4) does not exempt class representatives from the threshold requirements of Rule 23(a).  *Retired Chi. Police*, 7 F.3d at 599 ("Subclasses must satisfy the class action requirements before they may be certified."); *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 325 (N.D. Ill. 2010) (applying Rule 23(a) to class action pursued under Rule 23(c)(4)).  Without meeting typicality, Larson cannot be the class representative for any Minnesota "issue certification" subclass.

Plaintiffs also argue that Larson is an appropriate class representative for a Minnesota breach of warranty subclass because this cause of action does not require property damage.  See *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 53 (Minn. 1982) (explaining that the Minnesota Uniform Commercial Code provides "three types of damages for the kinds of harm caused by a breach of warranty" including general damages, which are "the difference in value between the goods as accepted and what they would have been worth as warranted").  But Plaintiffs gloss over the fact that their warranty subclasses definition encompasses class members who sustained damage from the failure of Defendant's product.  [See 286, at 7.]  "When there is

---

[55] Defendant frames this as an "adequacy" challenge [340, at 31], but it is really a typicality argument.

a claim by a buyer for damage to the defective product itself (and this includes consequential damages), the U.C.C. remedy is exclusive and tort will not lie." *Lloyd F. Smith Co. v. Den-Tal-Ez, Inc.*, 491 N.W.2d 11, 15 (Minn. 1992). Based on this exclusivity, Larson's warranty claims do not have the "same essential characteristics" as the claims of absent class members with property damage. *Oshana*, 472 F.3d at 514. Plaintiffs have not attempted to certify—or establish any of the Rule 23(a) requirements for—a Minnesota U.C.C.-exclusive subclass for product owners who lack other property damage, and the Court cannot find on this record that Larson's claims are typical.

### iv. Defendant's Other Typicality Arguments

Defendant's remaining "typicality" arguments seem to be more appropriately directed to other Rule 23 requirements. Defendant argues that none of the class representatives for the nationwide class or the state subclasses satisfy typicality because each "has a different story as to who purchased and installed their respective Connectors." [340, at 28–29.] Only three Plaintiffs personally purchased their connectors. *Id.* at 28. According to Defendant, this matters because it determines who is a "consumer" under CLRA. *Id.* But Defendant does not actually argue that any particular class representative is not a "consumer" and therefore his or her claim is not typical. In fact, Defendant ignores the Court's motion to dismiss opinion, which already addressed who is a "consumer" at least for pleading purposes. [231, at 11–14.] Defendant's cursory and conclusory assertion that these "gatekeeping issues as to liability * * * vary by individual plaintiff" adds nothing to that legal analysis. [340, at 29.]

Likewise, Defendant argues that only four Plaintiffs installed their own connectors, which will raises issues related to causation and consumer misuse. [340, at 29.] Defendant makes similar arguments about reliance, claiming that thirteen out of fourteen Plaintiffs "either

did not see the Connector before it was installed or were not aware of any labels or advertising related to [Defendant] and *never* inspected the label or relied on any warranty in the selection of the product." *Id.* "To be typical, a class member need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails." *Keegan*, 284 F.R.D. at 525. "Instead, she must establish that she is not subject to a defense that is '[a]typical of the defenses which may be raised against other members of the proposed class.'" *Id.* (citation omitted); accord *J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("[T]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation."). Here, Defendant argues that "the vast majority [of connectors fail] due to improper installation and misuse." [340, at 12.] Thus, if most consumers *did not* install their own connectors and will face a consumer misuse defense, then these facts appear to support the proposition that Plaintiffs' claims are typical of the absent class members. To the extent that reliance is even an element of state warranty claims [see 286, at 38–39], most consumers likely used someone else to purchase and install their connector, which means they will face the same arguments from Defendant as Plaintiffs do here. See *Suchanek*, 764 F.3d at 758 ("If very few members of the class were harmed, that is 'an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate' [defendant]." (citing *Butler*, 727 F.3d at 799)).

Finally, to the extent Defendant believes that the differences among its products require different state subclasses for each *product type* for each alleged defect, the Court also is not persuaded. The existence of "some factual variations" among Defendant's products does not defeat typicality. *Oshana*, 472 F.3d at 514. For example, all of the hoses within the class

definition used an EPDM or Santoprene inner-hose body.  [342-32.]  Plaintiffs complain that both materials "had insufficient bursting strength to withstand ordinary household water pressure."  [286, at 17.]  Defendant does not explain how a claim involving a hose connected to a faucet would fare differently than a claim involving a hose connected to a washing machine. Defendant asserts a common defense to *all* hose-related claims—insisting that 97 percent of these claims involved failures due to "improper exposure to corrosive materials."  [340, at 13.] The mere fact that a similarly designed product connects to different appliances or fixtures does not preclude typicality in a product defect case, and Defendant cites nothing to the contrary.  See *Butler*, 702 F.3d at 361 (certifying class for 27 different models of product with five design changes because "[t]he basic question in the litigation—were the machines defective in permitting mold to accumulate and generate noxious odors?—is common to the entire mold class, although the answer may vary with the differences in design").

To sum up, Plaintiffs' nationwide class action claim based on all fifty states' consumer protection laws does not satisfy typicality.  Alternatively, Plaintiffs' class representatives for a nationwide CLRA claim could satisfy typicality for coupling nut-related defects, but not hose-related defects.   Plaintiffs would need to identify a suitable class representative for any nationwide class for hose-related defects.  Furthermore, the class representatives for the state law subclasses for Vermont, Alabama, Arizona, and Tennessee are typical of only coupling nut-related claims, not hose-related claims.  The class representatives for the state law subclasses for Pennsylvania, Illinois, North Dakota, Georgia, Maine, New Hampshire, and California[56] are typical of hose-related claims, but not coupling nut-related claims.  Likewise, Plaintiffs would

---

[56] Defendant argues that there is no class representative for a California subclass [340, at 24 n.18], but apparently overlook Plaintiff Kevin Smith [286, at 25].

need to identify suitable class representatives in these states for the other alleged defect to advance further. Plaintiffs also fail to satisfy typicality for their Minnesota state law subclasses.

### 4. Adequacy

Rule 23(a)(4) requires a plaintiff to show that "the representative parties will fairly and adequately protect the interests of the class." To satisfy adequacy, Plaintiffs must demonstrate: (1) the class representative lacks conflicting or antagonistic interests compared with the class; (2) the class representative is sufficiently interested in the outcome of the case to ensure vigorous advocacy; and (3) class counsel is experienced, competent, qualified, and able to conduct the litigation vigorously. See *Retired Chi. Police*, 7 F.3d at 598; *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 392–93 (N.D. Ill. 2006). In some ways, typicality overlaps with adequacy: "if [a named plaintiff's] claim is atypical, he is not likely to be an adequate representative; his incentive to press issues important to the other members of the class will be impaired." *Robinson v. Sheriff of Cook Cty.*, 167 F.3d 1155, 1157 (7th Cir. 1999).

Defendant does not contest that Plaintiffs have demonstrated the latter two aspects of adequacy. The class representatives are sufficiently interested in the outcome in this case, evidenced by their retention of experienced counsel, production of documents, and active participation in discovery. [286, at 35.] Plaintiffs' class counsel has sufficient experience bringing class actions and acting as class counsel [see 286-66]. Defendant's only challenge to this requirement is whether there are conflicts of interest that defeat adequacy.

Defendant argues that "individual factual variances" will require the class representatives to "tailor their arguments to their respective highly-specific factual circumstances." [340, at 30.] But Defendant does not explain why those variances will create a conflict with any of the absent

class members.  Again, most class members did not directly purchase or install their connectors, which means the class representatives' incentives to disprove the significance of those facts aligns with the interests of the absent class members.  Similarly, Defendant claims that Rhyne's coupling nut "shows signs of nicks and chips consistent with tool installation, requiring significant focus on contributory negligence for failure to comply with instructions."  *Id.*  But Defendant also maintains that 95 percent of claims involving coupling nut failures are "due to provable over-tightening."  [340, at 13.]  The Court does not see how Defendant's contributory negligence defense will be "unique to the named Plaintiff or a small subclass," and thus Defendant fails to undermine Plaintiffs' showing of adequacy—at least for those claims where Plaintiffs could satisfy typicality (*e.g.*, named plaintiffs with hose-related claims seeking to represent absent class members with hose-related claims).  *Id.* (citation omitted).[57]

### 5. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  "Commonality demands more than a showing that the class members 'have all suffered a violation of the same provision of law' at the hands of the same defendant."  *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014) (citation omitted).  "What matters to class certification * * * [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350.  "Even a single common question will do."  *Id.* at 359 (internal punctuation omitted); see also *Walker v. Bankers Life & Cas. Co.*, 2007 WL 2903180, *4 (N.D. Ill. Oct. 1, 2007) ("Not all factual or legal questions raised in a lawsuit need be common so long as a single issue is common to all class members.").  A question is common if

---

[57] As discussed *supra*, the incentives of Plaintiffs who argue that one of the alleged defects caused their property damage do not align with absent class members who suffered no damages or claim damages were caused by a different alleged defect.

"determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Plaintiffs seemingly argue that commonality is satisfied whenever "the claim at issue relate[s] to a defective product design." [286, at 33.] The law is not so uniform; commonality is present in some product defect cases, but not others. Compare *IKO Roofing*, 757 F.3d at 603 (commonality shown where the issue was whether the product conformed to a particular industry standard), with *Bridgestone*, 288 F.3d at 1018 (no commonality because of significant variations in the product design and state law requirements). In fact, "the Ninth Circuit," where most of the CLRA case law cited by Defendant comes from, "has acknowledged the danger of *per se* class certification of defect claims." *McVicar v. Goodman Glob., Inc.*, 2015 WL 4945730, at *13 (C.D. Cal. Aug. 20, 2015) (citing *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010), and *Baker*). When commonality is not satisfied in product defect cases, it is often because of one of two reasons.

First, where the putative class's product defect claims are governed by many different states' laws, commonality is often lacking. See, *e.g.*, *Bridgestone*, 288 F.3d at 1015 ("No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality" requirement.); *Szabo*, 249 F.3d at 674 ("Differences of [state law] cut strongly against nationwide classes."); *Miller v. Gen. Motors Corp.*, 2003 WL 168626, at *2 (N.D. Ill. Jan. 26, 2003) ("No court has held that the fifty states' consumer fraud statutes, or common laws of fraudulent omission, are so similar that a single forum state's law could be applied to a multi-state class. In fact, virtually every court to face the issue has steadfastly refused to certify nationwide class actions due to variance in states' laws." (collecting cases));

*Siegel*, 256 F.R.D. at 585 (collecting cases). This same concept is also analyzed—maybe more properly—in terms of predominance. See, *e.g.*, *Bridgestone*, 288 F.3d at 1018.

Second, where the class seeks to include materially different products under an overarching product defect theory, commonality can be lacking. *Bridgestone*, 288 F.3d at 1019 ("The six trade names listed in the class certification order comprise 67 master tire specifications * * * [that] come in multiple diameters, widths, and tread designs; their safety features and failure modes differ accordingly. Plaintiffs say that all 67 specifications had three particular shortcomings that led to excess failures. But whether a particular feature is required for safe operation depends on *other* attributes of the tires, and as these other attributes varied across the 67 master specifications it would not be possible to make a once-and-for-all decision about whether all 60 million tires were defective, even if the law were uniform."); *In re Gen. Motors Corp. Dex-Cool Prod. Liab. Litig.*, 241 F.R.D. 305, 326 (S.D. Ill. 2007) (collecting cases).

### i.      Nationwide Class of All Fifty States' Laws

Because the Court has concluded that Plaintiffs' nationwide class action must be based on the consumer protection laws of all fifty states, there is no common issue of law. See *Bridgestone*, 288 F.3d at 1015–18. Plaintiffs vaguely assert that there is a "single, significant common issue of liability" [286, at 34], but "liability," of course, depends on the elements of a cause of action. "[S]tate consumer fraud laws differ with regard to several key issues—the type of prohibited conduct, proof of injury-in-fact, available remedies, scienter, statute of limitations, and reliance." *Siegel*, 256 F.R.D. at 585. The Court cannot frame a question that turns on application of fifty state's different laws in a way that will generate an answer that is "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

## ii.    Nationwide CLRA Class

If the nationwide CLRA class is viable, Plaintiffs can establish at least one common legal question. *Wal-Mart*, 564 U.S. at 359 ("Even a single common question will do."). For example, "[u]nder the CLRA, causation can be shown as to an entire class by proving materiality." *Keegan*, 284 F.R.D. at 530. "A misrepresentation or omission is material under California law 'if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Id.* at 529. Whether an objective "reasonable man" would consider Defendant's alleged representations or omissions about the product important to purchasing Defendant's product is a question common to the CLRA class. See *Suchanek*, 764 F.3d at 758 (holding that district court abused its discretion in failing to recognize an "objective question"—whether the defendant's packaging "was likely to mislead a reasonable consumer"—that satisfied the commonality requirement of Rule 23(a)(2)). Defendant does not argue otherwise.

Defendant's only argument concerns whether the variability in its product precludes commonality. [340, at 32.] But here too Defendant does not explain *how* these product differences matter to commonality. In *Bridgestone*, whether a tire's design feature caused the tire to fail was too dependent on "*other* attributes of the tires," which "varied across the 67 master specifications" of the tire. 288 F.3d at 1019. Putting aside Defendant's customer misuse defense, Defendant does not identify any attribute of the connector itself that would preclude a common determination of whether hose or coupling nut design would cause the product to fail. If an EPDM inner-hose body with a braided stainless steel sheath was insufficiently strong and constitutes a defect, why does it matter for commonality whether that hose was connected to a washing machine or a water heater? Defendant does not articulate this reason if it exists or

attempt to square its position with its consumer misuse defense.  And, to the extent Defendant contends that the existence of a customer misuse affirmative defense precludes commonality [340, at 32], it is unclear why that is true and Defendant does not cite anything to support that argument.  Such an argument is more properly directed to whether predominance is satisfied.  In short, Defendant has failed to show what prevents a finding that its coupling nut or hose is defective or not from driving the resolution of the litigation.  See *Wal-Mart*, 564 U.S. at 350.

### iii.      State Subclasses

Defendant does not raise any challenge to whether commonality is satisfied for the state law subclasses.  As with the CLRA claim, each subclass requires application of only a single state's law and the product differences do not vary to defeat commonality.  For the negligence and strict liability issue subclasses, the existence of inherent defects is a question of fact and law that is sufficiently common for all class members per state.  See *In re Gen. Motors Corp. Dex-Cool Prod. Liab. Litig.*, 241 F.R.D. 305, 312 (S.D. Ill. 2007).  For the warranty claim, while Defendant argues that the length of the warranty varied, it does not contend that its content varied.  [See 340, at 33–34.]  Accordingly, the legal question of whether the warranty is properly read to contain a promise as to the "quality and characteristics of the connectors" is common to the class.  [371, at 26]; see *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) ("[T]he legal question of whether the warranty contract is properly read to contain a promise to repair the type of common 'defect' in all the 1999 or 2000 throttle body assemblies (regardless of whether or not manifested during the warranty period) is also common to the class.").

### 6.      Predominance

The Court now turns to the first requirement of Rule 23(b)(3):  predominance.  Although related to the commonality requirement, "the predominance criterion is far more demanding."

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). It requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Plaintiffs satisfy predominance requirement only if they can show that "'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815 (citation omitted). "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Id.* (citation omitted); see also *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (Common questions are where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.").

As the Supreme Court recently explained, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (citation omitted).

### i. Nationwide Class of All Fifty States' Laws

Plaintiffs make no attempt to show that predominance could be satisfied if all fifty states' consumer protection laws applied to a nationwide class. Thus, Plaintiffs fail to sustain their

burden on predominance for that proposed class—a result in accordance with courts from this Circuit and across the country. See, *e.g.*, *Bridgestone*, 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *Pilgrim*, 660 F.3d at 947 ("[I]n view of plaintiffs' appropriate concession that the consumer-protection laws of the affected States vary in material ways, no common legal issues favor a class-action approach to resolving this dispute."); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189–90 (9th Cir. 2001) ("The complexity of the trial would be further exacerbated to the extent that the laws of forty-eight states must be consulted to answer such questions" about causation); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law," which defeats predominance.); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *Gianino*, 846 F. Supp. 2d at 1103 ("Considering that the laws of 50 states will have to be applied in this case, the Court concludes that the common questions of law do not predominate over the questions affecting individual class members."); *Marshall v. H & R Block Tax Servs. Inc.*, 270 F.R.D. 400, 407 (S.D. Ill. 2010) ("Application of multiple states' laws to class members' claims may eliminate common questions among the class members." (collecting cases)); *McDonald's*, 257 F.R.D. at 673–74 (denying certification of consumer protection class action because of "material conflicts among the fifty states' laws"); *Siegel*, 256 F.R.D. at 585 (denying certification for 45-state consumer protection class action). "[O]nly 'a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions' will yield the information needed for accurate evaluation of mass tort claims." *Bridgestone*, 288 F.3d at 1020.

### ii.       Nationwide CLRA Class

The parties mainly focus their attention on whether predominance has been shown for a nationwide CLRA class.  One challenge to answering this question is pinning down what exactly Plaintiffs' CLRA liability theory is.

From the briefs, Plaintiffs' theory appears to be that Defendant "omitted material information about the propensity" of its product to fail because of design defects.  [286, at 37.] But Plaintiffs often describe their theory in terms of representations, not omissions.  [See, *e.g.*, 286, at 10 ("Due to the defects, none of these representations were true."); *id.* at 28 (describing this case as "an action where the plaintiff has suffered purely pecuniary harm on account of false representations" as part of the choice of law inquiry).]   This conflation of omissions and representations is most apparent in Plaintiffs' pursuit of the same "price premium" damages methodology for its breach of *express* warranty claim and CLRA "omission" claim.  [See 336-5, ¶¶ 35–36, 51–52; 377, at 15 n.21.]  Plaintiffs plan to use their conjoint study to "estimate the increase (or decrease) in value associated with the *representations* that the No-Burst Lines are covered by a 10-year warranty and that they will not burst," and then use that estimate to calculate damages.  [286, at 40 (emphasis added); see also *id.* at 40 n.35 ("Dr. Pittaoulis's analysis uses the 10-year *representation* in order to show that the survey methodology is workable." (emphasis added)).]   Said differently, Plaintiffs argue that Defendant made an express representation that its products would not burst (*e.g.*, "NO BURST") for purposes of the warranty claim, but its failure to disclose that its products might have some "propensity" to burst is an actionable omission, but not a representation, for the CLRA claim.  Plaintiffs never explain

110

how the same fact is an omission for one claim but a misrepresentation for another while the damages for both claims are measured the same way.[58]

Even accepting that Plaintiffs' CLRA theory is one of omissions still encounters predominance problems. To the extent Plaintiffs argue that there is no need to show reliance under an omissions theory [286, at 37; 371, at 29], that is not the law. "An essential element for a fraudulent omission claim [under CLRA] is actual reliance." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). In fact, "actual reliance must be established for an award of damages under the CLRA." *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009).

"To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." *Daniel*, 806 F.3d at 1225. The nondisclosure must be a "substantial factor" in the decision to purchase the product. *Id.* Reliance can be "presumed, or at least inferred, when the omission is material," which is based on the objective reasonable consumer standard. *Id.* However, it is "necessary for everyone in the class to have viewed the allegedly misleading" information to invoke this presumption. *Mazza*, 666 F.3d at 596. A presumption of reliance does not arise when class members "were exposed to quite disparate information." *Id.*

Here, most class members did not directly purchase Defendant's product—either because they outsource that responsibility to a plumbing professional or because they purchased their home with Defendant's product already installed. [371, at 15; 340, at 37.] If these class members were not the direct purchasers of Defendant's product, then it is at best an open

---

[58] Despite arguing in their briefs that Defendant "misstate[d]" Plaintiff's CLRA theory as involving misrepresentations when it is an "omissions" theory [371, at 29], Plaintiffs shifted slightly at oral argument and described their claim as a "blended omissions and misrepresentation" theory. Of course, "[e]very misrepresentation, to some extent, involves an omission of the truth." *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 401 (D. Del. 2016) (citation and internal quotation marks omitted). Purporting to advance a "blended" theory does not clarify much.

question—and more likely a dubious proposition—whether they ever saw Defendant's product labeling or marketing. That makes this case much more like *Mazza*, where the Ninth Circuit reversed class certification for an omissions theory because many class members were not exposed to the defendant's misleading advertisements. 666 F.3d at 595–96. While Plaintiffs assert that "all Class members were injured in the same way * * * when they were relieved of their money by [Defendant's] deceptive conduct" [371, at 23], that presumes that (1) all class members were exposed to Defendant's conduct and (2) this conduct caused their alleged loss.

Without a presumption of reliance, individual issues of who was exposed to statements about Defendant's product and what they knew about the product predominate over common issues. See *Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 538 (S.D. Cal. 2011) ("Many putative class members, in fact, may not have even seen the home warranty plans before acquiring them. Thus, an inference of reliance on behalf of the proposed class is not permissible, and individual issues would once again overwhelm any common issues."); *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 646 (C.D. Cal. 2014) (finding no commonality and predominance on CLRA claim where "Plaintiff cannot show that all class members suffered the same injury because he cannot show that all class members relied on the alleged misrepresentation"); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) ("Claims requiring individual proof of reliance are generally not amenable to class certification."); see also *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1193 (2013) ("Absent the fraud-on-the-market theory, the requirement that Rule 10b–5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class.").[59]

---

[59] At oral argument, Plaintiffs relied heavily on *Suchanek*, in which the Seventh Circuit rejected the district court's "supposed rule that individual issues necessarily predominate" in cases involving

Plaintiffs rely on *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012), but that case involved consumers who purchased washing machines and the representations "on the product itself" were allegedly misleading. *Id.* at 486. Plaintiffs never explain why *Tait*'s reasoning should apply to consumers who did not purchase a product directly and never saw the statements on the product itself. See also *Cohen*, 178 Cal. App. 4th at 979 (no predominance because class included subscribers who never saw the offending advertisements before purchasing services, saw different advertisements without the allegedly misleading information, or purchased the services "based on word of mouth" or because they saw the service in a store or another person's home).

The same is true of *Keilholtz v. Lennox Hearth Prod. Inc.*, 268 F.R.D. 330 (N.D. Cal. 2010). In *Keilholtz*, a class action of homeowners with glass-enclosed fireplaces was certified against the fireplace manufacturers on a single uniform omissions theory—that the fireplaces may reach over 475 degrees Fahrenheit. The court explained that "as long as Plaintiffs can show that material misrepresentations were made to the class members, an inference of reliance arises as to the entire class." *Id.* at 343. The court anticipated that defendants might only be able to "defeat the showing of causation as to a few individual class members," but that this would not overwhelm the common issues of law and fact. *Id.* Here, Plaintiffs point to several advertising statements beyond the label terms that also purportedly are express warranties and false "representations." [See 371, at 26; 286 at 10.] Thus, there is no single uniform omission (or

"subjective inquiries into causality" or a showing of "reliance or causation * * * that requires an investigation of each purchaser." 764 F.3d at 759. The Seventh Circuit explained that such a "rule" was an "error of law." *Id.* What the Seventh Circuit did not do, however, was adopt the mirror-image of the district court's rule: that reliance issues can *never* predominate in a consumer fraud case. Otherwise, there would have been no need for the Seventh Circuit to remand with anything other than instructions to certify a class. *Id.* at 761 ("All of that said, we are not holding that the district court must certify the class on remand."). Instead, the Seventh Circuit required that the district court undertake "rigorous" and nuanced analysis of these issues, rather than relying on a blanket "rule." *Id.* at 760. This Court has endeavored to do precisely that.

misrepresentation) in this case and no basis to assume that the alleged misrepresentations reached the class members in any event, which means that reliance cannot be presumed on a classwide basis. See *Campion*, 272 F.R.D. at 538 ("Even if it were permissible to infer common reliance in a CLRA claim, * * * an inference of reliance would only be permitted when a specific material misrepresentation of a particular fact was made to each class member and the claims of all the class members stem from this source.").

That brings us to the second obstacle to predominance: Plaintiffs' CLRA damages theory. As a reminder, Plaintiffs plan to conduct a conjoint study to estimate the "impact that a NO BURST representation and representation of a 10-year warranty have on consumers' preferences for" connectors [334-3, ¶ 14], and then use the output of that study to calculate the "difference between the market value of the products as promised and as delivered," which is equal to each class member's damages since every consumer "overpaid" for their defective product [334-5, ¶ 37]. The Court excluded Dr. Pittaoulis's proposed survey [334] as presently constructed. Because Bernatowicz's damages formula depends on that survey, Plaintiffs do not have a common damages formula that they can rely on for class certification. Nevertheless, the Court will assume that some version of this survey is salvageable and could be input into Bernatowicz's damages formula.

Defendant argues that Plaintiffs' common damages theory is fatally disconnected from their CLRA theory and fails *Comcast*. In *Comcast*, the Supreme Court explained that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." 133 S. Ct. at 1433. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for

purposes of Rule 23(b)(3)." *Id.* "[F]or purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id.* (citation and internal quotation marks omitted).

To be clear, this does not mean that commonality of damages is essential. *IKO Roofing*, 757 F.3d at 602. If that were true, "then class actions about consumer products [would be] impossible." *Id.* What is necessary is that the "theory of loss" matches the "theory of liability." *Id.* Thus, this Court must determine "if there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016).

A damages calculation that reflects the difference between the market price of the product as represented and as delivered is neither novel nor problematic from a class certification perspective. See *IKO Roofing*, 757 F.3d at 603. In fact, that is a standard remedy for buyers provided by the U.C.C. for a breach of warranty. See Uniform Commercial Code § 2–714(2). Moreover, a "price premium" theory based on a conjoint analysis has been accepted by several courts. See, *e.g.*, *ConAgra*, 90 F. Supp. 3d at 953–54. Courts have even sanctioned a price premium damages theory related to a failure to disclose a product's propensity for non-conformance. See *Tait*, 289 F.R.D. at 479; *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013).

The problem for Plaintiffs, however, is that their Pittaoulis–Bernatowicz price premium damages model does not measure damages attributable to their liability theory. If class members were injured by the fact that Defendant "omitted material information about the propensity" of its product to fail [286, at 37], then damages should be the difference in the market price for a product with and without this "propensity" to fail. Yet, even a non-defective product would still

have a propensity to fail sometimes.[60]  For example, if the non-defective version of Defendant's product as represented would fail one percent of the time and Defendant's product as delivered fails five percent of the time, then damages should be the difference in market price between those two products.  The Court does not see how measuring a consumer's preference for a ten-year warranty or a "No Burst" representation has anything to do with an "omission of failure propensity" theory.  Why does it matter whether that the survey participants prefer the attribute "NO BURST" over "Fits All"?  Even assuming that the "NO BURST" is somehow connected to Defendant's failure to disclose its product's propensity to fail, determining the WTP for that attribute provides no insight into the value of the product that consumers ultimately received.

Similarly, no expert opines that Defendant's product typically fails after a certain length of time (*e.g.*, the product has a "propensity" to fail in the ninth year).  Again, one would need to know the baseline age of failure for a non-defective version of Defendant's product—the product as represented—for any meaningful comparison.  Maybe Plaintiffs think that the benchmark should be ten years because that is the length of the warranty.  If that is true, then it is unclear why that would not be a misrepresentation, rather than an omission.  Even so, how will measuring the WTP for warranty durations of "None, 1 year, 5 years, 10 years, [and] Lifetime" provide an answer to the damages question?  Bernatowicz measures damages by assuming that the ten-year warranty attribute was "missing" at the point of purchase.  [334-5, ¶ 36.]  Unless the product had a propensity to fail immediately, this "attribute" was not missing entirely.  If

---

[60] Plaintiffs expressly reject the implication that they are arguing that Defendant represented that its products are perfect.  [376, at 16.]  If Defendant did not promise perfection, then there must be some baseline "propensity to fail" rate to measure against.  Plaintiffs do not direct the court to any such baseline, and Bernatowicz does not incorporate one into his damages formula.  Even if one accepts that this difference in propensity should be measured by the number of failures per million compared with Defendant's standard recall rate [see 286, at 20], this difference in propensity is exceptionally small.  A difference between the baseline rate and the omitted "propensity" that is close to zero makes it hard to see how materiality, causation, or reliance can be satisfied.

Defendant's product fails after nine years, then the consumer's WTP for a ten-year warranty would still need to be reduced by the WTP for a product that lasts nine years—the product that the consumer actually received—before any damages are calculated. This is simply not the class-wide damages model that Plaintiffs submit for class certification.[61]

Defendant also challenges the appropriateness of averaging WTP for all class members based on any overpayment theory, arguing that class members with *no* WTP for the missing attributes will still be awarded damages under this theory. [334-1, at 17–18.] Plaintiffs respond that the "use of statistical sampling to determine averages is a concept accepted by the courts," citing *Tyson Foods*. [377, at 14.] But *Tyson Foods* held only that class action plaintiffs may use averages based on a representative sample "to establish classwide liability." 136 S. Ct. at 1049. The Supreme Court expressly declined to address whether "uninjured class members" can share in the class's recovery where liability is established through averages or whether there must be "'some mechanism to identify the uninjured class members prior to judgment and ensure that uninjured members (1) do not contribute to the size of any damage award and (2) cannot recover such damages.'" *Id.* at 1049–50 (citation omitted). As Chief Justice Roberts stated in his concurrence, "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. * * * Therefore, if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand." *Tyson Foods*, 136 S. Ct. at 1053 (Roberts, C.J., concurring).

In the instant case, Plaintiffs do not seek to establish liability through averages. Instead, they skip that step and try to prove damages through averages. This is not merely an incidental

---

[61] Defendant advances (and repeats) several arguments about the meaning of its warranty (that it is one for repair and replacement, not design defects) and that its "No Burst" statements are non-actionable puffery. [340, at 33–35; 336-1, at 10–12; 403, at 9.] These arguments go to the merits of Plaintiffs' claims, not the propriety of class certification. To the extent that is the basis for Defendant's *Daubert* motion against Bernatowicz, it is denied without prejudice to later renewal.

aspect of their damages theory, but an intentional design choice that Plaintiffs have made to create a "common" damages formula. [See 286, at 40.] *Tyson Foods* does not speak to such an expansive theory as a means to manufacture predominance. And it runs afoul of the Seventh Circuit's distinction between certifying classes where "class members who *were not* harmed and those who *could not* have been harmed." *Messner*, 669 F.3d at 825. Courts do not require "proof * * * that every [class] member has been harmed"—an issue related to the claim's outcome that should be decided after certification. *Suchanek*, 764 F.3d at 757; *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified."). They do require, however, that the class members *could have* pursued a claim. *Suchanek*, 764 F.3d at 757–78. Certifying a class based on a common damages model that is designed to award damages to millions of absent class members who "could not [have] br[ought] a valid [CLRA] claim even under the best of circumstances" is inconsistent with these mandates. *Messner*, 669 F.3d at 825.

Plaintiffs do not identify any other court that has accepted an average WTP price premium theory in similar circumstances. Cf. *Opperman v. Path, Inc.*, 2016 WL 3844326, at *14–15 (N.D. Cal. July 15, 2016) (rejecting at class certification a conjoint damages theory predicated on averages).[62] "[C]onsumers do not have identical preferences." *Id.* at 14. Plaintiffs claim to measure the "loss of the benefit of each class member's bargain" [286, at 40], but some

---

[62] Where the claim is that the product received is worthless, no WTP needs to be calculated and there are no predominance problems. See *Doster Lighting, Inc. v. E-Conolight, LLC*, 2015 WL 3776491, at *18 (E.D. Wis. June 17, 2015) ("As for damages, [plaintiff] contends that they can be calculated by a common methodology—subtracting the value of the defective LED products (which [plaintiff] claims to be zero) from the value of the LED products as warranted, i.e., the sale price."). In *In re: Syngenta AG MIR 162 Corn Litigation*, the court allowed the class to use averages to calculate the "general market price decrease" for sales of corn, which would be used to show "liability *and* damages." 2016 WL 5371856, at *5 (D. Kan. Sept. 26, 2016) (emphasis added). In that case, no *Daubert* motion was filed and plaintiffs' theory would not have compensated class members who suffered no damages. Plaintiffs also cite *Fleisher v. Fiber Composites, LLC*, 2012 WL 5381381 (E.D. Pa. Nov. 2, 2012), which addresses a motion to dismiss, not class certification, and does not discuss the specific damages methodology at issue.

consumers may place no value on a 10-year warranty and thus lose nothing in this bargain. See *Opperman*, 2016 WL 3844326, at *14 ("No damages number arising from this model will apply to all class members, particularly since some of the class members, by this measure, will not have been injured at all, *i.e.*, they would have not have required any premium to allow [defendant] to access their contacts, because they don't attach any value to them."). Such a consumer might include those who plan on moving out of their house before 10 years or plan to remodel their homes within that time period. "It may be that the average damages that [the Pittaoulis–Bernatowicz] model would predict will be very close to the damages actually suffered by every class member, but there is no way of knowing this. It is equally or more likely that [their] model would overcompensate some class members, while undercompensating others." *Id.*

Moreover, a theory that awards damages to people who were not damaged seems to be foreclosed by the CLRA. "[I]n order to bring a CLRA action, not only must a consumer be exposed to an unlawful practice, but some kind of damage must result." *Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 641 (2009). "If the [California] Legislature had intended to equate 'any damage' with being subject to an unlawful practice by itself, it presumably would have omitted the causal link between 'any damage' and the unlawful practice, and instead would have provided something like 'any consumer who is subject to a method, act, or practice declared to be unlawful by Section 1770 may bring an action' under the CLRA." *Id.* Courts are equally skeptical that a class member whose product has functioned properly and warranty has run still can recover under CLRA absent some safety concern. See *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006); *Wilson v. Hewlett-Packard Co.*, 2009 WL 3021240, at *1 (N.D. Cal. Sept. 17, 2009). Even assuming that Plaintiffs could overcome the Article III issues presented by their damages theory, awarding damages to people without "some kind of

damage" caused by the "deceptive conduct" or after expiration of a ten-year warranty does not measure damages attributable to any actionable theory of liability. *Comcast*, 133 S. Ct. at 1433.

Without a common "price premium" damages theory, Plaintiffs are left with their effort to recover property damages caused by the failure of Defendant's product.[63] And here is where individualized issues overwhelm the common ones. Defendant's claims rate shows that 99.9% of Defendant's sold products do not result in a claim of failure being reported (and the potential number of unreported failures does not appear to meaningfully change this percentage). Once the parties wade through the class members to find the roughly 0.1% of claims that experienced a failure, individualized inquiries into each consumer's installation, maintenance, misuse, causation, and the damages attributable to the failure would be required.[64] "[W]here the portion of the proposed class that even suffered malfunctions appears to be tiny, plaintiffs' proposal to certify the class of all [purchasers], then determine which few suffered [failures], and then determine which few of those few even arguably can attribute the [failures] to the design defect here alleged, would render the class action device nothing more than a facade for conducting a small number of highly individualized cases." *Canon*, 237 F.R.D. at 360; accord *Payne v. FujiFilm U.S.A., Inc.*, 2010 WL 2342388, at *6 (D.N.J. May 28, 2010) ("Because the great majority of the proposed class has not experienced any malfunction with the [product] and because individual issues of causation will still need to be adjudicated, the question of whether a

---

[63] At oral argument, Plaintiffs belatedly proposed a third damages theory: replacement damages. That theory does not appear in Plaintiffs' class certification motion [see 286, at 38–39, 40 (raising two damages theories)], and the Court will not address it other than to say that Plaintiffs' ability to pursue classwide replacement damages for people who never requested a replacement connector is not obvious.

[64] Plaintiffs cite the Ninth Circuit's decision in *Baker* as standing for the proposition that "a class could be certified where only '0.4%' of owners reported defects. [371, at 7 n.1] However, *Baker* addressed the district court's decision to strike class action allegations from the plaintiffs' complaint, not a motion for class certification. The Ninth Circuit "express[ed] no opinion on whether the specific common issues identified in this case are amenable to adjudication by way of a class action, or whether plaintiffs should prevail on a motion for class certification if such a motion is filed." *Baker*, 797 F.3d at 615.

defect exists in this case will need to be determined based on facts that are particular to each individual proposed class member.").

Plaintiffs argue that "multiple courts have held [that] the 'consumer misuse' defense in design defect cases is not a bar to certification" [371, at 24], but none of the three cases they cite reached any such broad holding. One refused to consider an argument not addressed by the district court and for which no details were provided. See *Butler*, 702 F.3d at 363 ("[Defendant] also makes arguments that were not considered by the district court, such as that mold problems may reflect how the owner of a washing machine uses it. That would be a defense of mishandling to the charge of breach of warranty. [Defendant] offers no details."). One found that "individual factors such as driving habits or weather" that might cause the manifestation of a defect did not predominate over the common question that the defendant's product was sold with a design defect. *Wolin*, 617 F.3d at 1173. Issues related to weather and driving habits implicate generalized questions about causation, not a consumer misuse defense. The last case on which Plaintiffs rely cited *Wolin* for the proposition that a class may be certified even if the defect has not caused the problem to manifest in all consumers, but did not specifically discuss any consumer misuse defense. *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 678 F.3d 409, 420 (6th Cir. 2012). Other courts have found that misuse can be a reason for failing to satisfy predominance. See *Am. Honda Motor Co. v. Superior Court*, 199 Cal. App. 4th 1367, 1378 (2011); *Canon*, 237 F.R.D. at 360; *Galitski v. Samsung Telecomms. Am., LLC*, 2015 WL 5319802, at *6 (N.D. Tex. Sept. 11, 2015). Because customer misuse will be directly relevant to Plaintiffs' efforts to recover property damages under their CLRA claim, these issues present predominance problems. And because these varied individualized issues will swamp any

common questions of law or fact, Plaintiffs have failed to show predominance for their nationwide CLRA claim.

### iii.     Warranty Subclasses

The parties devote very little attention to whether Plaintiffs satisfy predominance for their state law warranty subclasses.   Plaintiffs assert that "the same common evidence and expert analysis" will be used to show Defendant's product is defective at the point of sale and damages will be established through their experts' "common" Pittaoulis–Bernatowicz damages formula or "by individual proof of property damages."   [286, at 38–40.]   Defendant argues that warranty claims require individualized inquiries into whether consumer misuse voids the warranty and whether the warranty was in effect at the time of the failure.   [340, at 31–32.]

Plaintiffs' failure to provide a clear class definition presents a significant obstacle to determining predominance.   As drafted, Plaintiffs' warranty subclasses definition includes class members who:  (1) personally purchased Defendant's product; (2) acquired Defendant's product because someone else (*e.g.*, a plumber, home builder, friend, or family member) decided to buy it; (3) saw Defendant's "No-Burst" and ten-year "express warranties" before purchasing Defendant's product; (4) saw one of these warranties before acquiring Defendant's product; (5) saw neither of these warranties before acquiring Defendant's product; (6) saw the other "statements" about Defendant's product that Plaintiffs claim rise to the level of "express warranties as to the quality and characteristics of the connectors" [371, at 26]; (7) did not see these other "express warranties"; (8) suffered property damage; (9) suffered no property damage; (10) suffered property damage even though they never bought or acquired Defendant's product (*e.g.*, a neighbor or house guest); (11) renters (since they "acquire" the product); (12) owned a connector that failed because of a coupling nut-related issue; (13) owned a connector that failed

because of a hose-related issue; (14) owned a connector that did not fail; (15) have an unexpired warranty; (16) sold their house (and connector) within the life of the warranty; (17) have an expired warranty; and (18) never had a warranty. Some of the claims are based on express warranties. Others are based on implied warranties. Some are based on the U.C.C. Some are not. Sweeping all these disparate claims and class members together under a breach of warranty umbrella—even if there are six separate state subclasses—creates predominance problems.

Let's just take Pennsylvania as an example. An express warranty can be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." 13 Pa. Stat. and Cons. Stat. Ann. § 2313(a)(1). "A promise becomes the basis of the bargain if the plaintiff can prove 'that she read, heard, saw or knew of the advertisement containing the affirmation of fact or promise.'" *Starks v. Coloplast Corp.*, 2014 WL 617130, at *6 (E.D. Pa. Feb. 18, 2014). The Court can only determine whether Defendant's other "repeated and continuing statements" [371, at 26] outside of anything appearing on the product became part of the "basis of the bargain" through individual inquiries into whether the class member "read, heard, saw, or knew of" those statements. A similar rule applies to any third party recipient of an express warranty—which, presumably, would be most of the class members. In that case, "the third party recipient of an express warranty must be aware of the *specific terms* of the warranty in order to sustain a claim for breach of that warranty." *Penn. Employees Ben. Trust Fund v. Astrazeneca Pharm. LP*, 2009 WL 2231686, at *4 (M.D. Fla. July 20, 2009); see also *Peters v. LG Elecs. USA, Inc.*, 2007 WL 4591405, at *4 (D.N.J. Dec. 28, 2007). Plaintiffs do not explain how the Court can answer this basic question without individualized inquiries.

Moreover, "defects discovered after the term of the warranty are not actionable * * * even where the defect may have existed at the time of purchase but did not manifest itself until after the expiration of the warranty period." *Osness v. Lasko Prod., Inc.*, 868 F. Supp. 2d 402, 410–11 (E.D. Pa. 2012) (citations and internal quotation marks omitted). Individual inquiries into whether each class member's warranty has expired or whether they suffered property damage before this expiration are required. Furthermore, Plaintiffs propose including both those seeking economic losses and those seeking property damages in the same warranty subclasses. For the same reasons as Plaintiffs' CLRA theory, the Pittaoulis–Bernatowicz price premium damages model does not "measure only those damages attributable" to a breach of warranty theory. *Comcast*, 133 S. Ct. at 1433. That leaves, as Plaintiffs concede, only property damages claims that must be established by "individual proof." [286, at 39.] Those claims, which are shared by only a subset of class members, will all trigger individualized inquiries into each consumer's installation, maintenance, misuse, causation, and the damages attributable to the failure. Because similar issues will crop up in every warranty subclass, the Court finds that predominance has not been satisfied for the warranty subclasses.

### 7. Superiority

The second Rule 23(b)(3) requirement is that the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Issues relevant to superiority include (1) the class members' interests in individually controlling their cases; (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class"; (3) whether it is desirable to concentrate "litigation of the claims in the particular forum"; and (4) "the difficulties likely to be encountered in the management of a class action." *Szabo*, 249 F.3d at 676. "[W]hen a separate

evidentiary hearing is required for each class member's claim, the aggregate expense may, if each claim is very small, swamp the benefits of class-action treatment. And that is the case here." *Pastor v. State Farm Mut. Auto. Ins. Co*, 487 F.3d 1042, 1047 (7th Cir. 2007).

Plaintiffs did not even attempt to show that the Court could efficiently resolve this dispute in the event that all fifty states' consumer protection laws had to be applied. *Bridgestone*, 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."). Nor have Plaintiffs identified a sensible and "practicable way for the court to resolve efficiently the individual factual issues that bear on liability" such as reliance, causation, and damages "without conducting hundreds or thousands of mini-trials." *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 463 (N.D. Ill. 2013). The Court does not see how bifurcation, creating even more subclasses, or appointing a special master would make classwide treatment *more* efficient. Considering the differing incentives of class members without and with property damage, the two distinct defects alleged by Plaintiffs, the fractional difference in price for the product that Plaintiffs allegedly received, and the need for individualized hearings for the absent class members to establish their injuries, share of responsibility, and damages, the Court does not see the efficiency gains for classwide treatment. That is true even if the Court needs to apply *only* seven states' laws (California and the six states in the warranty subclasses). Plaintiffs have failed to show that a class action is superior to other methods of adjudication.

### 8.      Issue Certification:  Negligence and Strict Liability Subclasses

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Courts differ over whether plaintiffs pursuing an issue certification under Rule 23(c)(4) must also satisfy predominance under Rule 23(b)(3).

The Fifth Circuit at least arguably appears to require predominance. See *Castano*, 84 F.3d at 745 n.21. The Second, Third, and Ninth Circuits do not. See *In re Nassau County Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006); *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 200–02 (3d Cir. 2009); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). The Seventh Circuit has not expressly picked a side. See *Jacks v. DirectSat USA, LLC*, 2015 WL 1087897, at *4 (N.D. Ill. Mar. 10, 2015). And district courts in this circuit have divided. See *Gen. Motors*, 241 F.R.D. at 314 (predominance required); *Hamilton v. O'Connor Chevrolet, Inc.*, 2006 WL 1697171, at *6 (N.D. Ill. June 12, 2006) (predominance required); *Jacks*, 2015 WL 1087897, at *4 (no predominance); *Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 296 F.R.D. 587, 596 (N.D. Ill. 2013) (no predominance); *Fedex*, 2010 WL 1652863, at *2 (no predominance); *In re Factor VIII or IX Concentrate Blood Prod. Litig.*, 2005 WL 497782, at *2 (N.D. Ill. Mar. 1, 2005) (no predominance).

The Court believes that the Seventh Circuit likely would follow the trend of authority holding that a court may employ Rule 23(c)(4) "to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *Nassau County*, 461 F.3d at 227. As other courts have recognized, this approach aligns with the Seventh Circuit's efforts to "devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); accord *Jacks*, 2015 WL 1087897, at *4 (collecting Seventh Circuit authority). As the Seventh Circuit has stated, "a class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed." *Butler*, 727 F.3d at 800.

The main problem for Plaintiffs is that even if they do not have to satisfy predominance, their negligence and strict liability issue subclasses are not a viable path forward. Plaintiffs submit *seventeen* issues for certification, the answers to which will turn on applying *eleven* states' laws. That is 187 distinct legal issues for certification under Rule 23(c)(4). Plaintiffs do not direct the Court to any case that certified so many issues, and the Court cannot see how consolidated oversight of so many disparate factual and legal issues is sensible. See *McDaniel v. Qwest Comm'ns Corp.*, 2006 WL 1476110, at *16 (N.D. Ill. May 23, 2006) (declining to certify issue subclasses because of "the breadth of the six issues upon which Plaintiffs request certification vis-a-vis the underlying cause of action"). Of course, "merging the negligence" and strict liability standards of these eleven states to create "a kind of Esperanto instruction" is a non-starter. *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995).

Furthermore, many of these issues are designed to preempt Defendant's affirmative defenses. [See 286-72, at 6 ("Issue Four: Whether [Defendant] is barred from asserting an affirmative defense to any claim from an acetal coupling nut failure based on 'over tightening' because the coupling nut cannot withstand the 12 ft-lbs of installation torque"; "Issue Five: Whether [Defendant] possessed knowledge of the defect in workmanship and material of the acetal coupling no later than 2003; and therefore, all warranty periods are tolled as of that date.").] The factual circumstances in which a defendant could be "barred" from asserting a defense or every consumer's warranty period could be "tolled" are complex, varied, and potentially dependent on the actions of the consumer.[65] Likewise, Plaintiffs seek to certify as an issue "Whether the No-Burst Water Lines were expected to and did reach the user or consumer without substantial change in the condition in which [they were] sold." *Id.* at 6 (Issue Eight).

---

[65] Plaintiffs do not cite any case law related to the tolling of a warranty. Case law addressing the tolling of a statute of limitations based on fraudulent concealment "focus[es]" on the actions of the plaintiff. See, *e.g.*, *Knopick v. Connelly*, 639 F.3d 600, 607 (3d Cir. 2011).

Whether the end-user, in fact, received Defendant's product "without substantial change in the condition in which it was sold" seems to require individualized determinations into how each consumer's connector was installed. These are not the kind of discrete factual or legal matters amenable to classwide issue certification.

Even Issues One, Two, and Three—all of which relate to the different ways in which Defendant's product is allegedly "defective"—are not proper issues for certification. In *Rhone-Poulenc*, the Seventh Circuit addressed the interplay between proximate cause, negligence, and contributory negligence in a product defect case. The Court explained that "the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." 51 F.3d. at 1303. "The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact." *Id.* In *Rhone-Poulenc*, the first jury was not asked to determine liability, but "merely whether one or more of the defendants was negligent under one of the two theories." *Id.* The Court explained:

> The first jury may go on to decide the additional issues with regard to the named plaintiffs. But it will not decide them with regard to the other class members. Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members * * *, such issues as comparative negligence * * * and proximate causation. Both issues overlap the issue of the defendants' negligence. Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant. Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant. It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence. A second or subsequent jury might find that the defendants' failure to take precautions * * * could not be thought the *proximate* cause of the plaintiffs'

[injury]. How the resulting inconsistency between juries could be prevented escapes us.

*Id.* (citations omitted). The same kind of inescapable inconsistency and inefficiency is present with Plaintiffs' negligence and strict liability issue subclasses. This is not a case where Plaintiffs request certification of an issue that will establish "liability," leaving only damages to be decided by individual inquiries. Cf. *Butler*, 727 F.3d at 800. Rather, Plaintiffs have sought piecemeal certification of aspects of their negligence, strict liability, and warranty claims that will lead to classwide determination of one issue by one jury followed by the inevitable partial re-litigation of that same issue by subsequent juries. *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011) (citing "the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)" as one of the factors courts should consider before certifying an issue subclass).

"The district court is not obligated to grant partial certification if particular issues are common to a class," but may do so in its discretion. *Clark v. Experian Info. Sols., Inc.*, 256 F. App'x 818, 822 (7th Cir. 2007). Here, "little efficiency would be gained by certifying a class for only particular issues." *Id.* Accordingly, Plaintiffs' request for issue certification under Rule 23(c)(4) is denied.

**D.** *Pella* **Subclasses**

For the first time at oral argument, Plaintiffs proposed that, if they did not prevail on choice of law, the Court should consider certifying consumer protection subclasses like the ones described in *Saltzman v. Pella Corporation*, 257 F.R.D. 471 (N.D. Ill. 2009). In *Pella*, the plaintiff moved to certify six Rule 23(b)(3) statutory consumer fraud subclasses from California, Florida, Illinois, Michigan, New Jersey, and New York. *Id.* at 476. The court ultimately certified a liability-only class, excluding issues of causation and damages from the class. *Id.* at

479.  Moreover, the court specified that "the six statutory consumer fraud subclasses will consist only of plaintiffs with manifest defects" because "[d]amages are an essential element of the claim, and it is clear * * * that a latent defect does not qualify."  *Id.*  In distinguishing *Bridgestone*, the court explained:

> Defendants point to [*Bridgestone*] for the proposition that latent defect members and manifest defect members should not recover alongside one another.  The court in *Bridgestone* noted that a mixed system, compensating buyers for the risk of a latent defect and buyers who have a manifest defect overcompensates buyers and may lead to excess precaution by the manufacturer.  However, in this case, class members whose defect has not yet manifested are included in the damages class.  Only those class members who have experienced a manifest defect and have paid to repair or replace these windows may be entitled to damages.  Those class members whose windows have not manifested any defect may be entitled to declaratory and injunctive relief.  Only once their windows experience any manifest defect, if indeed they ever do, then those members will be able to submit a claim to Pella for repair.  There is no side-by-side recovery here.

*Id.* at 486–87 (internal citations omitted).  The Court then certified "a Rule 23(b)(3) statutory consumer fraud class, consisting of the following six state subclasses: California, Florida, Illinois, Michigan, New Jersey, and New York, for all members whose windows have exhibited wood rot and who have replaced the affected windows."  *Id.* at 487.  Finally, in affirming the district court's certification order, the Seventh Circuit explained, "[t]he narrow way in which the district court defined the classes here eliminates concern that the definitions are overbroad or include a great many people who have suffered no injury."  *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010).

Without question, Plaintiffs did not properly move for certification of state-specific consumer protections subclasses, and they do not meet their burden under Rule 23 by simply raising this idea as an afterthought at oral argument.  Indeed, the district court opinion from *Pella* is cited in one footnote (out of 248) in Plaintiffs' opening brief [286, at 26 n.157] and is absent from their reply.  Moreover, Plaintiffs do not have class representatives from four of these states

(Florida, Michigan, New Jersey, and New York), and so at present *Pella* is unquestionably a non-starter as a fallback for Plaintiffs. But all those issues aside, it is obvious that the classes certified in *Pella* bear practically no resemblance to this case. *Pella excluded* consumers with latent defects from the 23(b)(3) classes, while Plaintiffs' classes are intentionally designed to include them.[66] The *Pella* classes are limited to those who have manifested the defect *and* "replaced" the affected product, while Plaintiffs' classes do not require any consumer to have made a request to Defendant for replacement of their connector. The *Pella* classes do not include issues related to damages, while Plaintiffs propose certification of their class-wide damages theory. Based on the parties' current submissions, the Court does not see how *Pella* provides Plaintiffs any sanctuary.

### E. Further Reflections

At the beginning of oral argument on the parties' motions, one of Plaintiffs' attorneys succinctly articulated what appears to have been their approach to class certification. He said, "There is a class in here somewhere." What that class is, however, has changed from brief to brief, and sometimes paragraph to paragraph within briefs. At oral argument, the class changed yet again. Plaintiffs proposed a new class (a six-state subclass of consumer protection laws), new class representatives (any of the 14 class representatives besides Larson for the CLRA class), and a new damages theory (replacement costs). To say that Plaintiff's class certification arguments have been a moving target would be an understatement.

The Court has also continued to receive supplemental authority from Plaintiffs that raise additional questions about the class they seek. Just last week, they submitted a fourth notice of supplemental authority [491] from a court in this district that *denied* certification of a nationwide

---

[66] *Pella* only included these latent defect consumers in the Rule 23(b)(2) declaratory and injunctive relief class. 257 F.R.D. at 480–81. Plaintiffs here do not pursue such a class.

consumer protection class, but subsequently granted certification of a liability-only class after renewed and focused briefing where the plaintiffs "narrowed their proposed class to residents of five states" (California, Illinois, Missouri, New Jersey, and New York). [See 491-1, at 5–6, 35 (*Mednick v. Precor, Inc.*, 2017 WL 1021994, at \*1–2, 12 (N.D. Ill. Mar. 16, 2017)).] It is hard to know what to make of this submission. Maybe Plaintiffs are implicitly acknowledging that their present motion cannot succeed, but another one could. Or maybe Plaintiffs are asking this Court to certify a five-state consumer fraud liability-only subclass even though they never briefed that request and they lack class representatives from Missouri, New Jersey, and New York. Or maybe Plaintiffs thought the Court needed to see how one of the non-precedential cases that Defendant submitted as supplemental authority [477-4] turned out, regardless of whether the facts or arguments advanced there fit this case in its present posture. None of these reasons bolster the prospects for the present motion.

Whether refinement of Plaintiffs' opaque liability theories and indefinite class contours will ultimately show that a class *is* in here somewhere, the Court cannot say. It can only decide that, on the present motion, Plaintiffs have failed to meet their burden to show that *these* proposed classes satisfy every requirement of Rule 23. The motion for class certification [284; 286] therefore must be denied.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' motions to exclude Defendant's experts [378; 379; 381; 382; 384; 387; 390] are granted in part and denied in part, Plaintiffs' motion to strike [446] is granted in part and denied in part, Defendant's motions to exclude Plaintiffs' experts [334; 336; 337; 339] are granted in part and denied in part, and Plaintiffs' motion for class certification [284; 286] is denied. The Courtroom Deputy will contact the parties to arrange a mutually

agreeable time for the next status hearing before Judge Dow and Magistrate Judge Gilbert, at which time the parties may raise any issues regarding discovery, motions for reconsideration, and future motion practice before either of the assigned judges.

Dated: March 31, 2017

_____
Robert M. Dow, Jr.
United States District Judge